Bertram ZWEIBON et al., Appellants,

v.

**John N. MITCHELL, Individually and as Attorney General of the United States of America, et al.**

No. 73–1847.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 23, 1974.

Decided June 23, 1975.

As Amended June 24, 1975.

Rehearing Denied Aug. 29, 1975.

McGowan, Circuit Judge, concurred in the judgment and filed opinion.

Robb, Circuit Judge, concurred in the judgment and filed opinion.

Wilkey, Circuit Judge, concurred in part and dissented in part and filed opinion.

MacKinnon, Circuit Judge, concurred in part and dissented in part and filed opinion.

Bazelon, Chief Judge, dissented as to Part III–B of the opinion of Circuit Judge J. Skelly Wright and filed an opinion.

Circuit Judge J. SKELLY WRIGHT, in an opinion joined by Circuit Judges LEVENTHAL and SPOTTSWOOD W. ROBINSON, III, and by Chief Judge BAZELON except as to Part III–B, concerning which he filed a dissenting opinion, concluded that:

1. In Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court held that a federal cause of action for damages exists to remedy violations of the Fourth Amendment. The warrantless surveillance conducted by appellees constitutes such a Fourth Amendment violation. *Infra,* 170 U.S.App.D.C. at ———–, 516 F.2d at 611–654.

(a) Although Presidents since the time of Franklin Roosevelt have authorized warrantless national security surveillance, the practice does not justify dispensing with the warrant requirement. Since the practice developed at a time when there were no Fourth Amendment restrictions on non-trespassory surveillance, we cannot view it as an affirmative declaration by prior Presidents that their surveillance activities were immune from constitutional strictures. In any event, an unconstitutional practice, no matter how inveterate, cannot be condoned by the judiciary. *Infra,* 170 U.S. App.D.C. at ———–, 516 F.2d at 616–620.

(b) Prior Supreme Court decisions concerning the broad plenary powers of the President in the field of foreign af-. fairs do not predetermine the proper accommodation of presidential powers with the mandate of the Fourth Amendment and do not require that the President's national security surveillance orders be either exempted from any judicial review or exempted from prior judicial

scrutiny. Although these cases indicate that the President's power to obtain foreign intelligence information is vast, they do not suggest that he is immune from constitutional requirements; the procedural question of how the President may constitutionally exercise his powers remains even though those substantive powers are found to exist. *Infra,* 170 U.S.App.D.C. at ———–, 516 F.2d at 616–627.

(c) Both appellees in this case and some other courts facing the question of warrantless national security surveillance have asserted that, since "reasonableness" is the ultimate test under the Fourth Amendment, the reasonableness of such warrantless surveillance is to be determined on the circumstances of the particular case. However, this approach is inconsistent with the methodology the Supreme Court has consistently followed when addressing Fourth Amendment problems: absent special circumstances, a warrantless search is *per se* unlawful. As the *Keith* decision indicates, a court must ask more than whether there is a legitimate presidential need to conduct electronic surveillance; it must also ask whether a warrant, which places a neutral and detached magistrate or judge between investigative or prosecutorial officials of the Executive Branch and the First and Fourth Amendment rights of our citizens, should be obtained before doing so. This requires an analysis of whether a warrant would *frustrate* the legitimate governmental goal in the *category* of cases of which this is but one example. *Infra,* 170 U.S.App.D.C. at ———–, 516 F.2d at 627–633.

(d) In balancing individual rights and governmental needs in the intelligence gathering area, it is clear that prior judicial review can prevent Executive abuses and safeguard not only the Fourth Amendment right of privacy, but also the First Amendment values of freedom of speech and association. Thus prior judicial review should be required unless it will frustrate the legitimate goals of surveillance. A search of prior cases upholding the President's asserted

right to conduct warrantless foreign security surveillance reveals almost a total lack of reasons for not requiring a warrant. Nevertheless, possible factors that might dictate abrogation of the warrant requirement include (1) lack of judicial competence to deal with foreign affairs data; (2) danger of security leaks which might endanger the lives of informants and agents and which might seriously harm national security; (3) the fact that such surveillance is not being used for criminal prosecutions, but only for "strategic" intelligence gathering; (4) the possibility that the delay involved in the warrant procedure might result in substantial harm to national security; and (5) the fact that the administrative burden on the courts or the Executive Branch which would result from such a requirement would be enormous. Our analysis of these factors indicates that none is persuasive as a reason for abrogating the warrant procedure when the President seeks to obtain information that affects foreign affairs. *Infra,* 170 U.S.App.D.C. at —— — ——, 516 F.2d at 633–652.

(e) Although the above analysis suggests that, except for situations where exigent circumstances are present, there should be *no* category of surveillance for which the President need not obtain a warrant, our holding today does not sweep that broadly. We only hold in this case that, even where foreign affairs are involved, the President must obtain a warrant when the domestic organization which is the subject of the surveillance is neither an agent of nor acting in collaboration with the foreign power posing the national security threat. This holding is particularly reinforced by the rationale and approach of the *Keith* decision. *Infra,* 170 U.S.App.D.C. at —— — ——, 516 F.2d at 650–655.

(f) Since judges will be forced to decide whether "probable cause" to install national security wiretaps exists, we offer some guidance on the factors which judges should consider in issuing warrants. These include the importance of the information sought by the Govern-

ment, the availability of less intrusive means for obtaining the information, and the degree to which surveillance of a particular scope and duration will infringe individual rights. *Infra,* 170 U.S. App.D.C. at —— — ——, 516 F.2d at 655–659.

2. Congress intended that the procedures and remedies of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 would apply to all surveillance which must, under the Constitution, be conducted pursuant to a warrant procedure. Since we hold that a warrant is constitutionally required under the circumstances of this case, appellants are entitled to the liquidated damages recovery provided in that Act, unless appellees on remand establish an affirmative defense of good faith. *Infra,* 170 U.S.App.D.C. at —— — ——, 516 F.2d at 659–673.

(a) The dictum in *Keith* concerning possible future congressional legislation in the national security area is consistent with our holding that Congress intended Title III to be as comprehensive as possible, covering all surveillance which the Constitution dictates must be conducted only after securing judicial approval. This statutory construction is supported by the language of Title III, by its legislative history, by the fate of proposed wiretap legislation over the past 20 years, and by various policy considerations. *Infra,* 170 U.S.App.D.C. at —— — ——, 516 F.2d at 659–670.

(b) Appellees may on remand, however, avoid damages on both constitutional and statutory grounds if they can establish (1) that they had a subjective good faith belief that it was constitutional to install warrantless wiretaps under the circumstances of this case, and (2) that this belief was itself reasonable. *Infra,* 170 U.S.App.D.C. at —— — ——, 516 F.2d at 670–673.

———————

Circuit Judge McGOWAN, concurring in the judgment of the court only on statutory grounds, concluded that in order to escape the statute's general pro-

hibition of warrantless electronic surveillance, 18 U.S.C. § 2511(1) (1970), the instant wiretaps must fall within the statutory exemption for "measures . . . necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power." *Id.* § 2511 (3). Since, in Judge McGowan's view, such measures do not include surveillances directed, as these were, at citizens having no affinity with a foreign power whose hostile acts are feared, he would hold the instant surveillances illegal on that ground alone, without reference to the Constitution.

---

Circuit Judge ROBB concurs in the judgment of the court on statutory grounds without reaching the constitutional questions.

---

Circuit Judge WILKEY, concurring in the judgment of the court only on constitutional grounds and dissenting on statutory grounds, concluded that:

Although not regulated by or in violation of the provisions of Title III, the warrantless surveillance of the JDL nevertheless violated the minimal procedural requirements of the Constitution; therefore, the appellants have a cause of action against the appellees for damages under the Fourth Amendment.

(a) The question whether the surveillance should be exempted from the Fourth Amendment's warrant requirement can only be answered by balancing the exigencies of intelligence gathering in this case against the constitutional values placed on prior judicial approval.

(b) The waiver approved by the District Court is an extremely broad exemption whose employment by the Executive might be subject to inordinate abuse. It poses a grave threat to the Fourth Amendment values of privacy, political freedom, and judicial oversight of governmental searches and seizures which are not outweighed in this case by the need for speed, secrecy, expertise, and Presidential freedom of action in foreign intelligence operations.

(c) The arguments for a "foreign affairs" exemption from the warrant requirement are strongest where foreign agents and collaborators with a foreign power are involved. In addition, an exemption limited to this narrow class of criminals minimizes conflict with First and Fourth Amendment values.

(d) If a "foreign affairs" exemption exists, therefore, it applies only to surveillances involving foreign agents and collaborators. It has no application to the warrantless wiretaps employed by the Executive here.

---

Circuit Judge MacKINNON concurs in part, dissents in part, and files a separate statement.

Nathan Lewin, Washington, D. C., with whom Herbert J. Miller, Jr., and Martin D. Minsker, Washington, D. C., were on the brief, for appellants.

Edward S. Christenbury, Atty., Dept. of Justice, with whom Henry E. Petersen, Asst. Atty. Gen., and Kevin T. Maroney, Deputy Asst. Atty. Gen., were on the brief, for appellees.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting *en banc.*

Circuit Judge J. SKELLY WRIGHT announced the judgment of the court and delivered an opinion in which Circuit Judges LEVENTHAL and ROBINSON concurred and in which Chief Judge BAZELON concurred except as to Part III–B, concerning which he filed an opinion dissenting in part.

Circuit Judges McGOWAN and ROBB filed opinions concurring in the judgment.

Circuit Judge WILKEY filed an opinion concurring in part and dissenting in part.

Circuit Judge MacKINNON filed a dissenting opinion.

J. SKELLY WRIGHT, Circuit Judge:

Over the past several years there has been increasing anxiety[1] and increasing litigation[2] concerning actions which the Executive Branch of our Government has undertaken under the rubric of "national security." Undoubtedly the President, our Chief Executive and Commander-in-Chief of our Armed Forces, is imbued by the Constitution with vast and indispensable powers for dealing with the vital problems generated by our relations with foreign powers, including the duty to protect this country from foreign aggression or subversion.[3] The very existence of such tremendous power, however, renders it susceptible to abuse[4] and endangers those fundamental personal liberties which the Government was instituted to secure for its citizens and whose exercise elevates the nation to a stature worthy of defense.[5] Thus, although the attempt to claim Executive prerogatives or infringe liberty in the name of security and order may be motivated by the highest of ideals,[6] the judi-

1. See, e. g., Berger, The Incarnation of Executive Privilege, 22 U.C.L.A.L.Rev. 4, 26–29 (1974); Symposium, The Military After Vietnam: The Search for Legal Controls, 49 Indiana L.J. 539, passim (1974); Hearings on the Role of Dr. Henry Kissinger in the Wiretapping of Certain Government Officials and Newsmen Before the Senate Committee on Foreign Relations, 93d Cong., 2d Sess., passim (1974); Joint Hearings Before the Subcommittee on Administrative Practice and Procedure and the Subcommittee on Constitutional Rights of the Committee on the Judiciary and the Subcommittee on Surveillance of the Committee on Foreign Relations on Warrantless Wiretapping and Electronic Surveillance, 93d Cong., 2d Sess., passim (1974); Subcommittee on Surveillance of the Senate Committee on Foreign Relations and the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., Report on Warrantless Wiretapping and Electronic Surveillance (Committee print 1975); Report to the President by the Commission on CIA activities within the United States, passim (June 1975); United States v. Barker, 168 U.S.App.D.C. 312, 315, 514 F.2d 208, 211 (No. 73–2185, decided Feb. 25, 1975) (en banc) (Watergate burglars believed they were on national security assignment); American Character: Trial and Triumph, Harper's, Oct. 1974, passim (articles by individuals involved in Watergate activities); N.Y. Times, Dec. 22, 1974, at 1, col. 8 (allegations of domestic intelligence activity by CIA); Washington Post, March 22, 1975, at 1, col. 2 (20-year-old program of surreptitious opening of first-class mail by CIA); notes 107 & 197 infra.

2. See, e. g., Schlesinger v. Holtzman, 414 U.S. 1321, 94 S.Ct. 11, 38 L.Ed.2d 33 (1973) (challenge to Executive-ordered military operations in Cambodia); Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) (challenge to Army's domestic surveillance activities); United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (hereinafter cited as Keith) (challenge to warrantless internal security surveillance); New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (attempt to enjoin publication of classified material); United States v. Ehrlichman, D.D.C., 376 F.Supp. 29 (1974) (memorandum and order) (national security defense to burglary of Dr. Ellsberg's psychiatrist's office).

3. See infra, 170 U.S.App.D.C. at ——––—, ——, 516 F.2d at 615–626, 630–631. See also Keith, supra note 2, 407 U.S. at 310–311, 92 S.Ct. 2125.

4. Cf. Lord Acton, Essays on Freedom and Power 365 (Beacon Press 1948).

5. As Mr. Chief Justice Warren noted in holding one section of the Subversive Activities Control Act of 1950 to be an unconstitutional abridgment of the First Amendment right of association:

 [T]his concept of "national defense" cannot be deemed an end in itself, justifying any exercise of legislative power designed to promote such a goal. Implicit in the term "national defense" is the notion of defending those values and ideals which set this Nation apart. * * * It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties—the freedom of association—which makes the defense of the Nation worthwhile.

 United States v. Robel, 389 U.S. 258, 264, 88 S.Ct. 419, 424, 19 L.Ed.2d 508 (1967).

6. Almost 50 years ago, Mr. Justice Brandeis perceptively and eloquently observed:

 Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachments by men of zeal, well-meaning but without understanding.

 Olmstead v. United States, 277 U.S. 438, 479, 48 S.Ct. 564, 573, 72 L.Ed. 944 (1928) (dissenting opinion). See also Knauff v. Shaughnessy, 338 U.S. 537, 551, 70 S.Ct. 309, 317, 94 L.Ed.

ciary must remain vigilantly prepared to fulfill its own responsibility to channel Executive action within constitutional bounds.[7] The present case embodies this problem in a particularly acute form, since we are faced with the delicate and difficult task of reconciling the President's asserted power to obtain foreign intelligence information through use of electronic surveillance with the citizen's cherished right to maintain his privacy and associations inviolate against unreasonable governmental intrusion. Moreover, we must determine whether Congress, in enacting Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1970), intended to affect this relationship by providing a remedy for illegal Executive surveillance.

## I

■ Plaintiffs-appellants, 16 individuals who were members of the Jewish Defense League (JDL) during the period covered by this action,[8] sought damages from John Mitchell, then Attorney General of the United States, and nine special agents or employees of the Federal Bureau of Investigation [9] for electronic surveillance overhearings of plaintiffs' telephone conversations which transpired during the month of October 1970 and from January 5 through June 30, 1971.[10] The overhearings were alleged to violate plaintiffs' rights under both Title III of

317 (1950) (Jackson, J., dissenting) ("[s]ecurity is like liberty in that many are the crimes committed in its name").

7. United States v. Nixon, 418 U.S. 683, 703, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039 (1974), recently reiterated this long-standing principle:

Many decisions of this Court * * * have unequivocally reaffirmed the holding of Marbury v. Madison, 1 Cranch 137 (1803), that "it is emphatically the province and duty of the judicial department to say what the law is."

See also cases cited infra, 170 U.S.App.D.C. at ——–——, 516 F.2d at 626–627. See generally Symposium, United States v. Nixon, 22 U.C.L.A.L.Rev. 1–140 (1974).

8. Although the named plaintiffs sought to bring this suit as a class action on behalf of all others similarly situated, see JA at 7, the District Court never ruled on this issue. See Zweibon v. Mitchell, D.D.C., Civil No. 2025–71, slip op. at 3 (Oct. 27, 1972) (pretrial hearing). We express no opinion as to the propriety of a class action in a case such as the present one, particularly given the fact that forced disclosure of the names of those individuals whose conversations were overheard might itself pose difficult statutory or constitutional problems.

9. Claims that illegal searches and seizures were conducted by investigative or law enforcement officers of the United States on or after March 16, 1974 may now be brought directly against the federal government. See Pub.L. 93–253, § 2, 88 Stat. 50 (1974), amending 28 U.S.C. § 2680(h) (1970) (intentional torts exception to Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (1970)). Although the language of the amendment does not appear to encompass illegal non-trespassory electronic surveillance, Congress clearly indicated that such situations were in fact within the ambit of the Act. See 1974 U.S.Code Cong. & Adm. News 2789, 2791 (S.Rep.No.588, 93d Cong., 2d Sess. (1974)) ("it is the intent of the Committee [on Government Operations] that these borderline cases under the present law, such as trespass and invasion of privacy, would be viewed as clearly within the scope of the Federal Torts Claims Act"). Since the surveillance in this case occurred in 1970–71, however, the amendment has no effect on the current proceedings.

10. See JA at 73–74. There is some discrepancy as to the date the surveillance was terminated. Plaintiffs alleged, and the District Court held, that the surveillance continued until June 30, 1971. Id. at 8; Zweibon v. Mitchell, D.D.C., 363 F.Supp. 936, 938 (1973). However, Mr. Mitchell's deposition and FBI records indicate that the surveillance lasted until July 3. JA at 56–57 (deposition of Mr. Mitchell); memorandum from J. Edgar Hoover, FBI Director, to Attorney General Mitchell, July 9, 1971. The more conservative June 30 date would indicate a 208-day duration of the surveillance.

Mr. Mitchell, as Attorney General, authorized installation of the surveillance equipment. Acting pursuant to his direction, the other defendants listened to plaintiffs' telephone conversations and summarized their contents in logs which were made available to plaintiffs by order of the District Court. See 363 F.Supp. at 938. All of the original recordings had been destroyed pursuant to a general FBI policy on intelligence surveillance. See JA at 58 (deposition of Mr. Mitchell). This policy, which is inconsistent with Government representations made on other occasions, has troubled other courts. See, e. g., United States v. Huss, 2 Cir., 482 F.2d 38, 47–48 (1973).

the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1970),[11] and the Fourth Amendment.[12]

The instant action was filed shortly after pretrial proceedings in the consolidated criminal cases United States v. Bieber, No. 71–CR–479 (E.D.N.Y.), and United States v. Joffe, No. 71–CR–480 (E.D.N.Y.),[13] revealed that the Justice Department had installed wiretaps on the telephones of JDL's New York headquarters without prior judicial approval, and had overheard conversations of certain defendants who were about to stand trial. At a subsequent hearing before Judge Weinstein,[14] the Government prosecutor admitted that six telephone lines had been involved in the taps and that there were "volumes and volumes" of transcripts of intercepted communications.[15] Plaintiffs-appellants herein allege that their conversations were illegally monitored[16] by this surveillance

11. Title III of the Omnibus Crime Control and Safe Streets Act of 1968 is Congress' comprehensive legislation authorizing use of electronic surveillance in specifically delineated circumstances and under carefully regulated procedures. For general discussions of Title III, see, e. g., United States v. Tortorello, 2 Cir., 480 F.2d 764, 771–775 & n.6, cert. denied, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973) (upholding constitutionality of Title III), and cases cited therein; United States v. Scott, D.D.C., 331 F.Supp. 233, 238–240 (1971); United States v. Escandar, S.D.Fla., 319 F.Supp. 295, 297–302 (1970). For detailed discussion of the damage provision of Title III and its relevance to this case, see infra, 170 U.S.App. D.C. at ——–——, 516 F.2d at 659–673.

12. See infra, 170 U.S.App.D.C. at ——–——, 516 F.2d at 611–614.

13. Indictments in these cases were returned on May 12, 1971.

14. The proceedings were conducted in compliance with the Supreme Court's holding in Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), which specified the standards and procedures to be followed in deciding whether evidence in a criminal trial was the tainted product of an illegal surveillance. Although a trial judge may initially determine in camera whether a surveillance is lawful, see Giordano v. United States, 394 U.S. 310, 313–314, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969) (Stewart, J., concurring); cf. Taglianetti v. United States, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969), Alderman required that the records of all illegal taps, even if not arguably relevant to the prosecution, be turned over to a defendant who has standing to object to their admission into evidence; an adversary hearing could then be held on the issue of whether they also tainted other evidence. The rationale for this decision was that "the task is too complex, and the margin of error too great, to rely wholly on the in camera judgment of the trial court to identify those records which might have contributed to the Government's case." 394 U.S. at 182, 89 S.Ct. at 971. See also note 113 infra.

With respect to surveillance which occurred prior to enactment of Title III, the Alderman decision has been modified legislatively. See 18 U.S.C. § 3504 (1970) (transcripts of illegal wiretaps need only be disclosed if judge determines they are relevant to pending claim of admissibility). See also United States v. Butenko, 3 Cir., 494 F.2d 593, 637–641 (1974) (Gibbons, J., dissenting), cert. denied, sub nom. Ivanov v. United States, 419 U.S. 881, 95 S.Ct. 147, 43 L.Ed.2d 121 (1974) (discussing constitutionality of § 3504). Mandatory disclosure of the contents of illegal surveillance overhearings is still required for wiretaps occurring after June 19, 1968. See 1970 U.S. Code Cong. & Adm.News 4027. See also 18 U.S.C. § 2518(10)(a) (1970).

15. Brief for appellants at 4. The hearing before Judge Weinstein is unreported.

16. Each court presented with the question of the legality of these wiretaps in the criminal context has either not reached the issue, see United States v. Bieber, E.D.N.Y., 71–CR–479, slip op. at 6 (July 23, 1971) (sentencing memorandum and order), found them to be illegal, see United States v. Schwartz, E.D.N.Y., 71–CR–977 (Sept. 26, 1972), quoted infra, 170 U.S. App.D.C. at ——, 516 F.2d at 653, or noted the Government's concession that the taps were illegal, see United States v. Cohen, S.D.N.Y., 358 F.Supp. 112, finding of contempt vacated and remanded, sub nom. United States v. Huss, supra note 10. Appellees now insist that those findings were due to the fact that the courts were not fully informed of the data upon which the decision to install the wiretaps was made. See brief for appellees at 6 n.4; Zweibon v. Mitchell, D.C.Cir., No. 73–1847, transcript of Sept. 10, 1974 proceedings at 31–33. Although we certainly do not hold appellees to be collaterally estopped from asserting the legality of these surveillances, we find it curious that surveillances which were merely a "domestic security wiretap" which the "government concede[d] * * * were unlawful" when a contempt citation was involved, see United States v. Huss, supra note 10, 482 F.2d at 42, have become "foreign" se-

during calls they made to or from, or calls they received on or from, those telephones.

Although defendants-appellees have since admitted that each of the named plaintiffs had in fact been overheard during conversations over the telephones in question, they claim that this surveillance did not abridge plaintiffs' statutory or constitutional rights.[17] The primary ground for this position was explicated in an affidavit submitted by former Attorney General Mitchell, in which he stated:[18]

> The surveillance of this telephone installation was authorized by the President of the United States, acting through the Attorney General in the exercise of his authority relating to the nation's foreign affairs and was deemed essential to protect this nation and its citizens against hostile acts of a foreign power and to obtain foreign intelligence information deemed essential to the security of the United States * * *.

Judge Pratt, on cross-motions for summary judgment in the District Court, sustained this assertion and granted defendants' motion, finding as a matter of fact that the Attorney General had authorized the wiretaps "after a determination was made by him that the activities of the JDL were obviously detrimental to the continued peaceful relations between the United States and the Soviet Union and threatened the President's ability and constitutional authority to conduct the foreign relations of this country," Zweibon v. Mitchell, D.D.C., 363 F.Supp. 936, 942 (1973), and holding as a matter of law that "[n]o prior authorization from a Court is necessary where, as in this case, electronic surveillances relate to the foreign aspects of our national security." Id. at 943.[19] Judge Pratt then concluded that when there is a "clear threat to this country's foreign relations, it is the executive and not the judiciary, which should determine whether or not an electronic surveillance requires prior judicial autho-

---

curity wiretaps now that personal liability in damages is alleged. See infra, 170 U.S.App. D.C. at —— —— & note 42, 516 F.2d at 607–610 & note 42.

**17.** Brief for appellees at 4–5; JA at 20 (answer to complaint).

**18.** See JA at 14. This quote is from the affidavit of the Attorney General of the United States filed June 12, 1971 in United States v. Bieber, supra note 16. It was attached as Exhibit A to plaintiffs' complaint in this case, and it was repeated almost verbatim as the "First Defense" in defendants' answer to that complaint. See JA at 17, 20.

Defendants also interposed several defenses whose validity was never reached by the District Court and which are urged upon us in support of the position that, even if the actions of the Executive were unlawful, defendants should not be held liable in damages. These defenses are based on the following theories:

(1) If the illegality of these wiretaps is based upon the Supreme Court's decision in Keith, supra note 2, discussed infra, ·170 U.S.App. D.C. at ——, ——, —— ——, 516 F.2d at 612–614, 651–653, 659–663 there are strong factors which dictate that that decision should not be applied retroactively in this damage suit, which is based upon surveillance which occurred before the date of that decision.

(2) Since they were acting in their official capacities, defendants should be absolutely im-

mune from liability because of the doctrine of official immunity.

(3) Damages should not be awarded because defendants acted in the good faith belief that their actions were lawful.

Plaintiffs contend that if we find the wiretapping to be illegal we should find these defenses to be invalid and grant summary judgment on the issue of liability. Both parties have extensively briefed these issues. Compare brief for appellants at 45–71 with brief for appellees at 41–66. However, we do not express any opinion as to the merits of these arguments, and in light of our disposition of the question of the legality of the wiretapping, we leave the initial determination concerning these affirmative defenses to the District Court on remand. See infra, 170 U.S.App.D.C. at —— —— & note 274, 516 F.2d at 670–673 & note 274.

**19.** Judge Pratt found that, because "foreign aspects" of national security were involved in this case, the Supreme Court's decision in Keith, see infra, 170 U.S.App.D.C. at ——, 516 F.2d at 651–652, was "clearly distinguishable." 363 F.Supp. at 943. However, he failed to articulate any basis for deciding the question which Keith had reserved, see infra, 170 U.S. App.D.C. at ——, 516 F.2d at 612, in the manner that he did. See generally 363 F.Supp. at 936–944.

rization," *id.*, and that the Attorney General's actions were "reasonable within the meaning of the Fourth Amendment and were therefore lawful." *Id.* at 944.

Judge Pratt's findings that these surveillances were motivated by foreign threats to the national security, and were a reasonable response in light of those threats, are premised on the actions and statements of JDL members and the reactions they provoked on the part of officials of the Soviet Union. Although the JDL was originally organized to achieve various domestic goals, its focus eventually shifted to the international arena, where it was primarily directed at opposing the Soviet government's restrictive emigration policies as they related to Soviet Jewry.[20] In furtherance of these ends, JDL members [21] engaged in a broad spectrum of activities directed against Soviet officials and installations in the United States. These activities ranged from purely peaceful demonstrations through acts of violence, including the bombing of Amtorg and Intourist-Aeroflot [22] offices in New York City.[23] Soviet officials vigorously and

20. *See, e. g.*, Schwartz, Threats and Bombs—A Nasty Phase for the Two Nations, N.Y. Times, Jan. 10, 1971, § 4, at 3, col. 1.

21. Many of the more violent illegal activities were attributed to the JDL by the Soviet Government, or were reported by the news media to have been undertaken by individuals who were active members of the JDL. *See, e. g.*, Exhibit B–1(3) at 1–2 (telegram from American Embassy, Moscow to Sec. of State); Exhibit B–2(1) (translation of letter from Soviet Ministry); Exhibit B–2(6) (translation of letter from Soviet Embassy to Dept. of State); Exhibit B–3(5) (telegram from American Embassy, Moscow to Sec. of State); Exhibit B–3(6) (telegram from Sec. of State to American Embassy, Moscow); Schwartz, *supra* note 20, at 2, col. 8. Even if these acts were in fact perpetrated by JDL members, there is substantial latitude for abuse when such determinations are made by those engaged in investigatory or prosecutorial functions rather than by neutral members of the judiciary. *See infra*, 170 U.S.App.D.C. at —— & note 98, 516 F.2d at 633–635 & note 98.

22. Amtorg is a Soviet trade organization, and Intourist-Aeroflot is the Soviet airline. Violent activity was also directed at Soviet political installations in New York and Washington.

23. For a summary of many of these activities, see 363 F.Supp. at 939–942. Some of the activities which the Soviet government specifically protested were clearly protected First Amendment speech. For example, Soviet Ambassador to the United Nations Malik wrote to the Mayor of New York in an effort to prevent a "hostile demonstration" from taking place at his residence in Glen Cove, New York:

> I can not but express my surprise over the fact [that] * * * the demonstration, as you suppose, may take place. It is hard to imagine that the authoritative U. S. authorities can be so powerless to deal with the group of hoodluming Zionist element who are propagating ultrachauvinistic rasist [*sic*] and fascist ideology of "chosen people" that create animosity and hatred in your country towards the people of other nations and that openly proclaimed the worsening of relations between the USA and the USSR as its goal.

Exhibit B–2(4) (April 1971) (unofficial translation). The Soviet government was particularly upset by demonstrations occurring near its installations, and by such "hostile acts" as conducting "a clearly planned and, for the Soviet Union, insulting scenario before the lenses of numerous movie and television cameras," Exhibit B–2(6), and "using offensive language" against members of the Soviet mission, Exhibit B–3(1). But even where violence resulted, the demonstrations and speeches which led up to them were probably protected speech. *See, e. g.*, Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (per curiam) (speech advocating violence cannot be prohibited unless "such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action"). Of course, much of the activity attributed to the JDL was clearly illegal. But the Soviet government primarily wanted punishment of such criminal activities and indemnification for damages. *See, e. g.,* Exhibit B–2(1) at 4 (translation of letter from Soviet Ministry) ("The Ministry expects that * * * effective measures will be taken immediately to protect the USSR Mission to the UN and other official Soviet establishments * * * and that the persons guilty of carrying out the above-mentioned impermissible actions will be severely punished, and that appropriate Soviet establishments and citizens will be fully indemnified for the damage inflicted as a result of these actions"); Exhibit B–3(6) (telegram from Sec. of State to American Embassy, Moscow) ("USSR embassy insists that State Dept. take all suitable steps immediately to ensure security of Soviet establishments and their employees in U. S.; to fine and punish criminals who are perpetrating explosions * * * and to pay compensation for damages * * * "). Moreover, there is no indication that the State Department wanted intelligence information

continuously protested these activities, for which they held the United States Government responsible. In the wake of these protests the Attorney General, fearing the possibility of international embarrassment or Soviet retaliation against American citizens living in Moscow, initially gave his approval to an FBI request for authorization to install wiretaps on JDL headquarters during the month of October 1970 on the occasion of the 25th session of the General Assembly of the United Nations.[24]

Although there was no evidence that this surveillance had achieved its purported aim of "provid[ing] advance knowledge of any activities of JDL causing international embarrassment to this country," [25] the Attorney General approved a second FBI request for authority to install a wiretap beginning in early January 1971. This second request

on the activities of the JDL, since it was apparently content with "the return of indictments and resulting prosecutions" as deterrents to illegal activity and was concerned with formulating "Federal legislation designed to deter future acts of violence and harassment." Exhibit B–1(5) (letter from the Undersecretary of State to Attorney General Mitchell, Feb. 10, 1971). Although we accept, for purposes of this case, appellees' assertion that the purpose of the surveillance was intelligence gathering, these and other aspects of the facts before us, see, e. g., infra, 170 U.S.App. D.C. at —— & notes 24, 26, 31–32, 34, 516 F.2d at 609–610 & notes 24, 26, 31–32, 34, demonstrate the potential for abuse of such surveillance as a means for circumventing the warrant requirement in normal criminal investigations. See also infra, 170 U.S.App.D.C. at —— – ——, —— – ——, 516 F.2d at 633–636, 648–649.

It should also be noted that the acts which the Soviet government protested were all public acts, and even the Soviet protests and the worsening of Soviet-American relations were publicly known phenomena rather than national security secrets. See, e. g., Schwartz, supra note 20, at 2, col. 8; N.Y. Times, Jan. 9, 1971, at 1, col. 1 (reporting "stern protest" and "Soviet threat to retaliate against Americans in Moscow"); N.Y. Daily News, Jan. 13, 1971, at 3, cols. 1–3.

**24.** The memorandum requesting approval of the surveillance stated three reasons for the installation: (1) the JDL's "proclivity for demonstrations and violence" against Soviet and Arab diplomatic installations which resulted in injury to private citizens and law enforcement officials; (2) news media reports that the leader of the JDL stated that the organization might attempt to hijack an Arab airliner if similar activities by Arab terrorists continued; and (3) the fact that foreign dignitaries would be in New York during the United Nations commemorative ceremonies, which would afford an opportunity for JDL demonstrations and violence.

The surveillance purportedly was to provide advance information concerning JDL activities which "could create a situation of international embarrassment to this country." See Plaintiffs' Exhibit M–1 (memorandum from J. Edgar Hoover to John Mitchell, Sept. 14, 1970). No mention was made of Soviet threats of retaliation against American citizens in Moscow or the effect of JDL activities on diplomatic relations with the Soviet Union. The Attorney General nevertheless contended that his decision to order the wiretap was also based on other oral information imparted to him during conversations with Dr. Kissinger (then head of the National Security Council), Undersecretary of State Irwin, and Assistant Secretary for European Affairs Hildebrandt. JA at 30–32, 34–36 (deposition of Mr. Mitchell); 363 F.Supp. at 938–939. There is no evidence that the State Department or the National Security Council actually requested installation of a wiretap, however. Even accepting Mr. Mitchell's statements that he did rely on information imparted by those sources, we nevertheless note the possibility of abuse when there are no written records of the justifications for instituting a surveillance. Such lack of records allows a search to be justified on information subsequently obtained from the surveillance and permits the assertion that more information was relied on than was in fact the case. Prior judicial approval for wiretapping, among other benefits, of course freezes the record as to the data upon which the surveillance was based. See, e. g., Beck v. Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964) (in reviewing constitutional validity of arrest, court must look to "the facts available to the officers at the moment of the arrest"); Aguilar v. Texas, 378 U.S. 108, 109 n.1, 84 S.Ct. 1509, 1511, 12 L.Ed.2d 723 (1968) ("It is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought to the magistrate's attention" (emphasis in original)). See also infra, 170 U.S.App.D.C. at —— & notes 143, 144, 516 F.2d at 644–645 & notes 143, 144.

**25.** Plaintiffs' Exhibit M–1 (memorandum from J. Edgar Hoover to John Mitchell, Sept. 14, 1970).

for a wiretap on JDL headquarters, which was approved to last for a period of 90 days,[26] was based solely on the fact that JDL demonstrations, many of which were "marked by violence," were targeted against Soviet installations in this country and were the subject of official Soviet protests.[27] Once again the surveillance was "expected to provide advance knowledge of activities of the [JDL] directed against anti-Jewish diplomatic establishments, which could create situations of international embarrassment to the United States."[28] This wiretap was extended for another 90-day period, based on the FBI's unsubstantiated assertion that "the authorized surveillance has continued to reveal details of plans by the * * * JDL to continue its program of harassment of Soviet and Arab bloc officials * * *. In each instance the [wiretap] installation furnished otherwise unobtainable information, well in advance of public statements by the JDL, thereby allowing for adequate countermeasures to be taken by appropriate police and security forces."[29] Apparently despite any intelligence information so gathered, JDL activities continued in full force during the period of the surveillance; indeed, the surveillance failed to generate information that would have prevented the bombing of Amtorg offices on April 22, 1971, which was reportedly executed by JDL members.[30] After 208 days, the wiretap installation was finally terminated, on June 30, 1971.[31] During this period, neither Mr. Mitchell nor other officials of the Attorney General's office reviewed the information obtained from or the necessity for the taps,[32] and Mr. Mitchell was unaware that the taps continued for more than a month after

---

**26.** Routine Justice Department policy is to authorize national security wiretap installations for 90-day periods. *See* Testimony of Clarence M. Kelley, Director, FBI, Concerning Senate Bill 2820, "Surveillance Practices and Procedures Act of 1973," Before the Subcommittee on Criminal Laws and Procedures and Constitutional Rights, at 12 (Oct. 2, 1974) (Justice Department release). And once such approval is given, it appears there is no reconsideration of the necessity for the surveillance during that period. Although Mr. Mitchell asserted that he had discussed information obtained from the surveillance, he could recall no specific information which was communicated to him, *see* JA at 40–42. Moreover, he admitted that he had never reviewed the logs of the surveillance and expressed his belief that neither the State Department nor the National Security Council had done so. *Id.* at 47–49.

**27.** *See* Plaintiffs' Exhibit M–2 (memorandum from J. Edgar Hoover to John Mitchell, Jan. 4, 1971). The memorandum also noted that the Soviet Union had blamed the JDL for cancellation of tours in this country of Soviet cultural groups. *Id.* at 2.

**28.** *Id.* at 2.

**29.** Plaintiffs' Exhibit M–3 (memorandum from J. Edgar Hoover to John Mitchell, March 31, 1971).

**30.** *See* 363 F.Supp. at 942 (Conclusion of Law 11(w)).

**31.** *See* note 10 *supra.* Although Mr. Mitchell could not recall the reason the installation was discontinued, it coincided with motions for disclosure made in the criminal cases, United States v. Bieber and United States v. Joffe, *supra. See* JA at 56–57, 62–64. Motions for disclosure were made on June 18, and a hearing was held on July 6. The wiretaps were terminated on either June 30 or July 3. *See* note 10 *supra.*

**32.** Q Was there, at any time, during the period of this installation any check by someone at your instruction to see whether, in fact, there had been any conversations overheard which produced such [national security intelligence] information in advance?

A * * * [T]o the best of my recollection, we had been provided by the [FBI] that was conducting the surveillance with information in this area.

Q But it was not a part of the regular routine to have someone from the Attorney General's Office or someone in the Internal Security Division check after ten days or after thirty days to see specifically what had been recovered by a wiretap of this kind?

A No. That was the obligation of the FBI, to keep us informed of it.

JA at 56 (deposition of Mr. Mitchell). Although Mr. Mitchell asserted that he personally reviewed all requests for national security wiretaps, *see id.* at 59, a recent Supreme Court decision indicates that the Attorney General was somewhat less faithful concerning his statutory duty to authorize surveillance under the provisions of Title III. *See* United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).

criminal indictments were handed down against several individuals (five of whom are plaintiffs in this case) whose conversations, including those with their attorney,[33] were overhead in violation of Justice Department regulations.[34]

## II

[■] In Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court held that a federal cause of action exists to remedy violations of the Fourth Amendment and that damages are recoverable upon proof that injuries resulted from the violation. There is still some doubt, however, as to whether all warrantless wiretapping constitutes such

a violation. In 1967, the Supreme Court first ruled that warrantless electronic surveillance conducted through non-trespassory methods[35] is an unreasonable search and seizure within the meaning of the Fourth Amendment. See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). But in a footnote, see id. at 358 n.23, 88 S.Ct. at 515, the Court explicitly cautioned:

> Whether safeguards other than prior authorization by a magistrate would satisfy the Fourth Amendment in a situation involving the national security is a question not presented by this case.

Although three Justices expressed their views on this subject in concurring opinions,[36] the issue was not squarely

---

**33.** Plaintiff Zweibon was an attorney representing several of the defendants in the criminal proceedings.

**34.** JA at 57. See also note 100 infra. The Sept. 14 and Jan. 4 requests for wiretap authorizations recognized that monitoring of the surveillance might result in "interception of conversations involving individuals who are or may be defendants or attorneys in pending Federal cases." The requests indicated that the FBI would comply with a prior memorandum from the Attorney General which ordered that any overhearings of such individuals were to be turned off, and that the logs of any accidental overhearings were to be sealed and kept unavailable to anyone else in the Justice Department. JA at 57.

**35.** Olmstead v. United States, supra note 6, had previously held that wiretapping and use of evidence obtained through such surveillance did not violate the Fourth Amendment since there was no trespass into a constitutionally protected area and nothing tangible was seized. See also infra, 170 U.S.App.D.C. at ——–——, 516 F.2d at 616–618. Similarly, a "bug" was considered to be free from constitutional strictures if there was no unauthorized physical invasion of the subject's premises. See, e. g., Goldman v. United States, 316 U.S. 129, 135–136, 62 S.Ct. 993, 86 L.Ed. 1322 (1942) (evidence admissible where federal agents used detectaphone attached to wall of one room to overhear conversations in adjoining room).

**36.** Commenting on the majority's footnote 23, Mr. Justice White indicated that such an inherent Executive power did exist:

> We should not require the warrant procedure and the magistrate's judgment if the President of the United States or his chief legal officer, the Attorney General, has considered the requirements of national security and authorized electronic surveillance as reasonable.

389 U.S. at 364, 88 S.Ct. at 518. Alarmed by this "wholly unwarranted green light" to Executive surveillance, Mr. Justice Douglas, with whom Mr. Justice Brennan joined, responded vigorously:

> Neither the President nor the Attorney General is a magistrate. In matters where they believe national security may be involved they are not detached, disinterested, and neutral as a court or magistrate must be. Under the separation of powers created by the Constitution, the Executive Branch is not supposed to be neutral and disinterested. Rather it should vigorously investigate and prevent breaches of national security and prosecute those who violate the pertinent federal laws. The President and Attorney General are properly interested parties, cast in the role of adversary, in national security cases. They may even be the intended victims of subversive action. Since spies and saboteurs are as entitled to the protection of the Fourth Amendment as suspected gamblers like petitioner, I cannot agree that where spies and saboteurs are involved adequate protection of Fourth Amendment rights is assured when the President and Attorney General assume both the position of adversary-and-prosecutor and disinterested, neutral magistrate.

Id. at 359–360, 88 S.Ct. at 516, cited with approval in Keith, supra note 2, 407 U.S. at 317, 92 S.Ct. 2125.

presented [37] to the Court until United States v. United States District Court [*Keith*], 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), narrowed the scope of the possible exception to the warrant requirement.

In a carefully reasoned opinion, Mr. Justice Powell, writing for six members

of the Court,[38] held that no exception exists for surveillance justified solely on the basis of domestic threats to the national security. Despite the fact that the Court expressed no opinion as to the result that would be required if foreign powers were involved in the threat to the national security,[39] some courts have

**37.** Alderman v. United States, *discussed at* note 14 *supra*, involved procedures to be followed in determining whether evidence was tainted by illegal wiretapping, and the Justices split over the proper procedure to be applied when national security interests are implicated. In particular, Mr. Justice Fortas argued that national security material—"a rigid and limited category * * * [of material] specifically directed to acts of sabotage, espionage, or aggression by or on behalf of foreign states," 394 U.S. at 209, 89 S.Ct. at 985 (opinion concurring in part and dissenting in part) —should not be subject to the Court's ruling that illegally obtained surveillance data must be turned over to a criminal defendant whether or not it is relevant to his prosecution. The Court did not decide, however, whether warrantless national security wiretapping was in fact unlawful. *See, e. g.,* Giordano v. United States, *supra* note 14, 394 U.S. at 314–315, 89 S.Ct. 1163 (Stewart, J., concurring).

**38.** Mr. Chief Justice Burger concurred in the result, while Mr. Justice Rehnquist took no part in consideration or decision of the case. Mr. Justice White, concurring in the judgment of the Court, would have premised the holding that the surveillance was illegal on purely statutory grounds. *See* notes 46, 222 *infra.*

**39.** *See infra,* 170 U.S.App.D.C. at —— & note 189, 516 F.2d at 651–653 & note 189.

In their opinions concurring in the judgment of this court, Judges McGowan and Robb have indicated, contrary to the submission of the Government and the finding of the District Court, that this is merely a case involving domestic crime rather than national security. This assertion, however, is simply not supported by the record evidence. *See, e. g.,* Wilkey opinion *infra,* 170 U.S.App.D.C. at —— & n.11, 516 F.2d at 690–692 & n.11. Judge McGowan quotes two State Department memoranda out of a voluminous record (and one of the two was written after the surveillance had been instituted) to prove that the State Department only sought "more effective enforcement of the criminal laws," McGowan opinion at 682, and that the FBI and the Justice Department "significantly shifted the emphasis away from criminal law enforcement alone." *Id.* However, Judge Pratt found as a matter of fact that prior to the initial wiretap the Attorney General had (as his affidavit and deposition

testimony indicated) had *conversations* with the Director of the FBI as well as other members of the National Security Council (including Henry Kissinger) and the State Department (including Undersecretary Irwin, Assistant Secretary for European Affairs Hildebrant, and State Department Counsel Stevenson) concerning the impact of JDL activities on this nation's foreign affairs (including threats of Soviet retaliation against United States diplomats in Moscow, cancellation of cultural exchanges, and a general deterioration of Soviet-American relations), and that the wiretaps were installed after the Attorney General had determined that those activities threatened the continuation of peaceful relations and the President's ability and constitutional authority to conduct this nation's foreign affairs. Similar allegations in the Attorney General's affidavit in *Keith* were accepted by the Supreme Court as indicative of internal security threats, even though those threats also involved domestic crime. *See, e. g.,* 407 U.S. at 300–301 & n.2, 303, 92 S.Ct. 2125; *infra,* 170 U.S.App.D.C. at —— ——, 516 F.2d at 651–654.

Judge McGowan acknowledges that the wiretap authorizations ordered that evidence derived therefrom not be used for prosecutorial purposes and admits that there is nothing in the record to indicate that any surveillance fruits were in fact used for such purposes. Yet Judge McGowan, without suggesting that Judge Pratt's findings are clearly erroneous, seems to say that these were electronic surveillances actually conducted for law enforcement purposes and thus were not within the comprehension of the national security proviso of Title III, *see infra,* 170 U.S.App.D.C. at —— ——, 516 F.2d at 659–673. Although we disagree with Judges MacKinnon and Wilkey to the extent they state we have made a *finding* that these wiretaps were in fact instituted in good faith purely for the acquisition of foreign affairs information (we leave it to the trial court's discretion on remand to reopen that question of motivation, *see* note 274 *infra*), on the present record we are constrained to accept the District Court's finding that the surveillance was neither intended nor employed for the acquisition of evidence pertaining to criminal prosecutions as opposed to mere intelligence information. *See* note 23 *supra.*

Moreover, Judge McGowan indicates that even if "the fruits of the surveillance in this

subsequently held that such an exception to the warrant requirement in fact exists.[40] We have serious doubts as to the methodology employed by those courts,[41] and we therefore undertake to analyze the issues with which we are presented in a manner more faithful to the spirit and rationale of *Keith*. For although this case is a civil damage suit, it square-

ly poses the problem of the meaning and scope of the *Keith* decision and the validity and viability of any distinction between surveillance justified on the basis of foreign, as opposed to domestic, threats to the national security.

■ Although we believe that an analysis of the policies implicated by foreign security surveillance [42] indicates

---

case were used solely for the purpose of providing security" to protect foreign diplomats and avoid exacerbation of Soviet-American relations, *see* McGowan opinion at n.1, the primary purpose of the surveillance would still be law enforcement because it is irrelevant that "the threatened crimes in this case were of a kind that the FBI would have greatly preferred—by the provision of security and by other precautionary steps—to prevent rather than prosecute * * *. The effort to prevent crime can always fail, in which case prosecution is sure to follow." *Id.* 170 U.S.App. D.C. at ——— ——, 516 F.2d at 682–683. This implies that if crime is involved or potentially involved in a national security surveillance, Judge McGowan would reject the President's national security justification and treat the surveillance as one directed at criminal law enforcement. However, Judge McGowan's approach would in effect mean that most presidential actions traditionally considered to be within the national security sphere are not, in fact, within that sphere. For example, presidential actions undertaken "to protect national security information against foreign intelligence activities" are not only considered vital to our national security, but are also specifically encompassed in the language of 18 U.S.C. § 2511(3), *discussed infra*, 170 U.S.App.D.C. at ——— ——, 516 F.2d at 659–673. And certainly in taking those actions the President would prefer to see the crime of espionage prevented rather than have the culprits prosecuted after the crime has transpired. Yet Judge McGowan's approach would deny that such surveillance should be categorized as having a primary national security purpose since, if the surveillance failed to prevent the crime of espionage, "prosecution is sure to follow."

40. *See infra*, 170 U.S.App.D.C. at ——— ——, 516 F.2d at 636–641.

41. *See infra*, 170 U.S.App.D.C. at ——— ——, ——— ——, 516 F.2d at 628–633, 639–641.

42. Throughout this opinion, "internal security" and "domestic security" will refer to threats to the structure or existence of the Government which originate directly from domestic organizations which are neither agents of nor acting

in collaboration with foreign powers, and "internal security" or "domestic security" surveillance will refer to surveillance which is predicated on such threats. *See infra*, 170 U.S.App. D.C. at ——, 516 F.2d at 651–653. "Foreign security" will refer to threats to the structure or existence of the Government which emanate either directly or indirectly from a foreign power, *see infra*, 170 U.S.App.D.C. at —— & note 189, 516 F.2d at 651–653 & note 189, and a "foreign security" surveillance will refer to surveillance which is predicated on such threats. A surveillance is a foreign security surveillance regardless of the stimulus that provoked the foreign power; thus the surveillance in this case will be treated as a foreign security surveillance even though the Soviet threats were provoked by actions of a hostile domestic organization. We believe such treatment is required by the limited holding of the Supreme Court in *Keith*. *See id.* "National security" will generally be used interchangeably with "foreign security," except where the context makes it clear that it refers to both "foreign security" and "internal security."

It should also be noted that the Government, *see* note 87 *infra*, is not limiting its argument for an exception to the warrant requirement to situations of foreign security; rather, it argues that such an exception, based on the President's preeminent powers in the field of foreign affairs, is justified for any intelligence gathering surveillance that will produce information that "affects" our relations with foreign powers. *See, e. g.,* brief for appellees at 29–32; *infra,* 170 U.S.App.D.C. at ——— ——, 516 F.2d at 655–657. For the most part our analysis will treat the Government's position as if it were limited to the more reasonable category of "security" situations. However, there is no litmus test for separating those actions of foreign powers which affect our security from those which do not, particularly when it is recalled that even minor trade difficulties in the present may have a substantial corrosive effect on our security in the future. Thus our analysis proceeds with the recognition that there may be no practical or logical way to differentiate national security situations from other situations within the President's foreign affairs powers. *See also* notes 108 & 203 *infra*. This does not,

that, absent exigent circumstances, all warrantless electronic surveillance is unreasonable and therefore unconstitutional, our holding need not sweep that broadly. Instead, we . hold today only that a warrant must be obtained before a wiretap is installed on a domestic organization that is neither the agent of nor acting in collaboration with a foreign power, even if the surveillance is installed under presidential directive [43] in the name of foreign intelligence gathering for protection of the national security. We do not reach this conclusion lightly or without sensitivity to the import or the controversiality of the problem of national security wiretapping. But the Constitution compels us to do no less. In any event, our decision does not limit in any way the ability of the Presi-

dent to conduct legitimate national security wiretaps, since we do not address the substantive scope of that power [44] or the exact standards upon which warrants should issue.[45] Rather, we merely decide that whatever the legitimate scope of that power, and whatever the standard which must be met to justify the intrusion of a wiretap, the decision as to whether the scope has been exceeded or the standard has been met is to be made by a neutral and disinterested magistrate or judge rather than by an Executive official engaged in investigatory or prosecutorial duties, at least in situations where the subject of the surveillance is a domestic organization that is not the agent of or acting in collaboration with a foreign power.[46]

of course, mean that if an exception to the warrant requirement were recognized, no lines could be drawn within the foreign affairs area. For example, although there are strong policies against allowing any such exceptions, *see infra,* 170 U.S.App.D.C. at ——— ——, 516 F.2d at 633–651, it would be possible to allow warrantless surveillance of foreign agents regardless of the importance of the information sought, so long as *post hoc* judicial review found the surveillance to be reasonable, while requiring a warrant whenever a domestic organization is wiretapped, regardless of the enormity of the foreign security threat which its actions provoked.

**43.** There is no indication that the President himself authorized or had knowledge of this surveillance. However, appellees assert that his constitutional powers were properly delegated to the Attorney General since "[e]ach head of a department is and must be the President's *alter ego* in the matters of that department where the President is required by law to exercise authority." Memorandum of Points and Authorities in Support of Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Partial Summary Judgment, at 15 n.10, in Zweibon v. Mitchell, D.D.C., Civil No. 2025–71 (brief filed April 24, 1973), *quoting* Myers v. United States, 272 U.S. 52, 133, 47 S.Ct. 21, 71 L.Ed. 160 (1926). We do not doubt the President's power to delegate execution of many of his functions to responsible subordinate officials. *See, e. g.,* Knauff v. Shaughnessy, *supra* note 3, 338 U.S. at 543, 70 S.Ct. 309. However, we find it curious that, in light of the fact that the asserted complexity and specialized nature of foreign policy matters is advanced as a factor

militating against prior judicial oversight of foreign security surveillance, *see infra,* 170 U.S.App.D.C. at ——, ——–——, 516 F.2d at 639–640, 641–648, this function has been delegated to the Attorney General rather than to the Secretary of State. *See also infra,* 170 U.S.App.D.C. at ——–——, 516 F.2d at 643–644.

**44.** In particular, we do not decide whether it would have been proper for a judge to authorize a surveillance under the circumstances of this case, or whether any authorized surveillance should have been of a different scope or duration than that actually conducted. *See* note 274 *infra.*

**45.** *See infra,* 170 U.S.App.D.C. at ——–——, 516 F.2d at 655–659.

**46.** Section 2511 of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1970), declares that "[e]xcept as otherwise specifically provided in this chapter [Title III]," interception of "*any* wire or oral communication" is illegal, and § 2520 of Title III specifies broad remedial relief, including liquidated damages, for surveillance conducted "in violation of this chapter." However, § 2511(3), the so-called "national security proviso" of Title III, disclaims any congressional intent, *inter alia,* to "limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities." *See generally infra,* 170 U.S.App.D.C.

## A.

Before engaging in our Fourth Amendment analysis, we must dispose of an argument, based on alleged precedent, that has been implicitly advanced by several courts [47] as well as by appellees in this case.[48] This argument in effect asserts that prior presidential practice and several Supreme Court holdings establish the President's preeminent power over the conduct of foreign affairs, and that this power in turn establishes the inherent authority of the President to engage in warrantless national security surveillances as a necessary concomitant of his responsibilities as Commander-in-Chief of the Armed Forces [49] and Chief Executive of the nation.[50]

To be sure, the fact that the *Keith* Court found the President's powers with respect to domestic affairs insufficient to justify an exception to the warrant requirement when the domestic aspects of national security are involved, yet refused to specify what procedures would be entailed if the national security threat had its origin with foreign powers,[51] indicates that any difference in re-

---

at ———, 516 F.2d at 659–673. Thus, although any electronic surveillance is presumptively unlawful if instituted without compliance with the strictures of Title III, a surveillance within the comprehension of the national security proviso would not be rendered unlawful by Title III. As we will develop more fully later in our opinion, *see infra,* 170 U.S.App. D.C. at ——— & notes 239, 244, 516 F.2d at 664–667 & notes 239, 244, the national security proviso was fashioned to encompass any presidential† surveillance which the Supreme Court might subsequently hold to be immune from the Fourth Amendment's warrant requirement; Congress was at pains not "to limit or disturb such power as the President may have under the Constitution." *Keith,* 407 U.S. at 303, 92 S.Ct. at 2130. *See also, e. g.,* note 240 *infra* (Senate Report broadly referring to proviso as encompassing presidential "conduct of foreign affairs"). Since, on the record before us, the surveillance of JDL headquarters was installed for national security reasons, it at least arguably falls within the language of the proviso; thus we must first analyze whether a national security surveillance instituted under these circumstances is subject to prior judicial scrutiny. *See also Keith,* 407 U.S. at 308, 92 S.Ct. 2125. Whatever disagreement we have with Judge Wilkey on the interpretation of § 2511(3), *compare infra,* 170 U.S.App.D.C. at ———, 516 F.2d at 659–673 with Wilkey opinion 170 U.S.App. D.C. at ———, 516 F.2d at 689–700, we are in accord in accepting the principle that, at a minimum, the legislative history and language of that section reflect a congressional intent that in any case in which *no warrant is constitutionally mandated,* Congress did not intend to impose a statutory warrant requirement. Indeed, although the premise is questionable, *see* note 228 *infra,* Congress apparently believed it would be unconstitutional to restrict any inherent Executive power to engage in warrantless surveillance. *See, e. g., infra,* 170 U.S.App.D.C. at —— & notes 239, 244, 516 F.2d at 664–667 & notes 239, 244.

Moreover, in *Keith,* Justice White, speaking only for himself, argued that Title III should be analyzed by first determining whether the surveillance was one encompassed by the exact language of the national security proviso; concluding that it was not, he avoided any constitutional analysis. *See* note 222 *infra.* This is in effect Judge McGowan's approach. *See, e. g.,* McGowan opinion at n.12. He, too, would approach the proviso by first determining whether a surveillance falls within its exact language. And although the broad statutory language makes no distinction with respect to the *subjects* of such surveillance (as opposed to its *purpose*) Judge McGowan would simply construe the statutory language to exclude all "noncollaborators" even if the President could constitutionally institute surveillance on them without compliance with the warrant requirement of the Fourth Amendment. Yet the Supreme Court in *Keith,* rejecting the methodology of Justice White, recognized that if the President could conduct warrantless national security surveillance permissibly under the Constitution, the framers of § 2511(3) did not intend to interpose statutory barriers to the surveillance. Thus, under the facts of our case, if no warrant is constitutionally required Title III cannot apply. That is why, as in *Keith,* we must initially undertake the constitutional analysis which follows.

47. *See* cases cited *infra,* 170 U.S.App.D.C. at ———, 516 F.2d at 636–641. *See also* United States v. United States District Court, 6 Cir., 444 F.2d 651, 658–659 (1971).

48. *See generally* brief for appellees at 21–32; Memorandum of Points and Authorities in Support of Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Partial Summary Judgment, at 13–20, in Zweibon v. Mitchell, *supra* note 43.

49. U.S.Const., Art. II, § 2.

50. *Id.* § 1.

51. *See infra,* 170 U.S.App.D.C. at ———, 516 F.2d at 651–653.

sult must turn on the President's peculiar powers in the field of foreign affairs. However, the precedents of Executive practice and judicial decisions merely substantiate the existence of those powers and legitimate the authority of the President to obtain information necessary to protect the national security from foreign aggression; they do not preordain the procedures with which the President must comply in exercising that authority. We will therefore discuss these precedents to elaborate why they are not themselves conclusive of the procedural [52] question; in a later section of this opinion we will scrutinize them to determine whether they are based on any policies which would be frustrated if a warrant requirement were to apply to the category of foreign security surveillances.

1.

■ Admittedly, Presidents since Franklin Roosevelt have authorized their Attorneys General to approve investigations "to secure information by listening devices directed to the conversation or other communications of persons suspected of subversive activities against the Government of the United States." [53] However, this practice has never received Supreme Court approval, and there can be no doubt that an unconstitutional practice, no matter how inveterate, cannot be condoned by the judiciary.[54] Indeed, the Supreme Court in *Keith* merely treated the similarly long-standing Executive practice of conducting surveillance "in cases vitally affecting the domestic security" [55] as indicative of the unchallenged Executive power to obtain intelligence information, not as determinative of the proper procedures to be followed in so doing.[56] Even more important, this Executive practice must be considered in its historical context, which illustrates why the 30-year policy of presidentially directed electron-

---

**52.** In referring to the warrant requirement as "procedural," we do not mean to imply that it does not have important substantive aspects and purposes. Rather, we employ the term to contrast the existence and scope of any Executive power to gather information with the safeguards pursuant to which such power is to be exercised. However, it is important to note that, in contrast to the detailed standards and procedures elaborated in Title III for regulating the warrant proceeding, *see infra,* 170 U.S. App.D.C. at ——, 516 F.2d at 668–669, the requirement of a warrant itself was for many years closely associated in congressional debates with the substantive powers of the Executive to use evidence derived from national security surveillance in criminal prosecutions, *see infra,* 170 U.S.App.D.C. at —— & note 240, 516 F.2d at 664–667 & note 240.

**53.** *See* Appendix A; *Keith, supra* note 2, 407 U.S. at 310–311 & nn. 10–11, 92 S.Ct. 2125. *See generally* Brownell, The Public Security and Wire Tapping, 39 Cornell L.Q. 195, 195–200 (1954); Donnelly, Comments and Caveats on the Wire Tapping Controversy, 63 Yale L.J. 799, 799–800 (1954); Gasque, Wiretapping: A History of Federal Legislation and Supreme Court Decisions, 15 S.C.L.Rev. 593, 600–601 (1963); Rogers, The Case for Wire Tapping, 63 Yale L.J. 792, 794–797 (1954); Theoharis & Meyer, The "National Security" Justification for Electronic Eavesdropping: An Elusive Exception, 14 Wayne L.Rev. 749, 753–768 (1968); Note, Wiretapping and Electronic Surveillance—Title III of the Crime Control Act of 1968, 23 Rutgers L.Rev. 319, 337–339 (1969); Note, The "National Security Wiretap": Presidential Prerogative or Judicial Responsibility, 45 S.Cal.L.Rev. 888, 902–905 (1972); Comment, Privacy and Political Freedom: Application of the Fourth Amendment to "National Security" Investigations, 17 U.C.L.A.L.Rev. 1205, 1217–1224 (1970).

**54.** *See, e. g.,* Committee for Public Education v. Nyquist, 413 U.S. 756, 792, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), *quoting* Walz v. Tax Comm'n, 397 U.S. 664, 678, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Katz v. United States, 389 U.S. 347, 352–353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Reynolds v. Sims, 377 U.S. 533, 579–580, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

**55.** Although President Roosevelt's memorandum authorized surveillance of "persons suspected of subversive activities," the thrust of the memorandum is to authorize surveillance which would be considered "foreign" security surveillance under the *Keith* opinion. The first presidential directive condoning surveillance in "cases vitally affecting the domestic security" came six years later. *See* Appendix A.

**56.** *Compare* 407 U.S. at 310–311 & n.10, 92 S.Ct. at 2133–2134 *with id.* at 314–315, 92 S.Ct. 2135–2136.

ic surveillance has no substantial bearing on whether the practice of warrantless surveillance is now constitutional.

To appreciate this problem, one must remember the Supreme Court's unfortunate decision in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928). Over vigorous dissents, including the renowned Brandeis celebration of personal privacy, the *Olmstead* Court held that, absent an actual physical trespass, there is no search within the meaning of the Fourth Amendment. Thus, from 1928 until 1967,[57] there was simply no dispute that *the Fourth Amendment was inapplicable to non-trespassory electronic surveillance; it was for this reason that warrants were not required.* However, shortly after the Olmstead decision, Congress enacted Section 605 of the Federal Communications Act of 1934,[58] which provided that

> no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person.

Section 605 was interpreted to prohibit the introduction into evidence of both the contents of conversations overheard on wiretaps installed by law enforcement officials, *see* Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937), and the fruits of such overhearings, *see* Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939).[59]

Although various bills were subsequently introduced to avoid the effects of these decisions, they never received congressional approval.[60] Nevertheless, the Justice Department construed the *Nardone* decisions not to prohibit wiretapping itself. As one Attorney General explained:

> The question soon arose as to whether mere interception by federal agents of messages was forbidden by Section 605. The Attorney General [Jackson] at that time took the view that what the law prohibited was *both* interception *and* divulgence, and that mere report of the intercepted message to public officials by FBI or other federal agents did not constitute divulgence.[61]

Attorney General Jackson announced in 1940 that the Justice Department would discontinue wiretapping; he reversed that position, however, two months later, after receiving a confidential memorandum from President Roosevelt, the first such presidential directive in the corpus of Executive precedents cited as authorizing *warrantless* wiretapping. In effect, the memorandum was actually a reaction to the *statutory construction* decision of *Nardone*, not an assertion of presidential immunity from constitutional constraints. Accepting the *Nardone* holding that evidence obtained through wiretaps could not be introduced in criminal prosecutions, President Roosevelt nevertheless did not accept the view that the statute prohibited the wiretapping itself, since he discounted the possibility that any dictum in *Nardone* was intended "to apply to grave matters involving the defense of the nation."

The Roosevelt memorandum clearly related solely to "wiretapping" which, unlike "bugging," was generally accom-

**57.** In 1967 the Supreme Court decided Katz v. United States, *supra* note 54, which overruled *Olmstead* and informed us that "the Fourth Amendment protects people, not places." *See* 389 U.S. at 351, 88 S.Ct. at 511. Legitimate expectations of personal privacy were therefore to be shielded against "the uninvited ear" as well as "the intruding eye." *Id.* at 352, 88 S.Ct. 507.

**58.** Ch. 652, Title VI, § 605, 48 Stat. 1103 (1934), as amended, 47 U.S.C. § 605 (1970).

**59.** *See also, e. g.*, United States v. Coplon, 2 Cir., 185 F.2d 629 (1950), cert. denied, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952).

**60.** For a relatively comprehensive picture of the legislative efforts in this area, *see generally* Theoharis & Meyer, *supra* note 53. *See also* Gasque, *supra* note 53; Rogers, *supra* note 53.

**61.** Brownell, *supra* note 53, at 197. *See also* Donnelly, *supra* note 53, at 800–801.

plished without a physical trespass.[62] Thus neither his memorandum nor those of Presidents Truman and Johnson [63] actually discussed the warrant requirement, since *Olmstead* had rendered the Fourth Amendment inapposite where non-trespassory surveillance was involved. Indeed, presumably because bugging was generally of a trespassory nature and thus subject to Fourth Amendment strictures even before *Katz*, President Johnson's pre-*Katz* memorandum on national security surveillance recognized that "[u]tilization of mechanical or electronic devices to overhear non-telephone conversations is an even more difficult problem [than wiretapping], which raises substantial and unresolved questions of Constitutional interpretation." [64]

■ We need not recount how this practice of presidentially authorized electronic surveillance has grown from a highly circumscribed and infrequently employed device under President Roosevelt [65] to its extensive scope under Presidents Truman and Johnson and its magnitude as an explicitly asserted constitutional exception under Presidents Nixon and Ford.[66] Nor need we maintain that *if* the Supreme Court in *Olmstead* had held the Fourth Amendment applicable to non-trespassory surveillance, prior Presidents would not have claimed a constitutional exception from the warrant requirement. We recount the background of this Executive practice only to refute the argument that it should be viewed as an *affirmative* statement by prior Presidents that they were not subject to the warrant procedure of the Fourth Amendment when they acted for national security purposes. Indeed, there are no similar memoranda from these Presidents advocating unwarranted physical trespasses, to which the Fourth Amendment would have applied.[67] To

62. For a description of "bugging" and "wiretapping" devices, *see, e. g.,* A. Westin, Privacy and Freedom 73–78 (Atheneum 1967).

63. *See* Appendix A.

64. *Id.* Apparently despite this recognition that the practice of warrantless trespassory national security surveillance might be unconstitutional, it was engaged in by law enforcement officials during the Johnson Administration. *See* Appendix A (memorandum from Acting Attorney General Clark to all United States Attorneys).

65. For example, President Roosevelt recognized that "under ordinary and normal circumstances," wiretapping should not be employed because "it is almost bound to lead to abuse of civil rights." Yet, faced with impending entry into World War II, he recognized the need to obtain information concerning sabotage and other "fifth column" activities. Nevertheless, he instructed the Attorney General to "limit these investigations so conducted to a minimum and to limit them insofar as possible to aliens." *See* Appendix A. It should also be noted that, in addition to the fact that the Fourth Amendment was not considered applicable to non-trespassory surveillance at the time, aliens were considered to have less than full Fourth Amendment rights. *See, e. g.,* Johnson v. Eisentrager, 339 U.S. 763, 769–772, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). *See also* note 105 *infra.*

66. For details of the expansion of surveillance activities from the Roosevelt to the Johnson Administration, *see, e. g.,* Theoharis & Meyer, *supra* note 53; Comment, *supra* note 53, 17 U.C.L.A.L.Rev. at 1221–1224. As indicated in text, both Presidents to hold office since the *Katz* decision have through their Attorneys General advocated the broadest possible exception to the warrant requirement when internal or national security matters are at issue. *See, e. g.,* brief for the United States in *Keith, supra* note 2; Statement of Attorney General William B. Saxbe on National Security Electronic Surveillance and S.2820 Before the Subcommittee on Criminal Laws and Procedures, Oct. 2, 1974 (Justice Department release); Washington Post, May 19, 1975, at 2, col. 1 (Ford administration asserts that federal agents have right to break into citizen's home without a warrant and search for items that might be used in foreign espionage or intelligence cases).

67. Nor is it likely that any court would have accepted the argument that, in the name of national security, officials of the Executive Branch could break and enter a home and rummage through books and papers without prior judicial approval. For the Fourth Amendment was specifically propounded and ratified with the memory of Wilkes v. Wood, 98 Eng.Rep. 768 (1763), and Entick v. Carrington, 95 Eng.Rep. 807 (1765), in mind. *See generally* Boyd v. United States, 116 U.S. 616, 624–630, 6 S.Ct. 524, 29 L.Ed. 746 (1886) (discussing the English and American abuses

be sure, the Executive Branch and its law enforcement agencies had become accustomed to conducting non-trespassory electronic surveillance unhampered by prior judicial scrutiny; it was therefore expedient to argue for a constitutional exception once *Katz* eliminated the trespassory/non-trespassory distinction in Fourth Amendment doctrine. However, even if we ignore the fact that expediency is no soil in which to root a constitutional doctrine, we must still stress the fact that support for a constitutional exception simply cannot be derived from Executive actions that solely concerned statutory matters and whose evolution was based on considerations other than the Fourth Amendment and the proper means of effectuating its guarantees.

### 2.

The second type of precedential authority relied on to justify warrantless national security surveillances is comprised of Supreme Court decisions not implicating the Fourth Amendment but relating to the President's broad powers over the conduct of foreign affairs. A very brief survey of these cases will reveal that they may be roughly divided into three overlapping subclasses: (1) cases finding that our "political" relations with foreign governments are non-justiciable; (2) cases recognizing that the President has certain "inherent" powers in the field of foreign affairs which are not dependent upon congressional authorization; and (3) cases recognizing an evidentiary privilege shielding information pertaining to military or diplomatic secrets from disclosure in open court. It will be seen that despite broad dicta in some of these cases, none stands for the proposition that the Executive Branch is immune from constitutional strictures in

---

which led to enactment of the Fourth Amendment). *See also* J. Landynski, Search and Seizure and the Supreme Court 28–48 (1966); N. Lasson, The History and Development of the *Fourth Amendment* to the U. S. Constitution 43–78 (1937). The *Boyd* Court indicated that the Founders would have been particularly acquainted with *Carrington*, "this monument of English freedom, * * * the true and ultimate expression of constitutional law." 116 U.S. at 626, 6 S.Ct. at 530. *Carrington* was an action in trespass occasioned when the Earl of Halifax, a British Secretary of State and Lord of the Privy Council, sent his personal messengers, under color of a purely executive warrant issued by Halifax in the King's name, to invade the studies of Entick and other political dissidents in search of papers which could be used as proof of the crime of seditious libel. Although "at different times from the time of the Revolution to this present time, the like warrants with that issued against the plaintiff, have been frequently granted by the Secretaries of State," 95 Eng.Rep. at 810, Lord Camden unequivocally repudiated the practice:

> [W]e can safely say there is no law in this country to justify the defendants in what they have done; if there was, it would destroy all the comforts of society * * *. It must have been the guilt or poverty of those upon whom such warrants have been executed, that deterred or hindered them from contending against the power of a Secretary of State and the Solicitor of the Treasury, or such warrants could never have passed for lawful till this time.

*Id.* at 817–818. Lord Camden considered seditious libel an "evil" which might "prove fatal to liberty, destroy Government and introduce anarchy," 95 Eng.Rep. at 818; in 18th century England, such libels were considered substantial threats to national security. Against such a background, it is understandable that Executives in this country did not assert any prerogative to rummage through the books, papers, and other effects of dissidents in the United States based on an Executive determination that they posed a threat to national security. However, it is difficult to see why such a prerogative should not exist if the Executive Branch is permitted to conduct non-trespassory electronic surveillance without a warrant. For once *Katz* rendered such surveillance subject to Fourth Amendment strictures, there was no reason to allow an Executive exception to the warrant requirement in non-trespassory searches and seizures but not in trespassory searches and seizures. Given the fact that warrantless trespassory searches were the "hard core" Executive abuses which the Fourth Amendment was designed to proscribe, *see, e. g., Keith, supra* note 2, 407 U.S. at 313, 92 S.Ct. 2125, and the fact that *Katz* abrogated the *trespassory/non-trespassory* line as a viable criterion for categorizing Executive actions for Fourth Amendment purposes, we believe it is more in keeping with the spirit and purpose of the Fourth Amendment to close areas of assertedly nonreviewable Executive prerogative rather than to retreat in doctrinal areas which have been settled since the Amendment was first promulgated. *See generally supra*, 170 U.S.App.D.C. at —— ——, 516 F.2d at 611–614; *infra*, 170 U.S.App.D.C. at —— ——, 516 F.2d at 628–633. *See also*

the conduct of the nation's foreign affairs. Indeed, after discussing these cases we will scrutinize a separate line of cases which has clearly subjected the Executive Branch to the normal system of constitutional checks and balances, and which has clearly indicated the limited ability of the President to justify actions taken in the United States on the basis of conditions abroad or relations with foreign powers.

■■■ The paradigmatic case of the first subclass of precedents concerning the President's conduct of foreign affairs is United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937), which appellees cite for the broad proposition that "the conduct of foreign relations was committed by the Constitution to the political departments of the government, and the propriety of what may be done in the exercise of this political power [is] not subject to judicial inquiry or decision." *Id.* at 328, 57 S.Ct. at 760, *quoted in* brief for appellees at 23. *See also* Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918); United States v. Pink, 315 U.S. 203, 222–223, 229, 62 S.Ct. 552, 86 L.Ed. 796 (1942). This language should

not, however, be divorced from its factual predicates. *Belmont, Pink,* and *Oetjen* were all basically "act of state" cases,[68] and the sole presidential decision that was given conclusive force concerned who was to be considered the lawful sovereign of the foreign power. Once the legitimate sovereign is determined, the act of state doctrine precludes *his* acts from being reexamined by the courts of another sovereign state.

In *Oetjen,* which only involved the "action, in Mexico, of the legitimate Mexican government when dealing with a Mexican citizen," 246 U.S. at 303, 38 S.Ct. at 311, this doctrine disposed of the case.[69] However, in *Belmont* and *Pink,* which involved an Executive agreement accepting the assignment to the United States of Russia's claims against property nationalized pursuant to a decree by the Russian government, objections were raised that the nationalization violated our Constitution. Although acknowledging the Executive's power to negotiate and finalize the agreement, the Court nevertheless addressed the constitutional validity of the Soviet expropriation. In *Belmont* the Court held that the Constitution has no extraterritorial effect, except with respect to United States citi-

United States v. United States District Court, *supra* note 47, 444 F.2d at 665.

**68.** The act of state doctrine is essentially a doctrine which provides that the acts of a foreign sovereign are not subject to review in the courts of another sovereign and must be presumed to be valid. *See, e. g.,* Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897); Ricaud v. American Metal Co., 246 U.S. 304, 309, 38 S.Ct. 312, 62 L.Ed. 733 (1918); First National City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 763, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972); H. Steiner & D. Vagts, Transnational Legal Problems 587–588 (1968). However, rather than declining jurisdiction, a court is supposed to exercise its jurisdiction and decide a case on the merits, after according the foreign act an irrebuttable presumption of legality. *See, e. g.,* Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 471–472, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964).

**69.** The *Oetjen* case was a suit in replevin for a large consignment of hides. In deciding the case the Court emphasized the act of state

doctrine, which rests on "considerations of international comity and expediency. To permit the validity of the acts of one sovereign State to be reexamined and perhaps condemned by the courts of another would certainly 'imperil the amicable relations between governments and vex the peace of nations.' * * * The remedy of the former owner [of the confiscated hides] * * * must be found in the courts of Mexico or through the diplomatic agencies of the political department of our Government." 246 U.S. at 304, 38 S.Ct. at 311.

It should be noted that in talking of the "political" branches of the Government *Oetjen* was referring to *both* the Executive and the Legislative Branches. *See id.* at 302, 38 S.Ct. 309. Indeed, most of the cases containing broad dicta concerning presidential power over the conduct of foreign affairs involved Executive action pursuant to congressional authorization. · *See infra,* 170 U.S.App.D.C. at ——–— & note 70, 516 F.2d at 621–623 & note 70.

zens, 301 U.S. at 332, 57 S.Ct. 758, and in *Pink* the Court held that the Fifth Amendment does not bar the federal government from giving priority to its own claims and those of its nationals as opposed to those of foreign creditors. 315 U.S. at 228, 62 S.Ct. 552. Thus viewed, the language quoted from these cases can be seen to be of limited value when a court is faced with the constitutional validity of actions undertaken domestically, even if in furtherance of the President's foreign affairs powers.

The paradigmatic case of the second subclass of precedents concerning the President's conduct of foreign affairs is United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), which held that, because they are of different origin and nature, the federal government's domestic and foreign powers are of a very different scope:

> The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect of our internal affairs. * * *
>
> \* \* \* \* \* \*
>
> Not only, as we have shown, is the federal power over external affairs in origin and essential character different from that over internal affairs, but participation in the exercise of the power is significantly limited. In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation. * * *

\* \* \* \* \* \*

\* \* \* [H]e, not Congress, has the better opportunity of knowing the conditions which prevail in foreign countries, and especially is this true in time of war. He has his confidential sources of information. He has his agents in the form of diplomatic, consular and other officials. Secrecy in respect of information gathered by them may be highly necessary, and the premature disclosure of it productive of harmful results.

*Id.* at 315–320, 57 S.Ct. at 219, *quoted in* United States v. Butenko, 3 Cir., 494 F.2d 593, 602 n.36, cert. denied, sub nom. Ivanov v. United States, 419 U.S. 881, 95 S.Ct. 147, 43 L.Ed.2d 121 (1974). Although *Curtiss-Wright* certainly supports the contention that the President's powers are not limited to those specifically enumerated in the Constitution, it is inapposite to the question of how those powers are to be reconciled with the mandate of the Fourth Amendment. For as the *Curtiss-Wright* Court itself recognized, "like every other governmental power, [the President's plenary power over foreign relations] *must be exercised in subordination to the applicable provisions of the Constitition.*" 299 U.S. at 320, 57 S.Ct. at 221 (emphasis added). Moreover, it must be remembered that although the Court recognized a core of inherent presidential power not dependent upon legislative authorization, *see id.*, the question actually presented in *Curtiss-Wright* was the constitutionality of a *congressional delegation of power* to the President, that is, whether a congressional resolution granting the President authority to prohibit arms shipments to an area of armed conflict vested him with an excess of discretion.[70]

---

**70.** In Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635–638, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (concurring opinion), Mr. Justice Jackson propounded his well known schema for categorizing situations in which the constitutionality of Executive action is challenged. He observed that presidential power is at a maximum when action is taken pursuant to express or implied congressional authorization, and he noted that it "is in this class of cases that we find the broadest recent statements of presidential power * * *. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, [57 S.Ct. 216, 221, 81 L.Ed. 255], involved, not the question of the President's power to act without congressional authority, but the question of his right to act under and in accord with an Act of Congress." 343 U.S. at 635–636 n.2, 72 S.Ct. at 870.

Indeed, the dicta as to the need for secrecy of information were uttered in the context of the reasonableness of "congressional legislation which is to be made effective through negotiation and inquiry." *Id.* Finally, unlike the domestic searches and seizures conducted in this case, the legislation in *Curtiss-Wright* was "intended to affect a situation in a foreign territory," *id.* at 321, 57 S.Ct. at 221; *Curtiss-Wright,* like all other "presidential power" cases, simply did not address the manner in which the President's foreign affairs powers are to be accommodated with the Fourth Amendment's dictates.[71]

Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948), similarly recognized that the President possesses in his own right certain powers with respect to foreign affairs.[72] In construing the judicial review provision of the Civil Aeronautics Act, 49 U.S.C. § 646,[73] not to authorize review of those orders, which are subject to approval by the President, concerning applications by citizen carriers to engage in overseas and foreign air transportation, Mr. Justice Jackson, writing for a sharply divided Court, penned an extensive passage which has often been cited or quoted as supporting the President's power to engage in warrantless national security surveillance. *See* United States v. Brown, 5 Cir., 484 F.2d 418, 426 (1973); United States v. Clay, 5 Cir., 430 F.2d 165, 171 (1970) (alternative holding), *reversed on other grounds,* 403 U.S. 698, 91 S.Ct. 2068, 29 L.Ed.2d 810 (1971); United States v. Smith, C.D.Cal., 321 F.Supp. 424, 426 (1971) (dictum); United States v. Butenko, D.N.J., 318 F.Supp. 66, 72 (1970), affirmed, 3 Cir., 494 F.2d 593, cert. denied, 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974). Mr. Justice Jackson proclaimed:

> The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world. It would be intolerable that courts, without the relevant informa-

---

71. For an excellent exegesis of the *Curtiss-Wright* opinion in light of the text of the Constitution and the history of its adoption, *see generally* United States v. Butenko, *supra* note 14, 494 F.2d at 630–637 (Gibbons, J., dissenting). Judge Gibbons, faced with the assertion that the President is immune from the warrant requirement when foreign affairs intelligence information is sought, carefully traced the manner in which the prerogatives of the British kings were dispersed among the several branches of our government, and concluded that there is no historical support for the contention that the President is not subject to the traditional system of constitutional checks and balances merely because foreign relations are implicated. Although the majority of the *Butenko* court also nominally accepted the proposition that, although the "expansive language of [*Curtiss-Wright*] provides support for the contention that the President is authorized to act unencumbered by the Fourth Amendment requirements of prior judicial approval and probable cause when he is dealing with national security matters, * * * customary Fourth Amendment analysis is [not] to be abandoned," 494 F.2d at 602, its reasoning was inconsistent with that proposition. *See infra,* 170 U.S.App.D.C. at —— & note 120, 516 F.2d at 639–641 & note 120.

72. *See also* Cafeteria & Restaurant Workers Local 473 v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), which recognized that, as Commander-in-Chief of the Armed Forces, the President is invested with broad powers to regulate access to military installations. Although the five-Justice majority in that case sustained the determination of a naval gun factory's security officer that a cook at the factory's cafeteria must be excluded as a security risk, it then addressed what it considered to be the separate question whether such a determination had to be preceded by notice and an opportunity to be heard. And although the majority concluded that the Fifth Amendment was not transgressed by the summary determination under the circumstances of that case, it is important to note that the decision was based on an assessment of what the Fifth Amendment required; the Court did not presume that the existence of legitimate presidential power itself foreclosed an inquiry into the manner in which it was to be implemented.

73. Act of June 23, 1938, ch. 601, title X, § 1006, 52 Stat. 1024 (now 49 U.S.C. § 1486 (1970)).

tion, should review and perhaps nullify actions of the Executive taken on information properly held secret. Nor can courts sit *in camera* in order to be taken into executive confidences. But even if courts could require full disclosure, the very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry. * * *

333 U.S. at 111, 68 S.Ct. at 436.

It is important to recognize that this declaration was made in the context of determining congressional intent for purposes of construing the judicial review provisions of the Civil Aeronautics Act; indeed, the actual decision in *Waterman*, based as it was on statutory construction, has been considerably eroded since 1948.[74] We thus do not find the above dicta conclusive as to the justiciability of presidential actions when a constitutional provision is at issue. Even Justice Jackson did not hesitate, only four years after authoring the *Waterman* opinion, to hold President Truman's seizure of domestic steel mills unconstitutional, despite its claimed necessity for preservation of national security during wartime. *See* Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 634, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (concurring opinion). Dismissing *Waterman* as an example of the "wide definition of presidential pow-

ers under statutory authorization," *see id.* at 636 n.2, 72 S.Ct. at 871, he warned:

> [N]o doctrine that the Court could promulgate would seem to me more sinister and alarming than that a President whose conduct of foreign affairs is so largely uncontrolled, and often even is unknown, can vastly enlarge his mastery over the internal affairs of the country by his own commitment of the Nation's armed forces to some foreign venture.

*Id.* at 642, 72 S.Ct. at 873. Since the national security claim in *Youngstown* was based on armed conflict, the direst action involving foreign affairs, it is doubtful that the Justice would have approved such an expansion of powers over internal affairs, which are inevitably involved in every wiretap situation, merely upon the President's assertion that his "conduct" of foreign policy is affected.

Similarly, we see no reason to take the *Waterman* dicta as a Supreme Court statement that any issue that touches foreign affairs is to be immunized from judicial review, particularly when there are strong countervailing constitutional interests that merit judicial protection. Indeed, the Supreme Court has itself recognized that

> [t]here are sweeping statements to the effect that all questions touching foreign relations are political questions. * * * Yet it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance. Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and the possible consequences of judicial action.

---

**74.** *See generally* Pan American World Airways, Inc. v. CAB, 129 U.S.App.D.C. 159, 167–169, 392 F.2d 483, 491–493 (1968); Miller, The Waterman Doctrine Revisited, 54 Geo.L.J. 5 (1965).

Baker v. Carr, 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).[75] As the *Keith* Court realized, the decision whether a citizen's privacy may constitutionally be invaded is not a "political" question similar to such questions as who should receive an overseas air route or who is the lawful sovereign of a foreign country; rather, it is a question of providing a bulwark against Executive excess, a task which the Fourth Amendment deliberately allocated to the neutral officials of the judiciary.[76] Moreover, as we will elaborate extensively below, we do not understand why a court cannot sit *in camera* to receive enough information to determine the legitimacy of Executive requests for authorization to conduct electronic surveillance. No one seriously contends that some degree of *in camera* judicial review of the same information would be impermissible in the context of a *post hoc* criminal prosecution based on evidence derived from such surveillance, and the Supreme Court has itself authorized *in camera* determinations of the validity of asserted Executive privilege with respect to evidence which might reveal military or diplomatic secrets.[77] More particularly, the Supreme Court has already directed lower courts to assess the legality under the Fourth Amendment of foreign security wiretaps, and has given no indication whatever that such a task is nonjusticiable.[78] Finally, to the extent Executive determinations in the area of foreign relations merit judicial deference or are based on confidential or sensitive information, the judiciary could fashion the standard of probable cause to account for any lack of expertise on its part and to accommodate the need to maintain such confidences as the identity of Government agents and the reasons underlying an Executive decision to pursue a particular foreign policy.[79]

75. The *Baker* Court, recognizing that there must be a more refined concept of what foreign affairs activities are so "political" as to be nonjusticiable, continued:

> While recognition of foreign governments so strongly defies judicial treatment that without executive recognition a foreign state has been called "a republic of whose existence we know nothing," and the judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory, once sovereignty over an area is politically determined and declared, courts may examine the resulting status and decide independently whether a statute applies to that area. Similarly, recognition of belligerency abroad is an executive responsibility, but if the executive proclamations fall short of an explicit answer, a court may construe them seeking, for example, to determine whether the situation is such that statutes designed to assure American neutrality have become operative. *The Three Friends*, 166 U.S. 1, 63, 66. Still again, though it is the executive that determines a person's status as representative of a foreign government, *Ex parte Hitz*, 111 U.S. 766, the executive's statements will be construed where necessary to determine the court's jurisdiction, *In re Baiz*, 135 U.S. 403. Similar judicial action in the absence of a recognizedly authoritative executive declaration occurs in cases involving the immunity from seizure of vessels owned by friendly foreign governments. Compare *Ex parte Peru*, 318 U.S. 578 [63 S.Ct. 793, 87 L.Ed. 1014], with Mexico v. Hoffman, 324 U.S. 30, 34–35.

Baker v. Carr, 369 U.S. 186, 212–213, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (footnotes omitted). *See also*, e. g., Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964). And the more directly "foreign" actions affect domestic activities protected by the Bill of Rights, the more urgent is the need *for judicial oversight, see infra*, 170 U.S.App. D.C. at ———, ———, 516 F.2d at 625–627, 633–636, particularly when the actions have not been authorized by Congress and are not so public as to permit informed scrutiny and review through the political process. *Cf.* Karst & Horowitz, Presidential Prerogative and Judicial Review, 22 U.C.L.A.L. Rev. 47, 59 (1974).

76. *See note 36 supra*; 170 U.S.App.D.C. at ——— & note 96, 516 F.2d at 633–634 & note 96.

77. *See infra*, 170 U.S.App.D.C. at ———, 516 F.2d at 625–626.

78. *See*, e. g., Alderman v. United States, *supra* note 14; notes 14 & 37 *supra*. Indeed, even the language of Katz v. United States, *supra* note 54, *quoted supra*, 170 U.S.App.D.C. at ———, 516 F.2d at 611, *which first indicated the possibility of a national security surveillance exception to the warrant requirement*, also appeared to contemplate some form of judicial review of such surveillance.

79. *See*, e. g., Keith, *supra* note 2, 407 U.S. at 322–323, 92 S.Ct. 2125; Camara v. Municipal Court, 387 U.S. 523, 534–535, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *infra*, 170 U.S.App.D.C. at ———, ———, 516 F.2d at 642–646, 656–657.

'The paradigmatic case of the third and final subclass of precedents concerning the President's conduct of foreign affairs is found in dicta in the recent decision of United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), which reaffirmed the *evidentiary* privilege of the Executive Branch with respect to production of documents whose publication could endanger military or diplomatic secrets. *See also* United States v. Reynolds, 345 U.S. 1, 7–11, 73 S.Ct. 528, 97 L.Ed. 727 (1953); Nixon v. Sirica, 159 U.S.App.D.C. 58, 71, 79, 487 F.2d 700, 713, 721 (1973).[80] Although quoting the *Waterman* statement concerning judicial nullification of Executive action based on confidential information, *see* 418 U.S. at 710, 94 S.Ct. at 3107–3110, and although it was abundantly clear that, if the legitimacy of an asserted privilege could be determined without an *in camera* inspection, such an inspection should not be ordered,[81] the *Nixon* Court reiterated the longstanding judicial position that the applicability of any privilege is

**80.** This evidentiary privilege was foreshadowed as early as 1875, when the Supreme Court unanimously recognized the President's foreign intelligence gathering powers, finding that President Lincoln "was undoubtedly authorized during the [Civil] war, as commander-in-chief of the armies of the United States, to employ secret agents to enter the rebel lines and obtain information respecting the strength, resources, and movements of the enemy." Totten v. United States, 92 U.S. (2 Otto) 105, 106, 23 L.Ed. 605 (1875). *See also* United States v. Reynolds, 345 U.S. 1, 7 nn.11–15, 73 S.Ct. 528, 97 L.Ed. 727 and sources cited therein (1953). In *Totten* the Supreme Court affirmed dismissal by the Court of Claims of an action brought for compensation for services allegedly rendered by the claimant's intestate under a contract with President Lincoln for gathering such secret information. Although this case is cited as justifying the need for secrecy of Executive action, and thus the necessity of avoiding prior judicial review, the Court's reasoning belies such an assertion. In effect, the Court merely determined that the contract for the spying mission of necessity contained an implied covenant of secrecy and that suit on the contract would itself constitute a breach justifying denial of any relief:

> It may be stated as a general principle, that public policy forbids the maintenance of any suit in a court of justice, the *trial* of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated. On this principle, suits cannot be maintained which would require a disclosure of the confidences of the confessional, or those between husband and wife * * *. Much greater reason exists for the application of the principle to cases of contract for secret services with the government, as the existence of a contract of that kind is itself a fact not to be disclosed.

92 U.S. (2 Otto) at 107 (emphasis added). The emphasis on exposure through a trial mechanism has been reiterated in the later opinions discussed in text. However, these later cases clarify the fact that it is *public* disclosure which is to be avoided; of necessity, *in camera* judicial inspection will often be imperative if a judge is to fulfill his own constitutional obligations.

**81.** It may be possible to satisfy the court, from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged. When this is the case, the occasion for the privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers.

United States v. Reynolds, *supra* note 80, 345 U.S. at 10, 73 S.Ct. at 533, *quoted approvingly in* United States v. Nixon, *supra* note 7, 418 U.S. at 711, 94 S.Ct. at 3109. There was no question, however, that the determination whether privileged information was involved was to be made by the trial court, which could presumably require an *in camera* showing if necessary to make that determination. The quoted passage was preceded by the warning:

> *Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers.* Yet we will not go so far as to say that the court may *automatically* require a complete disclosure to the judge before the claim of privilege will be accepted in any case.

345 U.S. at 9–10, 73 S.Ct. at 533 (emphasis added). Thus the principle of *Reynolds* was not that military or diplomatic information may not be reviewed by a trial judge, but that a trial judge should not *unnecessarily* require disclosure in situations where he is satisfied, based on other information, that the documents requested should in fact be accorded a privileged status. A similar function of preventing Executive abuses while accommodating legitimate intelligence gathering needs is of course served by a judge in an *in camera* and *ex parte* warrant proceeding.

undeniably a question for the courts to decide:

> Since this Court has consistently exercised the power to construe and delineate claims [of the Legislative or Executive Branches] arising under express powers, it must follow that the Court has authority to interpret claims with respect to powers alleged to derive from enumerated powers.

418 U.S. at 704, 94 S.Ct. at 3105.[82] The role of the judiciary and the propriety of judicial scrutiny of documents allegedly pertaining to national security were also evident in the procedure mandated by the Court:

> When the subpoenaed material is delivered to the District Judge *in camera* questions may arise as to the excising of parts [on the basis of military or diplomatic privilege] and it lies within the discretion of that court to seek the aid of the Special Prosecutor and the President's counsel for *in camera* consideration of the validity of particular excisions, whether the basis of excision is relevancy or admissibility or [*sic*] under such cases as *Reynolds, supra,* or *Waterman Steamship, supra.*

418 U.S. at 715 n.21, 94 S.Ct. at 3111 n.21.[83]

■ This brief survey of the types of cases which have acknowledged, either in holding or in dictum, the vast scope of Executive power in the domain of foreign relations should clarify any misconception that they render that power exempt from judicial review or immune to constitutional limitations. Indeed, there is another series of cases which graphically establishes the limits on presidential power when national security is used as a talisman to invoke extraordinary powers in the conduct of domestic affairs. Probably the most celebrated decision holding executive action unconstitutional is Youngstown Sheet & Tube

Co. v. Sawyer, *supra,* previously referred to with respect to Mr. Justice Jackson's concurrence, which found that President Truman's order directing the Secretary of Commerce to seize and operate most domestic steel mills, in order to avert a nationwide steel strike that the President believed would threaten the national defense, was without statutory or constitutional basis. The case posed the question of inherent Executive power in stark form, since the Korean conflict exacerbated the potential consequences of any steel strike:

> The indispensability of steel as a component of substantially all weapons and other war materials led the President to believe that the proposed work stoppage would immediately jeopardize our national defense and that governmental seizure of the steel mills was necessary in order to assure the continued availability of steel.

343 U.S. at 583, 72 S.Ct. at 865. Although the President asserted that he had inherent power, under the aggregate of his constitutional powers as Commander-in-Chief of the Armed Forces and as the nation's Chief Executive, to avert the "national catastrophe" which would result from such a work stoppage, *see id.* at 582, 584, 72 S.Ct. 863, a majority of the Court did not hesitate to rule that, under the circumstances of the case, the exercise of his asserted power was unconstitutional. And although *Youngstown* involved the question of the Executive's usurpation of legislative power without congressional authorization, an analogous problem is presented when the President attempts to usurp the judiciary's traditional and constitutional role of giving prior approval to searches and seizures that need not be immediately undertaken due to exigent circumstances.

A plethora of other cases have similarly recognized constitutional limits on the

---

**82.** *See also* note 7. *supra.*

**83.** *See also, e. g.,* Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C.

385, 390–392 & n.12, 463 F.2d 788, 793–795 & n.12 (*per curiam*), *application for injunction in aid of jurisdiction denied,* 404 U.S. 917, 92 S.Ct. 242, 30 L.Ed.2d 191 (1971).

President's powers as Commander-in-Chief or as the nation's spokesman in the arena of foreign affairs. The Supreme Court has indicated that "even the war power does not remove constitutional limitations safeguarding essential liberties," Home Building & Loan Assn. v. Blaisdell, 290 U.S. 398, 426, 54 S.Ct. 231, 235, 78 L.Ed. 413 (1934) (dictum), and that, despite allegations that a newspaper's "publication of [the contents of a classified study recounting the history of American decision-making on Vietnam policy] should be restrained because it would gravely prejudice the defense interests of the United States," see United States v. Washington Post Co., 144 U.S. App.D.C. 326, 327, 446 F.2d 1327, 1328 (en banc) (per curiam), affirmed, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), the Government had not overcome the First Amendment's presumption against imposition of prior restraints. See New York Times Co. v. United States, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam);[84] cf. United States v. Robel, 389 U.S. 258, 263, 88 S.Ct. 419, 420, 19 L.Ed.2d 508 (1967) ("the phrase 'war power' cannot be invoked as a talismatic incantation to support any exercise of congressional power which can be brought within its ambit"). The Court has also refused to allow the Executive to ignore constitutional strictures during wartime. See, e. g., Duncan v. Kahanamoku, 327 U.S. 304, 66 S.Ct. 606, 90 L.Ed. 688 (1946) (substitution of military law for civilian process unconstitutional despite allegation that Hawaii was in danger of attack and martial law was

necessary); Ex parte Milligan, 71 U.S. (4 Wall.) 2, 121, 18 L.Ed. 281 (1866) (President cannot impose martial law on civilians, thereby suspending the Sixth Amendment right to jury trial, "where the courts are open and their process unobstructed"); Mitchell v. Harmony, 54 U.S. (13 How.) 115, 134, 14 L.Ed. 75 (1852) (compensation under the Fifth Amendment would be required even if private property were lawfully destroyed by military officers to keep it from falling into enemy hands); cf., e. g., Reid v. Covert, 354 U.S. 1, 5, 17, 77 S.Ct. 1222, 1230, 1 L.Ed.2d 1148 (1957) (plurality opinion) (military trial of civilian dependents abroad unconstitutional, since the "prohibitions of the Constitution were designed to apply to all branches of the National Government and they cannot be nullified by the Executive or by the Executive and the Senate combined"); Ex parte Merryman, 17 Fed. Cas. No. 9487, p. 144 (C.C.Md.1861) (Taney, C. J.) (President cannot suspend the writ of habeas corpus). But cf. Hirabayashi v. United States, 320 U.S. 81, 92, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943) (constitutional for Congress and Executive, acting together, to order internment of United States citizens of Japanese ancestry as an emergency war measure). In light of these cases, which unqualifiedly subject the President to constitutional limitations,[85] we must undertake an analysis of whether the Fourth Amendment mandates that the President must in fact submit his national security wiretapping installations to prior judicial approval.

---

84. See also New York Times Co. v. United States, supra note 2, 403 U.S. at 716, 91 S.Ct. at 2142 (Black, J., concurring):

> [T]he Solicitor General argues and some members of the Court appear to agree that the general powers of the Government adopted in the original Constitution should be interpreted to limit and restrict the specific and emphatic guarantees of the Bill of Rights adopted later. I can imagine no greater perversion of history.

85. .See also Keith, supra note 2, 407 U.S. at 312–315, 92 S.Ct. 2125; United States v. Bu-

tenko, supra note 14, 494 F.2d at 634–635 (Gibbons, J., dissenting); Note, Foreign Security Surveillance and the Fourth Amendment, 87 Harv.L.Rev. 976, 978–979 (1974) ("Though [foreign affairs] powers may exist in the executive independently of express constitutional or legislative delegation to a greater extent than do other executive powers, there is no support in the Constitution for the proposition that the fourth amendment, ostensibly a general limitation on otherwise legal governmental activity, applies any less fully to one set of powers than to another."); Comment, supra note 53, 17 U.C.L.A.L.Rev. at 1239.

## B.

⬛ The Fourth Amendment guarantees one of our "indispensable freedoms," [86] the right to be free from unreasonable searches and seizures. Its dictates are simple:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

In its brief to this court arguing that warrantless electronic surveillance conducted pursuant to the President's foreign affairs powers does not violate the strictures of this Amendment, the Government [87] in effect continues to advance [88] a theory of the Fourth Amendment that the Supreme Court has consistently discredited: that "[t]he relevant test is not whether it [was] reasonable to procure a search warrant, but whether the search was reasonable." [89] We are

---

**86.** Shortly after his return from the Nuremberg trials, Mr. Justice Jackson wrote of the great import of Fourth Amendment values:

These [Fourth Amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.

Brinegar v. United States, 338 U.S. 160, 180, 69 S.Ct. 1302, 1313, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting), quoted approvingly in Almeida-Sanchez v. United States, 413 U.S. 266, 274, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973).

**87.** In the course of this opinion we will often refer to appellees as "the Government" or "the Executive Branch." The suit was instituted against Mr. Mitchell while he was still Attorney General of the United States and is premised on actions he took as Attorney General pursuant to the alleged prerogatives of the President in the field of foreign affairs. As Attorney General Mr. Mitchell had the duty to advise the President concerning questions of law such as those involved in this case, see 28 U.S.C. § 511 (1970), to conduct litigation to which an officer of the United States was a party, see 28 U.S.C. §§ 516, 519 (1970), and to attend to the interests of the United States in any court proceeding, see 28 U.S.C. § 517 (1970). Moreover, even after Mr. Mitchell resigned as Attorney General his successor was responsible for defending this civil suit based on his official actions, see 28 U.S.C. § 2679 (1970). Indeed, the Assistant Attorney General and attorneys from the Justice Department are representing appellees, and we presume their arguments as to the legality of warrantless national security wiretapping conducted pursuant to the President's foreign affairs powers would be no different if the United States were a named party in this proceeding.

**88.** For example, such an argument was advanced by the Government and rejected by the Supreme Court in Keith, supra note 2. See 407 U.S. at 315–316 & n.16, 92 S.Ct. 2125. See also, e. g., United States v. Smith, C.D. Cal., 321 F.Supp. 424, 427 (1971).

**89.** Appellees assert that we must determine whether the surveillance was reasonable "Upon The Facts And Circumstances Necessitating The Surveillance Of The Office Of The Jewish Defense League." Brief for appellees at 21. See also id. at 8, 25–27. Keith emphatically rejected this approach to the Fourth Amendment in the context of national security surveillance:

Though the Fourth Amendment speaks broadly of "unreasonable searches and seizures," the definition of "reasonableness" turns, at least in part, on the more specific commands of the warrant clause. Some have argued that "[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable," United States v. Rabinowitz, 339 U.S. 56, 66 (1950).[16] This view, however, overlooks the second clause of the Amendment. The warrant clause of the Fourth Amendment is not dead language.

[16] This view has not been accepted. In Chimel v. California, 395 U.S. 752 (1969), the Court considered the Government's contention that the search be judged on a general "reasonableness" standard without reference to the warrant clause. The Court concluded that argument was "founded on little more than a subjective view regarding the acceptability of certain sorts of police conduct, and not on considerations relevant to Fourth Amendment interests. Under such an unconfined analysis, Fourth Amendment protection in this area would approach the evaporation point." Id., at 764–765.

407 U.S. at 315 & n.16, 92 S.Ct. at 2137. See also, e. g., Almeida-Sanchez v. United States,

advised that we must focus our attention on "the circumstances of this case," brief for appellees at 8; that "the circum-

stances to be weighed by this Court in considering the reasonableness of the conduct of the Executive challenged

*supra* note 86, 413 U.S. at 277, 93 S.Ct. 2535 (Powell, J., concurring); Katz v. United States, *supra* note 54, 389 U.S. at 356–357, 88 S.Ct. 507; Comment, *supra* note 53, 17 U.C.L.A.L. Rev. at 1224–1234. Even if the Supreme Court were to decide that valid considerations dictate that a warrant need not be obtained when the President orders installation of electronic surveillance pursuant to his foreign affairs powers, we presume it would approach the problem from the perspective of whether it is reasonable to except from the warrant procedure the *category* of cases involving that power, rather than whether it was reasonable to conduct a surveillance (with or without a warrant) under the particular circumstances involved in this case. Nevertheless, many courts confronted with the question of the legality of such surveillance have erroneously followed the latter approach. *See infra*, 170 U.S.App.D.C. at —— ——, 516 F.2d at 636–641.

It might be argued that two recent Supreme Court opinions, United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), and United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), have retreated somewhat from the approach to the Fourth Amendment discussed in text below. In *Robinson* the Court held:

> A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.

414 U.S. at 235, 94 S.Ct. at 477. Ignoring the merits of the *Robinson* decision, *compare id.* at 219–237, 94 S.Ct. at 469–477 (majority opinion), *with id.* at 238–259, 94 S.Ct. at 469–488 (Marshall, J., dissenting); *compare* United States v. Robinson, 153 U.S.App.D.C. 114, 119–140, 471 F.2d 1082, 1087–1108 (1972) (en banc) (majority opinion), *with id.*, 153 U.S. App.D.C. at 144–156, 471 F.2d at· 1112–1123 (Wilkey, J., dissenting), we doubt that the Court intended the decision to alter the traditional approach to Fourth Amendment analysis. *See infra*, 170 U.S.App.D.C. at ——, 516 F.2d at 630–633. Rather, the Court appeared to be saying that a search incident to a valid custodial arrest is always justified by the exigent circumstance of potential danger to the arresting officer, and that a case-by-case judi-

cial redetermination of the actual danger is improper. *See* 414 U.S. at 233–235, 94 S.Ct. 467; 153 U.S.App.D.C. at 146–152, 471 F.2d at 1114–1120 (dissenting opinion). Indeed, *Robinson* can be viewed as a converse case to those decisions which hold that, even though a magistrate might have issued a warrant, the warrantless search by a police officer was *per se* unreasonable. Moreover, one of the Justices in the majority attributed the "essential premise" of the decision to the conviction that a person who is lawfully subjected to a custodial arrest "retains no significant Fourth Amendment interest in the privacy of his person," and that the search incident to arrest · therefore requires no additional justification. *See* 414 U.S. at 237, 94 S.Ct. at 494 (Powell, J., concurring). In the surveillance context, however, it is evident that the initial decision to search entails the significant invasion of an expected zone of privacy and thus has the greatest need for antecedent judicial scrutiny.

The *Edwards* case is somewhat more enigmatic since the five-Justice majority referred to a prior case—which sustained the search of an automobile one week after it was seized—as rejecting the argument that "the police could have obtained a search warrant, for the Court held the test to be not whether it was reasonable to procure a search warrant, but ·whether the search itself was reasonable, which it was." 415 U.S. at 807, 94 S.Ct. at 1239, *discussing* Cooper v. California, 386 U.S. 58, 61–62, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). The five-Justice majority in *Cooper*, however, relied on United States v. Rabinowitz, 339 U.S. 56, 66, 70 S.Ct. 430, 94 L.Ed. 653 (1950), for that proposition, *see* 386 U.S. at 62, 87 S.Ct. 788, and the approach of *Rabinowitz* was subsequently explicitly rejected by the Court in Chimel v. California, 395 U.S. 752, 764–765, 768, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). *See* 415 U.S. at 811–812, 94 S.Ct. 1234 (Stewart, J., with whom Douglas, Brennan & Marshall, JJ., joined, dissenting). Although we might agree with the *Edwards* dissenters that the Court's decision was somewhat inconsistent with prior Fourth Amendment doctrine, we do not believe the majority intended to overrule *sub silentio* the basic Fourth Amendment approach which holds that, absent exigent circumstances, a warrantless search is *per se* unreasonable. *See infra*, 170 U.S.App.D.C. at —— & notes 91 & 93, 516 F.2d at 630–633 & notes 91 & 93. For in· holding seizure of the defendant's clothes 10 hours after his arrest to be reasonable even though warrantless, the majority considered the search and seizure to fall within the "search incident" exception, since it found that "the normal processes incident to arrest

herein, are the actions of the Jewish Defense League, directed toward Soviet officials in this country, which were of such a character as to materially effect [*sic*] the relations between this country and the Soviet Union, and which, through the threat of reciprocal action, endangered the lives of American citizens in that country," *id.* at 25–26; that we need not consider the implications of warrantless surveillance on the exercise of First Amendment rights, since "the actions of the Jewish Defense League, which necessitated the surveillance of their organization, simply were *not limited to* the exercise of constitutionally protected speech and conduct," *id.* at 27 (emphasis added); and that the reasonableness of warrantless wiretapping is somehow predetermined by the legitimate need of the Executive Branch to acquire information, *see generally id.* at 21–32. These are all erroneous contentions. Unfortunately, in their zeal to present a favorable facade of justifications for these surveillances, appellees have only superficially addressed the substantial questions concerning the rel-

ative merits and demerits of requiring the Government to proceed by way of the warrant procedure in obtaining necessary foreign intelligence information.[90]

■■■■ Quoting Cady v. Dombrowski, 413 U.S. 433, 439, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973), appellees correctly observe that the "ultimate standard set forth in the Fourth Amendment is reasonableness." Brief for appellees at 25. However, they neglect to quote the immediately following sentence, which represents the proper approach to a Fourth Amendment problem:

> In construing this command [of reasonableness], there has been general agreement that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara v. Municipal Court,* 387 U.S. 523, 528–529 [87 S.Ct. 1727, 1731, 18 L.Ed.2d 930] (1967). See *Coolidge v. New Hampshire,* 403 U.S. 443, 454–455 [91 S.Ct. 2022, 29 L.Ed.2d 564] (1971).[91]

and custody had not been completed when Edwards was placed in his cell." *See* 415 U.S. at 804, 94 S.Ct. at 1237. In effect, the Court cited *Cooper* in the context of arguing that, once the police are justified in conducting a search or seizure, their authority does not evaporate even after passage of a substantial period of time. *See id.* at 805–809, 94 S.Ct. 1234. The dissent primarily objected to characterization of the search as being "incident" to the arrest. *See id.* at 810–811, 94 S.Ct. 1234. But it would appear that such an "exigent circumstances" exception, justified on the basis of police safety, destruction of evidence, or escape of the prisoner, prompted the majority holding, *see id.* at 802–803, 806–809, 94 S.Ct. 1234 (particularly the closing quote from United States v. DeLeo, 1 Cir., 442 F.2d 487, 493 (1970)), and that the majority did not in fact intend to divorce the question of a search's reasonableness from the Fourth Amendment's warrant requirement, except in the traditional category of cases where exigent circumstances are involved. Indeed, the decisive factor in *Edwards*, which distinguishes it from most other Fourth Amendment cases, was probably the fact that the clothes, which were in "plain sight," were themselves evidence of criminal activity. *See* 415 U.S. at 806, 94 S.Ct. 1234.

**90.** Appellees merely refer to the decisions of other courts in support of their position that it is reasonable for the Executive to institute warrantless foreign security wiretaps, *see* brief for appellees at 29–32, but neither those decisions nor appellees in this case discuss actual interests—such as delay, judicial competence, or avoidance of security leaks—which might arguably render the warrant procedure inappropriate where foreign threats to national security are the basis for electronic surveillance. *See infra,* 170 U.S.App.D.C. at —— – ——, 516 F.2d at 633–651.

**91.** *See also, e. g.,* Almeida-Sanchez v. United States, *supra* note 86, 413 U.S. at 280–282, 93 S.Ct. 2535 (Powell, J., concurring); *Keith, supra* note 2, 407 U.S. at 315–316, 318, 92 S.Ct. 2125; Chimel v. California, *supra* note 89, 395 U.S. at 762, 89 S.Ct. 2034; Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Katz v. United States, *supra* note 54, 389 U.S. at 357, 88 S.Ct. 507.

The remainder of appellees' discussion of the proper method of analyzing a Fourth Amendment problem is similarly misleading and erroneous. *See* brief for appellees at 24–25. Appellees quote Terry v. Ohio, *supra*, which qualifiedly approved the police practice of "frisk-

It is of course true, as appellees contend, that "the Fourth Amendment does not prohibit all warrantless searches and seizures." [92] However, the presumption has always been that a warrant should be obtained whenever practicable, and exceptions to the warrant requirement have been based on exigent or other circumstances where delay would frustrate legitimate police activity. Indeed, in *Keith* the Supreme Court recognized that these exceptions "are few in number and carefully delineated." 407 U.S. at 318, 92 S.Ct. at 2137.[93]

ing" individuals who are "stopped" for questioning, for the proposition that

> the central inquiry under the Fourth Amendment [is] the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.

392 U.S. at 19, 88 S.Ct. at 1878, *quoted in* brief for appellees at 25. But the *Terry* Court hastened to limit the scope of its holding:

> We do not retreat from our holdings that the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure, * * * or that in most instances failure to comply with the warrant requirement can only be excused by exigent circumstances * * *. But we deal here with an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure.

392 U.S. at 20, 88 S.Ct. at 1879.

Similarly, appellees cite *Keith* for the proposition that the Fourth Amendment is flexible, requiring that courts "examine [the then competing circumstances] and balance the basic values at stake * * *." Brief for appellees at 25, *quoting* 407 U.S. at 314, 92 S.Ct. 2125 (bracketed language supplied in brief). They then argue this case as if the only circumstances to be considered were those actually involved herein—the actions of the JDL and the responses of the Soviet Union. *Id.* at 25–26; *see supra,* 170 U.S.App.D.C. at ——, 516 F.2d at 627–630. However, the *Keith* Court made it clear that the factors to be balanced were those values implicated by the *category* of cases of which *Keith* was but one example—the duty of the Government to protect the domestic security and the invasion of individual privacy and free expression that might result from abuse of warrantless surveillance, *see* 407 U.S. at 314–315, 92 S.Ct. 2125. What the Court did *not* do was weigh the reasonableness of installing a wiretap under the specific circumstances of that case, where the subject of the wiretap had allegedly bombed a CIA office. *See infra,* 170 U.S.App.D.C. at ——, —— 516 F.2d at 632, 634–635. And, of course, the Court decided that a warrant was in fact required for such surveillance.

Finally, appellees cite Camara v. Municipal Court, *supra* note 79, for the proposition that the Fourth Amendment does not prohibit all searches and seizures based on less than traditional "probable cause." Brief for appellees at 24–25. We recognize this fact, but realize that the Court in *Camara* imposed a warrant requirement; the special governmental interests justifying a search in that case only merited an exception from the strict showing that evidence of a crime would be produced by the search. Similarly in our case, factors which might cause a court to issue a warrant on less than traditional probable cause are not themselves factors which require total abrogation of the warrant procedure for determining if the lowered probable cause standard is actually met. *See infra,* 170 U.S.App.D.C. at ———, ——, 516 F.2d at 644–646, 656–657. *See also* 407 U.S. at 314–323, 92 S.Ct. 2125 (warrant required for domestic security surveillance, although probable cause showing may differ from that in context of "ordinary crime").

**92.** Brief for appellees at 24.

**93.** *See also, e. g.,* Jones v. United States, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958) (exceptions to rule requiring that search warrant be obtained have been "jealously and carefully drawn"); cases cited at note 91 *supra.* As indicated by the quotes from *Camara* and *Keith* in text below, these exceptions are premised on the notion that compliance with the warrant requirement in such circumstances would frustrate the legitimate governmental purpose of an otherwise lawful search; "in general, they serve the legitimate needs of law enforcement officers to protect their own well-being and preserve evidence from destruction." 407 U.S. at 318, 92 S.Ct. at 2137.

One category of cases excepted from the warrant requirement—the "border search"—might, however, seem anomalous and therefore supportive of the view that governmental need might itself justify warrantless searches and seizures. *See also* note 94 *infra.* In Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the first "automobile search" case, the Supreme Court observed in dictum:

> Travellers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as enti-

Thus, although we do not "seriously doubt in this time of serious international insecurity and peril that there is an imperative necessity for obtaining foreign intelligence information, and we do not believe such gathering is forbidden by the Constitution," brief for appellees at 29–30, *quoting* United States v. Clay, *supra*, 430 F.2d at 172, this is but the beginning, not the end, of our inquiry.

The question is not, at this stage at least, whether these inspections may be made, but whether they may be made without a warrant. * * * In assessing whether the public interest demands creation of a general exception to the Fourth Amendment's warrant requirement, *the question is not whether the public interest justifies the type of search in question, but whether the authority to search should be evidenced by a warrant, which in turn depends in part upon whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search.*

Camara v. Municipal Court, 387 U.S. 523, 533, 87 S.Ct. 1727, 1733, 18 L.Ed.2d 930 (1967) (emphasis added). In *Keith*, the Supreme Court reiterated this methodology:

If the legitimate need of Government to safeguard domestic security requires the use of electronic surveillance, the question is whether the needs of citizens for privacy and free expression may not be better protected by requiring a warrant before such surveillance is undertaken. We must also *ask whether a warrant requirement would unduly frustrate the efforts of Government to protect itself from acts of subversion and overthrow directed against it.*

407 U.S. at 315, 92 S.Ct. at 2135 (emphasis added).[94] Similarly, here we must de-

---

tled to come in, and his belongings as effects which may be lawfully brought in. *Id.* at 154, 45 S.Ct. at 285. *See also* Almeida-Sanchez v. United States, *supra* note 86, 413 U.S. at 272–273, 93 S.Ct. 2535. As the *Carroll* Court acknowledged, searches classified as border searches or "functional equivalents" thereof have always been free of both the warrant and the probable cause requirements of the Fourth Amendment. *See, e. g., Almeida-Sanchez, supra,* 413 U.S. at 272–273, 93 S.Ct. at 2536–2540 (majority opinion); *id.* at 288, 291–293, 93 S.Ct. at 2547, 2548–2549 (dissenting opinion); Note, Border Searches and the Fourth Amendment, 77 Yale L.J. 1007 (1968). However, there are several crucial considerations which possibly justify the special treatment for border searches and which differentiate such searches from normal searches governed by the Fourth Amendment or the national security searches involved in this case. First and most important is the fact that a border search is conducted incident to conferral of the privilege of admittance to the country, and it is certain that the subject of the search is in fact receiving that benefit. *Cf.* United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); Colonnade Catering Corp. v. United States, 397 U.S. 72, 76–77, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970). *See also Almeida-Sanchez, supra,* 413 U.S. at 270–272, 93 S.Ct. 2535. In effect, a reasonable border search is "consented" to in order to obtain a benefit that is only to be accorded those who can show that they should gain admittance and who can demonstrate that they are only transporting goods which can lawfully be brought into the country. Moreover, there is little danger of abuse of such searches. *See generally* Note, From Bags to Body Cavities: The Law of Border Search, 74 Colum.L.Rev. 53 (1974) (discussing dangers inherent in extended and intrusive border searches). The whole class of those entering the country is treated fairly homogeneously, inspections take place at identifiable places, over-intrusive searches will be apparent to their subjects and may thus be challenged in court, and there is a minimal invasion of privacy since there is an expectation on the part of those entering that they and their possessions will in all probability be searched to at least some extent. Finally, unlike the national security searches involved in our case, *see infra,* 170 U.S.App.D.C. at ——— ———, 516 F.2d at 633–636, there is no substantial likelihood that border searches will chill the exercise of First Amendment rights.

**94.** *See also* United States v. United States District Court, *supra* note 47, 444 F.2d at 666–667. One seemingly anomalous case which arguably considered the Government's needs determinative of the authority to search is Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), which upheld a New York statute and implementing regulations requiring that welfare recipients either permit home visitations by their case workers or suffer loss of their aid benefits. The divided Court initially held that home visitations were not searches

termine whether a warrant requirement will better protect Fourth Amendment rights when foreign intelligence gathering is involved, and whether such a requirement would unduly fetter the legitimate functioning of the Government. For unless there are valid reasons for abrogating the warrant procedure when foreign relations are implicated, the President must comply with that traditional procedure. We cannot, as appellees and some courts have done, simply ignore that threshold question in determining the reasonableness of searches and seizures carried out in furtherance of the President's responsibilities for protecting the national security from foreign dangers.

### C.

To admit that there is a legitimate need on the part of the Executive Branch to acquire foreign intelligence information for either long- or short-term national security purposes [95] is not, we must repeat, to admit that the locus of initial decision-making power as to the propriety of a particular surveillance should itself rest with the Executive Branch. As the Supreme Court recognized in both *Katz v. United States, supra,* and *Keith,* the Fourth Amendment is a bulwark against unreasonable governmental intrusion by non-trespassory as well as by trespassory means; both the spirit and the history of that Amendment demonstrate that there is a legitimate expectation that one's conversations no less than one's home are to be sheltered by the full panoply of Fourth Amendment safeguards. And of the potential safeguards, "[p]rior review by a neutral and detached magistrate is the time-tested means of effectuating Fourth Amendment rights." *Keith,* 407 U.S. at 318, 92 S.Ct. at 2137.[96]

Prior judicial review is important not only to protect the privacy interests of those whose conversations the Government seeks to overhear, but also to protect free and robust exercise of the First Amendment rights of speech and association by those who might otherwise be chilled by the fear of unsupervised and unlimited Executive power to institute electronic surveillances.[97] As the *Keith* Court stressed:

National security cases * * * often reflect a convergence of First and

---

within the meaning of the Fourth Amendment, since the visits were consented to; a recipient could withhold consent without violating the law, although such action would be at the cost of his welfare benefits. *See id.* at 317–318, 91 S.Ct. 381. *See also* note 93 *supra.* A wiretap, of course, has been conclusively held to be a search and seizure, *see* Katz v. United States, *supra* note 54, and we doubt that that characterization is in any degree dependent upon the type of information sought. As an alternative holding, however, the *Wyman* Court held that, even if the visitation were considered a search, it was not unreasonable under the Fourth Amendment even though warrantless. Since the Court emphasized the peculiar factual situation of the case, *see* 400 U.S. at 318–324, 91 S.Ct. 381, and since *Keith* and subsequent cases have adhered to traditional Fourth Amendment analysis without feeling constrained to discuss *Wyman,* we believe the Court either considers the first alternative holding to be the actual basis for the opinion, or else has merely limited *Wyman* to its particular factual context.

**95.** At the risk of repetition, we· must emphasize that we are not today deciding any of the

delicate and, we believe, exceedingly difficult questions concerning the exact scope of the President's substantive powers in the information gathering field.

**96.** *See also, e. g.,* Coolidge v. New Hampshire, 403 U.S. 443, 449, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Katz v. United States, *supra* note 54, 389 U.S. at 356–357, 88 S.Ct. 507; Wong Sun v. United States, 371 U.S. 471, 481–482, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Johnson v. United States, 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

The Fourth Amendment contemplates a prior judicial judgment, not the risk that executive discretion may be reasonably exercised. This judicial role accords with our basic constitutional doctrine that individual freedoms will best be preserved through a separation of powers and division of functions among the different branches and levels of Government.

*Keith, supra* note 2, 407 U.S. at 317, 92 S.Ct. at 2137 (footnote omitted).

**97.** *See, e. g.,* Note, *supra* note 85, 87 Harv.L. Rev. at 987–988, 994.

Fourth Amendment values not present in cases of "ordinary" crime. Though the investigative duty of the executive may be stronger in such cases, so also is there greater jeopardy to constitutionally protected speech. \* \* \* History abundantly documents the tendency of Government—however benevolent and benign its motives—to view with suspicion those who most fervently dispute its policies.

407 U.S. at 313–314, 92 S.Ct. at 2135. Such a convergence of First and Fourth Amendment values is particularly evident in the case before us. Many of the JDL activities [98] which antagonized the Soviet government were clearly protected exercises of First Amendment rights.[99] Indeed, there is no evidence that more than a small percentage of the thousands of JDL members engaged in criminal activity. Yet the actions of that minority have formed the basis for intrusive surveillance that lasted over seven months and that resulted in seizure of the contents of the conversations of innumerable innocent individuals. As appellants forcefully argue:

> [A]n examination of the logs [of the surveillance] would show that it [*sic*] contains the names and addresses of many individuals who called the organization, contributed funds or membership dues, and gave the office receptionist information regarding their mailing addresses. A broadside attempt to obtain such a membership list would plainly violate the First Amendment's protection for association (NAACP v. Button [Alabama ex rel. Patterson], 357 U.S. 449 [78 S.Ct. 1163, 2 L.Ed.2d 1488] (1958); Bates v. Little Rock, 361 U.S. 516 [80 S.Ct. 412, 4 L.Ed.2d 480] (1960)), and to obtain it by such clandestine means is a patent evasion of the constitutional liberty.

Brief for appellants at 30.[100] In reconciling the Government's need for information with the rights of these individuals, a judge in a warrant proceeding might have limited the surveillance to the phones of those actually suspected of criminal behavior, or directed that no recordings or logs be made [101] of conversa-

---

98. An additional benefit of prior judicial review when a group is the proposed subject of a wiretap is a neutral determination as to whether the individuals who allegedly engaged in criminal activity or who allegedly must be overheard to obtain national security information are actually members of the group, what their level of participation in the group is, and whether the actions and their consequent legal ramifications may properly be attributed to the group as well as to the individuals involved. In the case before us, the Soviet government and members of the press attributed many of the violent activities to the JDL, and individuals purporting to be JDL members claimed responsibility for many of the bombings of Soviet installations. *See* note 21 *supra.* A judge would be able to assess dispassionately the reasonableness of these allegations and the propriety of accordingly wiretapping the organization. This assessment is particularly essential when a political organization is involved or when the bulk of an organization's membership has merely exercised its legitimate First Amendment rights.

99. *See supra,* 170 U.S.App.D.C. at —— & note 23, 516 F.2d at 607–610 & note 23.

100. When criminal indictments have already been returned against some subjects of a sur-

veillance, as was true in this case, *see supra,* —— U.S.App.D.C. at —— & note 34, 516 F.2d at 610–611 & note 34, surreptitious surveillance may also deny those subjects effective assistance of counsel in derogation of their Sixth Amendment rights. *See, e. g.,* United States v. Zarzour, 5 Cir., 432 F.2d 1, 3 (1970); Coplon v. United States, 89 U.S.App.D.C. 103, 112, 191 F.2d 749, 758 (1951), *cert. denied,* 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952). *See also* O'Brien v. United States, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967); Black v. United States, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966). We do not mean to suggest that appellees were even partially motivated by a desire to overhear privileged attorney-client communications concerning pending criminal trials. *See* note 23 *supra.* However, we note that such motivations may prompt surveillance in other situations and thus constitute another abuse which prior judicial authorization may help to curb.

101. As a prophylactic measure, a court in a warrant proceeding should order recording of all conversations that enforcement officials overhear. *See infra,* 170 U.S.App.D.C. at ——, 516 F.2d at 668; *cf.* 18 U.S.C. § 2518(8)(a) (1970). However, a court could require that, as soon as the agent determines

tions that clearly pertained to lawful JDL political or organizational activities.

Of course, even if this case itself involved only nonprotected activity, the problem of chilling First Amendment rights of others would remain. In *Keith,* for example, the defendant's alleged bombing of a CIA office would certainly have been beyond the pale of protected speech;[102] yet the Court recognized that similar cases often *would* affect the exercise of fundamental personal rights.[103] More important, appellees here do not limit their assertion of Executive power, and the holding of the District Court would appear to apply as readily to situations in which a foreign government threatened retaliation against American officials based *solely* on protected activities of American citizens.[104] Nor would

a limitation of such warrantless surveillance to "agents" of a foreign power [105] alter the fact that First Amendment rights of others are likely to be chilled. Under such a test, a few alien members in a political organization would justify surveillance of the conversations of all members. For example, antiwar organizations which sponsored speeches by South Vietnamese political dissenters during the 1960's could have been wiretapped without a warrant because of the disruptive effect their actions allegedly had on the conduct of peace negotiations in Paris.[106] Indeed, even a domestic political leader could be wiretapped without a warrant if the Government believed he had wittingly or unwittingly become the "agent" of a foreign power.[107] To allow the Executive

that a conversation does not pertain to the authorized subject of the wiretap, both the overhearing and the recording cease until another conversation has been initiated.

**102.** *Cf., e. g.,* United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

**103.** *See Keith, supra* note 2, 407 U.S. at 313–314, 320, 92 S.Ct. 2125.

**104.** *See generally* 363 F.Supp. at 942–944 (particularly Conclusions of Law 7 & 8).

**105.** *See, e. g.,* Recent Decision, 41 Geo.Wash. L.Rev. 119, 131 (1972). To be acceptable doctrinally, it would be necessary to ground such a distinction on a construction of the Fourth Amendment which accords an alien an "ascending scale of rights as he increases his identity with our society." Johnson v. Eisentrager, *supra* note 65, 339 U.S. at 770, 70 S.Ct. at 940. However, such a construction is inconsistent with the thrust of current cases dealing with the constitutional rights of aliens. *See, e. g.,* Note, *supra* note 85, 87 Harv.L.Rev. at 988 & n.56. *See also* In re Griffiths, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973). Moreover, it would not accommodate the situation of an American citizen who is collaborating with a foreign power. And, as noted in text, such an exception would be subject to abuse, particularly in defining what constitutes collaboration. Of course one way of curtailing some of the potential for abuse of any such exception would be to require a prior judicial determination that the proposed subject of the surveillance was within the category of individuals being accorded less stringent Fourth Amendment rights, *see, e. g.,* United States v. Smith, *supra* note 88, 321 F.Supp. at 426; Comment, *supra* note 53, 17 U.C.L.A.L.Rev. at

1241–1242, 1249, and to provide some judicial supervision to ensure that the location for the wiretap was not conveniently chosen so that substantial numbers of non-aliens would also be overheard.

**106.** *See infra,* 170 U.S.App.D.C. at ——, 516 F.2d at 653–654.

**107.** *See, e. g.,* N.Y. Times, Feb. 8, 1972, at 1, col. 8 (presidential aide claims critics of President's peace plan are "consciously aiding and abetting the enemy of the United States"). *See also* Note, *supra* note 85, 87 Harv.L.Rev. at 987.

In raising the spectre of "horrible hypotheticals," we are reminded of Judge Prettyman's comments for this court in a Fourth Amendment context:

[W]e are dealing with doctrines and not with the presumable taste and sense of individual officials. Maybe none of these examples would ever occur. But the question before us is not whether they would happen but whether they legally could.

District of Columbia v. Little, 85 U.S.App.D.C. 242, 247–248, 178 F.2d 13, 18–19 (1949), *affirmed on other grounds,* 339 U.S. 1, 70 S.Ct. 468, 94 L.Ed. 599 (1950). Unfortunately, recent events reveal that such activities are actually more than mere hypotheticals. For example, Senator Nelson, in introducing a bill to establish procedures for national security surveillance, listed several recent cases in which national security was used to cloak questionable surveillance practices employed by the Executive Branch. *See generally* 119 Cong.Rec. S23026 (daily ed. Dec. 17, 1973). Among these were:

(1) Installation in 1969 of warrantless wiretaps on 13 Government officials and four

Branch to make its own determinations as to such matters invites abuse, and public knowledge that such abuse is possible can exert a deathly pall over vigorous First Amendment debate on issues of foreign policy.[108]

Thus confronted with the realization that prior judicial review can serve to safeguard both First and Fourth Amendment rights,[109] we turn our attention to possible arguments for abrogating the warrant requirement where our national security is endangered by foreign threats. In so doing, we are mindful of the warning of the Supreme Court that such arguments must not be grounded in expediency or utility, but must relate to factors that would cause the warrant procedure to needlessly frustrate legitimate gathering of foreign intelligence

---

newsmen, purportedly because they were leaking or publishing sensitive foreign intelligence information. Two of these wiretaps were even continued after their subjects had left Government service and had begun working on Senator Muskie's presidential campaign. *See generally* Hearings on the Role of Dr. Henry Kissinger in the Wiretapping of Certain Government Officials and Newsmen Before the Senate Committee on Foreign Relations, 93d Cong., 2d Sess. (1974).

(2) White House authorization in 1969 of a burglary of the home of newspaper columnist Joseph Kraft for installation of an alleged national security wiretap.

(3) Invocation of national security in inducing the CIA to assist in the burglary of Daniel Ellsberg's psychiatrist's offices.

(4) The 1970 drafting by the White House of a plan to engage in massive warrantless wiretapping and burglary which, although approved on national security grounds, was scrapped after objections from FBI Director Hoover.

(5) Surveillance by the Kennedy Administration of Dr. Martin Luther King, Jr. and other civil rights activists who were suspected of being Communist sympathizers or dupes.

Such examples can be multiplied several times over, and they demonstrate the need for judicial oversight of Executive surveillance practices. Indeed, one might even question whether the Government would have had the audacity to present many of these practices to a neutral magistrate, or whether it would have undertaken them in contravention of the warrant proceeding if it could not have rationalized them *post hoc* as being necessary for preservation of the national security. *See also* note 154 *infra.*

**108.** Indeed, "foreign" security wiretapping can even exert a pall over robust discussion of issues that would ordinarily be considered domestic, given the close interrelationship between domestic and foreign affairs and the fact that most domestic issues "affect" foreign affairs to some degree. For example, even the quantity of domestic wheat production could be said to relate to foreign assistance to under-developed countries, *see, e. g.,* N.Y. Times, Nov. 16, 1974, at 1, col. 8 (increased emergency food aid impossible because of, *inter alia,* level of domestic supplies), or to trade with such powers as the Soviet Union, *see, e. g.,* Washington Post, Oct. 6, 1974, at 1, col. 7 (private grain deal with Soviet Union cancelled because of potential adverse effects on depleted American grain supplies). It is no response to say that the President would only wiretap for "security" matters. The tendency has been to give the term "national security" an overly broad definition, and the whole point of Fourth Amendment protection in this area is to avoid such Executive abuses through prior judicial review. Moreover, the exception advocated by the Government and accepted by some courts is not limited to "national security" wiretapping in its traditional sense, but extends to *any* information which "affects" foreign affairs or which may be of use in formulating foreign policy decisions. *See infra,* 170 U.S.App.D.C. at —— ——, 516 F.2d at 655–656. Indeed, if the asserted Executive exception is based on the President's plenary powers in the field of foreign affairs, it is difficult to see how any principled approach could distinguish his power to wiretap without a warrant (as opposed to whether such wiretapping is in fact reasonable) on the basis of the importance of the information as it relates to foreign affairs. Of course, some such distinction along national security lines might be logically acceptable if the power to wiretap were based on the President's status as Commander-in-Chief; but the President's powers as a military leader have always been cited merely as supplemental support for his authority to wiretap, and it has been the presumed nonjusticiability of foreign affairs decisions which has prompted other courts to accept the proposed exception for warrantless national security surveillance. *See infra,* 170 U.S.App. D.C. at —— ——, 516 F.2d at 636–641.

**109.** For a discussion of the likely efficacy of the warrant requirement in actually achieving its theoretical aims, *see generally* Note, *supra* note 85, 87 Harv.L.Rev. at 989–992.

information.[110] However, since appellees have not directed our attention to such factors, we are relegated to seeking the rationales which have caused several other courts to except foreign intelligence activities from the strictures of prior judicial authorization.

In *Keith*, the Supreme Court cited *United States v. Smith, supra,* 321 F.Supp. at 425–426, *United States* v. *Clay, supra,* and American Bar Association Project on Standards for Criminal Justice, Electronic Surveillance 120, 121 (Approved Draft 1971, and Feb. 1971 Supp. 11), for the "view that warrantless surveillance * * * may be constitutional where foreign powers are involved." 407 U.S. 322 n.20, 92 S.Ct. at 2139.[111] The American Bar Association Project, after noting that "the national security interest is properly a concern primarily of the federal government under our constitutional system," merely asserts that "[l]imitations which are proper when the internal affairs of the nation are solely involved become artificial when international realities are considered," *id.* at 121; a system of prior judicial supervision would be "unworkable in this area." *Id.* No reasoning whatever is propounded as to why the warrant procedure would actually be "artificial" or "unworkable." [112] In *Clay*

---

**110.** *See supra,* 170 U.S.App.D.C. at ——, 516 F.2d at 631–633. *See also* Berger v. New York, 388 U.S. 41, 62, 87 S.Ct. 1873, 1885, 18 L.Ed.2d 1040 (1967) ("we cannot forgive the requirements of the Fourth Amendment in the name of law enforcement").

**111.** *See also* United States v. Stone, D.D.C., 305 F.Supp. 75 (1969) (decision based on pre-*Katz* Fourth Amendment doctrines); United States v. O'Baugh, D.D.C., 304 F.Supp. 767 (1969) (same). In United States v. Hoffman, D.D.C., 334 F.Supp. 504 (1971), the court upheld the legality of a foreign intelligence wiretap while invalidating four domestic security surveillances. Although the court did not state its reasons for these holdings, it meticulously recounted the case law up to that time and the Government's arguments concerning the legality of both types of national security surveillance. *See id.* at 506–509. These arguments included contentions that a warrant procedure posed a risk of security leaks and that decisions concerning installation of such wiretaps involved a broad range of factors, many of them secret. *See id.* at 506.

It should be noted that the *Keith* Court apparently cited these sources for "informational" purposes; that is, it merely referred to them neutrally rather than approvingly. Indeed, in the text of its opinion the Court explicitly cautioned that it "express[ed] no opinion as to" the issue. *See* 407 U.S. at 321–322, 92 S.Ct. 2125; *infra,* 170 U.S.App.D.C. at ——, 516 F.2d at 651–653.

**112.** Admittedly, the ABA also quotes J. Madison, The Federalist, No. 41, p. 270 (Cooke ed. 1961):

It is in vain to oppose constitutional barriers to the impulse of self-preservation. It is worse than in vain; because it plants in the Constitution itself necessary usurpations of power, every precedent of which is a germ of unnecessary and multiplied repetitions.

*See* Tentative Draft at 120. Although this passage has been quoted on various occasions by Justices unhappy with decisions limiting Executive discretion, *see, e. g.,* United States v. Robel, *supra* note 5, 389 U.S. at 289, 88 S.Ct. 419 (White, J., dissenting), several caveats should be expressed. As the ABA apparently understands, *see* Tentative Draft at 120–121, the proposition that national security is of utmost import does not resolve a host of difficult questions. Madison's comment came in the context of supporting a constitutional power in the federal government to raise armies and equip fleets. It is an entirely different problem when one seeks to determine how that power is to be distributed among the branches of government and how the constitutional system of checks and balances is to operate with respect to that power. Hamilton, writing a later Federalist paper, expressed extreme concern that such dispersion of power was essential lest the President's powers become too grandiose for a single individual. *See, e. g.,* A. Hamilton, The Federalist, No. 69, at 464–465 (Cooke ed. 1961). Moreover, it must be remembered that the Bill of Rights, including the Fourth Amendment, was promulgated after adoption of the original Constitution, presumably as a general limitation on governmental power and a broad shield against governmental excess. *See supra,* 170 U.S.App.D.C. at —— & notes 84 & 85, 516 F.2d at 627 & notes 84 & 85. Despite the apparent concern voiced in Madison's statement, no language exempting the federal government from the prohibitions of the First Amendment, for example, was included for the category of governmental activity relating to the national security.

In the ABA's Proposed Final Draft of its Standards Relating to Electronic Surveillance (Jan. 1971), the Special Committee noted that it had defeated a proposed amendment that would have suggested that the President

the Fifth Circuit was similarly opaque. After determining that the wiretap was approved by the Attorney General and was made in connection with acquisition of foreign intelligence information, the court simply asserted:

> No one would seriously doubt in this time of serious international insecurity

and peril that there is an imperative necessity for obtaining foreign intelligence information, and we do not believe such gathering is forbidden by the Constitution or by statutory provision * * *.

430 F.2d at 172.[113] We have, of course, recognized the necessity for such intelli-

---

should submit to a warrant proceeding before engaging in electronic surveillance in the foreign security area. It indicated that

> the Special Committee was reluctant to approve any standard that might unduly circumscribe, even indirectly, the power of the President to protect the national security interest or to suggest that what is constitutional for the Commander-in-Chief to do under one provision of the Constitution could somehow be termed constitutionally "unreasonable" under the Fourth Amendment.

*Id.* at 11. With all due respect to the Special Committee, we are surprised at the simplicity of this reasoning. We fail to comprehend how a clause of the Constitution may be read as holding warrantless wiretapping to be "constitutional" without reference to the remainder of the Constitution, particularly when the clause is one giving such a textually limited power as the Commander-in-Chief clause; indeed the scope of that clause can *only* be given meaning by reference to the Constitution as a whole, as well as the history of its adoption and its judicial and legislative gloss. We doubt that the Committee would have suggested that it is "constitutional" for the President as Commander-in-Chief to arrest a political dissident for giving speeches criticizing the amount of money expended on the military in this country, and that it could not suggest that such action could be termed an unconstitutional denial of "due" process under the Fifth Amendment. Nor would the Committee likely say that it is "constitutional" for the President as Commander-in-Chief to encourage military discipline by torturing offenders, and then say that it could not suggest that such a practice could be termed "cruel and unusual" under the Eighth Amendment.

**113.** Although the Fifth Circuit also quoted Chicago & Southern Air Lines v. Waterman S. S. Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948), for the proposition that it would be "intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret," 333 U.S. at 111, 68 S.Ct. at 436, *quoted in* 430 F.2d at 171, it is unclear what the court intended, since it had already conducted an *in camera* review of the logs.

It should also be observed that the *Clay* decision was made in the procedural posture of

an *Alderman* proceeding, *see* note 14 *supra,* and the court's *in camera* inspection of the logs of the disputed wiretap revealed that the contents were not relevant to any count in the criminal indictment. *See* 430 F.2d at 170–172. *See also, e. g.,* United States v. Brown, 5 Cir., 484 F.2d 418 (1973), *discussed* note 120 *infra.* Thus it was reasonable to deny unnecessary disclosures that might unduly prejudice national security interests. But under the *Alderman* doctrine this result could only be accomplished by actually deciding the Fourth Amendment question; we suspect this pressure might have substantially influenced the decisions in these cases. In contrast, a panel of this court has taken a somewhat more candid approach when faced with a similar situation. In United States v. Lemonakis, 158 U.S. App.D.C. 162, 485 F.2d 941 (1973), *cert denied,* 415 U.S. 989, 94 S.Ct. 1586, 1587, 39 L.Ed.2d 885 (1974), the court upheld the District Court's order refusing to compel disclosure of the logs of certain national security wiretaps. But rather than deciding the constitutional issue, the court based its holding on an *in camera* determination that the wiretaps did not produce any evidence leading to the criminal indictment:

> It is not in the national interest for revelation of either the existence or the product of [foreign intelligence surveillance] to extend beyond the narrowest limits compatible with the assurance that no injustice is done to the criminal defendant accidentally and peripherally touched, as was [the defendant]. In a field as delicate and sensitive as foreign intelligence gathering, we think there is every reason why the court should proceed *in camera* and without disclosure to explore the issue of whether the contents of a foreign intelligence surveillance have any relevance to a criminal prosecution plainly unrelated as to subject matter. In a context where, as here, external circumstances indicate such an improbability that the criminal defendant is likely to be adversely affected, we think that [*in camera* inspection is sufficient].

158 U.S.App.D.C. at 184, 485 F.2d at 963, *citing* Alderman v. United States, *supra* note 14, 394 U.S. at 201, 89 S.Ct. 961 (Fortas, J., concurring). As *Lemonakis* suggests, it might be appropriate to limit any holding that warrantless foreign security wiretaps are illegal to pro-

gence gathering,[114] but we realize the necessity of also ascertaining whether such activities must first receive prior judicial approval. The Fifth Circuit, however, apparently advanced no reasons for its conclusion that no warrant is in fact required.

In *Smith,* the possible foreign security exception was mentioned purely as dictum, since the court was only presented with the question eventually decided in *Keith.* In deciding that question against the permissibility of warrantless domestic security surveillance, the *Smith* court distinguished a situation in which warrantless surveillance was predicated on foreign threats to the national security:

> It might very well be that warrantless surveillance of this type, while unconstitutional in the domestic situation, would be constitutional in the area of foreign affairs. This possible distinction is largely due to the President's long-recognized, inherent power with respect to foreign relations.

321 F.Supp. at 426, *citing Chicago & Southern Air Lines, Inc. v. Waterman S. S.Corp., supra,* and *United States v. Belmont, supra.* We have already discussed this inherent power of the President,[115] and have shown that it does not answer the question of the propriety of an exception to the warrant procedure. The *Smith* court, unlike appellees in this case, acknowledged this fact, since it then analyzed the asserted exception with respect to domestic security taps in terms

of whether any factors militated in favor of abrogating the traditional warrant procedure.[116] The principal factor which the Government there urged for that result was the fact

> that the decision to initiate surveillance in this type of case must be "based on a wide variety of considerations and on many pieces of information which cannot readily be presented to a magistrate". Gov't Br. at 8.

321 F.Supp. at 428. Although the *Smith* court rejected this factor as a justification for warrantless domestic security surveillance, it noted that it might have greater force in the foreign security context:

> In cases involving foreign affairs this argument might very well prevail. In that situation, numerous non-judicial factors are relevant and the decision would probably be far removed from the consideration of probable cause.

*Id.*[117] This argument, which we will label the "judicial competence" argument, has some merit, and we will therefore address it as a possible justification for dispensing with the warrant requirement in foreign security cases.

Before doing so, however, we must consider whether post-*Keith* cases advanced other possible factors which we must consider. The cases, which all arose in the context of criminal prosecutions involving *Alderman* procedures,[118] include United States v. Brown, 5 Cir.,

---

spective applicability only, at least with respect to *Alderman* proceedings, in order that national security interests not be needlessly frustrated. By the same token, *Lemonakis* indicates that judicial supervision of such surveillance is appropriate, and we see no reason why *in camera* inspection is any more opportune during *post hoc* review than it would be in a warrant proceeding. *See infra,* 170 U.S. App.D.C. at ———, 516 F.2d at 641–648.

**114.** *See supra,* 170 U.S.App.D.C. at ————, ——, 516 F.2d at 615–616, 631–633.

**115.** *See id.*

**116.** The *Smith* court noted that under the Fourth Amendment methodology advocated by appellees in this case, *see supra,* 170 U.S.App. D.C. at ———— & notes 89 & 91, 516 F.2d

at 628–632 & notes 89 & 91, "'reasonableness' becomes solely a value judgment," 321 F.Supp. at 427, and "'Fourth Amendment protection in this area would approach the evaporation point,'" *id., quoting* Chimel v. California, *supra* note 89, 395 U.S. at 765, 89 S.Ct. 2034.

**117.** Curiously, the *Smith* court contemplated the possibility that, even if there were a category of cases in which the President need not obtain a warrant, it might be desirable that there be a prior judicial proceeding to determine whether the case in fact fell within that exempted area. *See* 321 F.Supp. at 426. *See also* Comment, *supra* note 53, 17 U.C.L.A.L. Rev. at 1249–1250.

**118.** *See* note 14 *supra.*

484 F.2d 418 (1973), *affirming* E.D.La., 317 F.Supp. 531 (1970), and United States v. Butenko, 3 Cir., 494 F.2d 593 (1974) (*en banc*), *affirming* D.N.J., 318 F.Supp. 66 (1970), *cert. denied,* 419 U.S. 881, 95 S.Ct. 147, 43 L.Ed.2d 121 (1974). Our reading of these opinions indicates that they simply overlooked the substantial body of case law,[119] including *Keith,* which rejects the contention that the warrant requirement may be abrogated merely because the Government has a legitimate need to engage in certain activity. Instead of following the proper analysis of determining whether a warrant proceeding would *frustrate* the legitimate need of the Executive to acquire foreign intelligence information, these courts treated the need itself as determinative of the legality of warrantless surveillance.[120] We find this meth-

119. See supra, 170 U.S.App.D.C. at —— & note 91, 516 F.2d at 630–633 & note 91.

120. *See also* 363 F.Supp. at 943–944 (apparently considering the fact that the President has the constitutional power to gather essential foreign intelligence information as conclusive of any questions as to judicial review). In United States v. Brown, *supra* note 113, the Fifth Circuit merely stated:

> [B]ecause of the President's constitutional duty to act for the United States in the field of foreign relations, and his inherent power to protect national security in the context of foreign affairs, we reaffirm what we held in United States v. Clay, *supra,* that the President may constitutionally authorize warrantless wiretaps for the purpose of gathering foreign intelligence. * * * Restrictions upon the President's power which are appropriate in cases of domestic security become artificial in the context of the international sphere. * * *
>
> Our holding in *Clay* is buttressed by a thread which runs through the Federalist Papers: that the President must take care to safeguard the nation from possible foreign encroachment, whether in its existence as a nation or in its intercourse with other nations.

484 F.2d at 426. The *Brown* court also quoted the *Waterman* language concerning judicial nullification of Executive actions. Nevertheless, it was evident that the court had conducted an *in camera* review of the surveillance logs, and no reasons were articulated as to why *post hoc* review posed any less danger of "nullification" than would prior judicial authorization. *See also infra,* 170 U.S.App.D.C. at —— ——, 516 F.2d at 641–648. Moreover, at least one member of the *Brown* court contemplated a relatively rigorous review of the justifications for the surveillance:

> Courts must insure that there be no future tidal wave of warrantless wiretaps and that the floodgates controlling their use not be opened for domestic intelligence purposes. The judiciary must not be astigmatic in the presence of warrantless surveillance; rather judges must microscopically examine the wiretaps in order to determine whether they had their origin in foreign intelligence or were merely camouflaged domestic intrusions. * * * The fact that we develop the law of national security wiretaps largely *in camera* can never be allowed to lessen our zeal in the protection of fundamental rights. Indeed, the very secrecy surrounding our decisions requires that we give the closest scrutiny to executive assertions of national security interest.

484 F.2d at 427–428 (Goldberg, J., concurring specially).

The *Butenko* court similarly treated the need to gather intelligence information as determinative of the legality of warrantless surveillance:

> While we acknowledge that requiring prior approval of electronic surveillance in cases like the present one might have some salutary effects * * * on balance, the better course is to rely, at least in the first instance, on the good faith of the Executive and the sanctions for illegal surveillances incident to post-search criminal or civil litigation. * * * In the present case, too, a strong public interest exists: the efficient operation of the Executive's foreign policy-making apparatus depends on a continuous flow of information. A court should be wary of interfering with this flow.

494 F.2d at 605 (footnotes omitted). Of course the *Butenko* court did continue:

> [F]oreign intelligence gathering is a clandestine and highly unstructured activity, and the need for electronic surveillance often cannot be anticipated in advance. Certainly occasions arise when officers, acting under the President's authority, are seeking foreign intelligence information, where exigent circumstances would excuse a warrant. To demand that such officers be so sensitive to the nuances of complex situations that they must interrupt their activities and rush to the nearest available magistrate to seek a warrant would seriously fetter the Executive in the performance of his foreign affairs duties.

*Id.* This would appear to be nothing more than an argument that warrantless electronic surveillance, like many other warrantless searches, may be justifiable in exigent circum-

odology simply inconsistent with the spirit and holding of *Keith* and prior cases, particularly given the substantial First and Fourth Amendment interests that may be infringed by unsupervised surveillance.

 Thus, mindful of the fact that the existence of presidential powers, whatever their scope, does not preclude a finding that the legitimate exercise of those powers would in no way be frustrated by subjecting them to prior judicial approval, we must look to commentators [121] and our own reasoning for possible justifications for exempting such surveillance from prior judicial scrutiny. In addition to the "judicial competence" justification,[122] such factors might include (2) the danger of "security leaks" which might endanger the lives of informants and agents and which might seriously harm the national security; [123] (3) the fact that such surveillance is of the "ongoing intelligence gathering" type and that, since criminal prosecutions are less likely, Fourth Amendment protections are not as essential as in a normal criminal context; [124] (4) the possibility that the delay involved in the warrant procedure might result in substantial harm to the national security; [125] and (5) the fact that the administrative burden on the courts or the Executive Branch which would result from such a require-

ment would be enormous.[126] We find that none of these factors is compelling.

(1) "*Judicial competence*": Although the judicial competence factor arguably has more force when made in the foreign rather than the domestic security context, the response of *Keith* to the analogous argument is nevertheless pertinent to any claim that foreign security involves decisions and information beyond the scope of judicial expertise and experience:

> We cannot accept the Government's argument that internal security matters are too subtle and complex for judicial evaluation. Courts regularly deal with the most difficult issues of our society. There is *no reason to believe that federal judges will be insensitive to or uncomprehending of the issues involved in domestic security cases.* Certainly courts can recognize that domestic security surveillance involves different considerations from the surveillance of "ordinary crime." *If the threat is too subtle or complex for our senior law enforcement officers to convey its significance to a court, one may question whether there is probable cause for surveillance.*

407 U.S. at 320, 92 S.Ct. at 2138 (emphasis added). Similarly, we do not believe federal judges will be "insensitive to or uncomprehending of the issues involved

---

stances; it does not justify total abrogation of the warrant requirement for all national security surveillance. *See infra,* 170 U.S.App.D.C. at ——, 516 F.2d at 649–650. Moreover, it should be evident that the argument that surveillance is "clandestine and unstructured," and that on-the-spot judgments might at times have to be made, indicates a lack of the presidential oversight that the *Butenko* court was theoretically deferring to in abnegating its duty of judicial oversight.

**.121.** For a particularly incisive analysis of the propriety of warrantless national security surveillance in light of the holding and methodology of the *Keith* opinion, *see* Note, *supra* note 85.

**122.** *See, e. g., id.,* 87 Harv.L.Rev. at 983–985; Comment, *supra* note 53, 17 U.C.L.A.L.Rev. at 1239–1243; *cf.* Note, *supra* note 53, 45 S.Cal.L. Rev. at 905–907; Kelley, *supra* note 26, at 9–10; Saxbe, *supra* note 66, at 3.

**123.** *See, e. g.,* Note, *supra* note 85, 87 Harv.L. Rev. at 981–982; Comment, *supra* note 53, 17 U.C.L.A.L.Rev. at 1242; *cf.* Brownell, *supra* note 53, 39 Cornell L.Q. at 210; Rogers, *supra* note 53, 63 Yale L.J. at 797–798; Note, *supra* note 53, 23 Rutgers L.Rev. at 340; Note, *supra* note 53, 45 S.Cal.L.Rev. at 899–901; Saxbe, *supra* note 66, at 3.

**124.** *See, e. g.,* Note, *supra* note 85, 87 Harv.L. Rev. at 985–987; Comment, *supra* note 53, 17 U.C.L.A.L.Rev. at 1243–1244; *cf.* Note, *supra* note 53, 45 S.Cal.L.Rev. at 890–895.

**125.** *See, e. g.,* Note, *supra* note 85, 87 Harv.L. Rev. at 980–981; *cf.* Brownell, *supra* note 53, 39 Cornell L.Q. at 210–211; Note, *supra* note 53, 23 Rutgers L.Rev. at 340; Saxbe, *supra* note 66, at 3.

**126.** *Cf., e. g.,* Kelley, *supra* note 26, at 9.

in" foreign security cases,[127] or that judges will deny any legitimate requests for a warrant.

Congress apparently concurs in the belief that judges are competent to analyze the substance of matters allegedly pertaining to the national security. This attitude was unambiguously expressed by the passage of Public Law No. 93–502, 88 Stat. 1561 (1974), which amended the Freedom of Information Act, 5 U.S.C. § 552 (1970),[128] to, *inter alia,* overrule the Supreme Court's decision in *EPA v. Mink,* 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). In *Mink* the Court interpreted 5 U.S.C. § 552(b)(1), which exempted from the forced disclosure mandate of the Act those matters "specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy," not to allow judicial review of Executive security classifications and not even to allow *in camera* inspection of a contested document bearing a security classification so that nonsecret matter could be separated from secret matter and ordered disclosed. 410 U.S. at 81–84, 93 S.Ct. 827. Congress responded with amendments to Section 552 which altered Section 552(b)(1) to exempt from disclosure those documents which are:

> (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order.[129]

It also specified that when the question of discoverability of a document is placed in issue, "the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld * * *." [130]

Although the conference report on these amendments expressed a congressional expectation that, since "Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse effects might occur as a result of public disclosure of a particular classified record, * * * Federal courts * * * will accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record," it unequivocally stated that the *Mink* decision was to be legislatively overruled with respect to *in camera* review and that the propriety of a document's classification was to be judicially determined with respect to "both procedural and substantive criteria contained in the Executive order under which it was classified." [131] Moreover, despite the fact that the amendments were vetoed by the President, primarily on the ground that "the courts should not be forced to make what amounts to the initial classification decision in sensitive and complex areas where they have no particular expertise," 120 Cong.Rec. H10705 (daily ed. Nov. 18, 1974) (Veto Message from the President of the United States), both Houses of Congress overwhelmingly voted to repudiate that contention by convincingly overriding the presidential veto.[132] Although such a congressional expression in no way binds us in the context of Fourth Amendment adjudication, we find that this vote of confidence

---

127. *See also, e. g.,* United States v. Barker, *supra* note 1, 168 U.S.App.D.C. at 312, 514 F.2d at 225.

128. For a brief description of the Freedom of Information Act, *see* EPA v. Mink, 410 U.S. 73, 79–80, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973).

129. Pub.L. No. 93–502, § 2(a), 88 Stat. 1563 (1974); *see* H.R.Rep.No.1380, 93d Cong., 2d Sess., 4, 11–12 (1974), U.S.Code Cong. & Admin.News, 1974, p. 6267 (conference report).

130. Pub.L.No.93–502, § 1(b)(2), 88 Stat. 1562 (1974); *see* H.R.Rep.No.1380, *supra* note 129, at 2, 12.

131. H.R.Rep.No.1380, *supra* note 129, at 12.

132. *See generally* 120 Cong.Rec. H10864–H10875 (daily ed. Nov. 20, 1974) (House override by vote of 371 yea, 31 nay, 32 not voting); *id.* at S19806–S19823 (daily ed. Nov. 21, 1974) (Senate override by vote of 65 yea, 27 nay, 8 not voting).

in the competence of the judiciary affirms our own belief that judges do, in fact, have the capabilities needed to consider and weigh data pertaining to the foreign affairs and national defense of this nation.

The description of current Executive procedures for authorizing national security wiretapping also gives us reason to hesitate in according undue deference to the "expertise" that the Executive Branch brings to each decision. Former Attorney General Saxbe,[133] testifying on "National Security Electronic Surveillance and S. 2820 [134] before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary" (Dept. of Justice release, Oct. 2, 1974), admitted that the practice of warrantless surveillance had apparently been abused in the past, *see id.* at 5–6,[135] and then described current procedures:

> First of all, for a request for a foreign intelligence surveillance to survive, it must first be approved by several different levels of supervision within the FBI before it even reaches the Director's office, and the request must contain very detailed information.
>
> If the request originates in an FBI field office, the proposal will be considered by the case Agent, the Supervisor, and the Special Agent in Charge of the field office. At FBI Headquarters the request will be considered by

the Supervisory Special Agent, the Unit Chief, the Section Chief, the Branch Chief, the Assistant Director, the Deputy Associate Director, and the Associate Director before it reaches the Director for his approval.

> If the Director approves the request, it is then sent to the Assistant Attorney General in charge of the Criminal Division, Mr. Petersen. He then forwards the request with his recommendation and comments for my consideration. If, and only if, I approve the request can the surveillance be installed and then for a maximum period of three months, after which I will approve a renewal only with what I deem sufficient justification. Let me assure you that I do not approve these automatically.
>
> Numerous requests are turned down long before they reach my desk. I personally have withheld some authorizations and on at least one occasion I have denied a request for an extension.

*Id.* at 6–7. With due deference to the former Attorney General, we believe this description, when considered together with the fact that there is a high turnover in the office of Attorney General,[136] indicates that most actual decisionmaking with respect to wiretapping occurs before a request reaches the desk of the Attorney General, and that he would therefore be predisposed to rely on the recommendations of his subordinates.[137]

---

**133.** Mr. Saxbe was Attorney General at the time of these statements. He tendered his resignation, which the President accepted, on Dec. 12, 1974, to be effective as of the date of his confirmation as Ambassador to India or the confirmation of his successor, whichever came first. *See* 10 Weekly Compilation of Presidential Documents 1562 (Dec. 16, 1974). His appointment as Ambassador was approved by the Senate on Dec. 19, 1974.

**134.** For the text of and commentary on S. 2820, a bill to establish standards and procedures for national security surveillance, *see* 119 Cong. Rec. S23025–S23030 (daily ed. Dec. 17, 1973). *See also* 120 Cong. Rec. § 1138–1142 (daily ed. Feb. 4 1974).

**135.** *See also* Kelley, *supra* note 26, at 2, 16–17.

**136.** Not counting acting Attorneys General, there have been eight Attorneys General in the past 10 years: Messrs. Kennedy, Katzenbach, Clark, Mitchell, Kleindienst, Richardson, Saxbe, and Levi.

**137.** For an extremely candid appraisal of the FBI's capabilities and performance in the field of intelligence gathering, *see* Sullivan, Personal Observations and Recommendations on Privacy, in Privacy in a Free Society 93 (final report of Annual Chief Justice Earl Warren Conference of the Roscoe Pound—American Trial Lawyers Foundation (1974) (Mr. Sullivan is the former Assistant to the Director of the FBI, in charge of criminal, intelligence, and security investigations).

We cannot blindly accept the argument that the Attorney General, who is chosen for his abilities as a lawyer rather than his acumen as a diplomat, is more likely than a federal judge [138] to have the analytical ability or sensitivity to foreign affairs necessary to evaluate such recommendations. Indeed, there is even a danger that an Attorney General, pressed for time and involved in other activities, will effectively delegate the task of supervising national security wiretaps to his aides; such was the case with his arguably less important although statutorily mandated duty to supervise wiretapping under the provisions of Title III.[139] To the extent the Attorney General bases his decisions on the factual data and recommendations of those career officials schooled in foreign relations and intelligence gathering, judges can be similarly informed *in camera*, as they often are during *post hoc* judicial review in criminal prosecutions or civil cases.[140] We simply do not believe that any margin of expertise possessed by the Attorney General can compensate for the neutral and detached attitude that a judge would bring to his decision; given the likely deference that a judge will accord the Attorney General's request, there is no substantial likelihood that any marginal lack of expertise will result in denial of legitimate requests for a warrant and frustration of proper intelligence gathering on the part of the Executive.

Finally, the Executive Branch itself acknowledges the fact that courts are competent to conduct *post hoc* review to determine whether a surveillance is reasonable. In its Memorandum for the United States in Ivanov v. United States, cert. denied, 419 U.S. 881, 95 S.Ct. 147, 43 L.Ed.2d 121 (1974) (responding to petition for writ of certiorari to the Third Circuit), the Government took the position that since, in its judgment, reasonable warrantless national security surveillance is constitutional, *Alderman* does not require anything more than an *in camera* determination that the evidence was obtained from a reasonable wiretap. The Government argued:

> The task of determining whether the purpose of a surveillance was foreign intelligence gathering is clearly not "too complex" nor is "the margin of error too great to rely wholly on the *in camera* judgment of the trial court." * * * Rather, in a field as delicate and sensitive as foreign intelligence gathering, there is every reason to proceed *in camera* and without disclosure.

*Id.* at 14.[141] To be sure, the Government was making these arguments in support of restricting access to foreign intelligence information to the judge rather than to the private litigants. But the arguments must be evaluated against the realization that no one seriously denies that at least *post hoc* judicial review, under whatever standard of "reasonableness," is proper even for wiretaps installed pursuant to the President's foreign affairs powers.[142] *If a court can*

---

**138.** In contrast to an Attorney General, a federal judge has lifetime tenure and could presumably develop an expertise in the field of foreign affairs if consistently resorted to for authorizations for foreign security wiretaps. This would be particularly true if Congress limited the power to grant authorizations to certain courts *cf. Keith, supra* note 2, 407 U.S. at 323, 92 S.Ct. 2125, or to the Chief Judges of the United States Courts of Appeals. We also take judicial notice of the fact that a not insubstantial number of judges have backgrounds in law enforcement that would probably render them particularly sensitive to the problems the FBI is confronted with in its intelligence gathering capacity.

**139.** *See, e. g.,* United States v. Giordano, *supra* note 32, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341.

**140.** *See, e. g.,* cases cited *supra,* 170 U.S.App. D.C. at —— & notes 83, 113, 120, 516 F.2d at 624–626 & notes 83, 113, 120; *see also* note 43 *supra.*

**141.** *See also, e. g.,* United States v. Hoffman, *supra* note 111, 334 F.Supp. at 506 (noting Government admission that national security surveillance is subject to *post hoc in camera* review).

**142.** *See* notes 113, 120 *supra. But see* United States v. Brown, E.D.La., 317 F.Supp. 531, 536 (1970), *affirmed,* 5 Cir., 484 F.2d 418 (1973)

*make a proper determination of reasonableness after a wiretap has been installed, and since the reasonableness of a search and seizure cannot depend on information secured after it occurs,*[143] *there is no reason why judges should be presumed to be incompetent before the surveillance takes place.*

Although judicial competence *per se* is thus no argument against prior rather than *post hoc* judicial review, there may be other factors actually behind the competence theory which would suggest that a warrant requirement would frustrate legitimate Executive surveillance. First, there may be a fear on the part of the Government that the standard of probable cause will be higher in a prior rather than in a *post hoc* judicial proceeding. Even if this were true as a practical matter, it is clearly wrong as a matter of law, and we decline to base a decision as to the legality of warrantless national security surveillances on so thin a reed. Moreover, we doubt whether this fear[144] is realistic as a practical matter. As the quote from *Keith* indicates,[145] judges are

likely to be highly deferential to the Executive's determination concerning need to install a wiretap, particularly where a judicial error might substantially harm the national interest;[146] in a *post hoc* review in a criminal or civil case, removed from the exigencies of day-to-day intelligence gathering activities, a court might be harsher in its judgment as to the reasonableness of the particular surveillance. And if pure practicalities are being considered, it should be remembered that the Government has its choice as to what judge to seek a warrant from,[147] a circumstance usually not present with respect to *post hoc* judicial review.[148]

Actually, this aspect of the competence argument is properly directed to the *standard* for judicial review, not to whether it should occur before or after the surveillance takes place. To the extent nonjudicial policy factors constitute the Executive's rationale for desiring intelligence information, it is possible the standard for probable cause would reflect that fact.[149] We must reemphasize

(pre-*Keith* decision which appears to say that Executive expertise and factual background not only rendered presidential decision to install a wiretap immune from the warrant requirement, but also totally insulated it from *post hoc* review; appellate court did, however, conduct *in camera* inspection).

**143.** *See, e. g.,* Beck v. Ohio, *supra* note 24, 379 U.S. at 96, 85 S.Ct. 223, *quoting* Wong Sun v. United States, *supra* note 96, 371 U.S. at 479, 83 S.Ct. at 413 ("Whether or not the requirements of reliability and particularity of the information on which an officer may act are more stringent where an arrest warrant is absent, they surely cannot be less stringent than where an arrest warrant is obtained."); Washington v. United States, 134 U.S.App.D.C. 223, 226, 414 F.2d 1119, 1122 (1969) (dictum) ("information subsequently obtained cannot fill the gap if probable cause is lacking").

**144.** Of course, rather than being a subjectively real fear, the asserted worry may in fact be a *sub silentio* attempt to preserve the freedom to justify a surveillance on the basis of evidence derived therefrom. This problem is particularly acute when there is no warrant proceeding, there is no requirement that the factors upon which the Executive acted be memorialized in writing, and the actual recordings of the conversations involved are destroyed. *See* notes

10, 24, 26 *supra; infra,* 170 U.S.App.D.C. at —— & note 256, 516 F.2d at 668 & note 256. *See also* United States v. Huss, *supra* note 10, 482 F.2d at 46–51.

**145.** *See supra,* 170 U.S.App.D.C. at ——, 516 F.2d at 641.

**146.** Indeed, one suspects that any judicial error in a warrant proceeding would be in favor of the Government. *See* Note, *supra* note 85, 87 Harv.L.Rev. at 984. Nevertheless, prior review is likely to prevent clear abuses that might result from well-intentioned but overzealous Executive actions. *See, e. g.,* notes 6, 23, 109 *supra.*

**147.** Indeed, there is nothing to prevent the Government from seeking a warrant from a second judge should the first one contacted refuse to authorize the surveillance. *Cf.* 18 U.S.C. § 2518(1)(e) (1970).

**148.** For example, a civil plaintiff may have his choice of forum, and a presiding judge will be determined on a random basis. *See, e. g.,* Rule 3–3(a) of the United States District Court for the District of Columbia.

**149.** *See, e. g.,* Camara v. Municipal Court, *supra* note 79, 387 U.S. at 531–532, 534–539, 87 S.Ct. 1727; *infra,* 170 U.S.App.D.C. at ——––, 516 F.2d at 656–659.

the fact that we are not presented with the question of the scope of the President's substantive powers, but only with the procedural question whether a presidentially directed surveillance must run the gauntlet of judicial review before or after its installation. Since factors relating to judicial competence may arise at either time, we believe they should at most affect the standard of judicial review, not its timing.

Focusing on the timing of judicial intervention, however, we perceive a second fear that may actually be behind the judicial competence argument: even if the same standard is applied in prior as in *post hoc* judicial proceedings, an error before a surveillance occurs is likely to cause irreparable harm to the national security, whereas an error after it occurs may only result in improper award of damages or release of a single criminal defendant. The assumptions upon which this fear is based are, to say the least, questionable, and relate to the implicit belief that national security or foreign affairs information is of paramount import in all situations. The argument assumes that the erroneous invasion of individual privacy which prior review could prevent is invariably of less importance than the erroneous denial of information which could have been obtained from a reasonable wiretap. Even ignoring our belief that any error in a warrant proceeding is likely to be in favor of the Government, we find this view of foreign security information to be unduly myopic. Not only does it relegate the personal interests protected by the Fourth and First Amendments to the level of second-class rights,[150] it also naively equates all foreign threats with such dangers as another Pearl Harbor.[151]

Domestic security information, which must, under *Keith,* be obtained pursuant to the warrant procedure, may be no less important than foreign security information, and the potential harm from judicial error no less devastating. For example, if there were grounds to believe that a massive conspiracy existed among military officers in this country to overthrow civilian rule and institute martial law, a judge would have to approve any surveillance. Yet the Government would have us approve a rule of law that would grant the President the power to himself authorize surveillance to obtain information pertaining to routine commercial affairs, so long as they "affected" such an international problem as our balance of payments.[152] And it should be obvious that as the magnitude of a national security threat approaches that of a pre-emptive nuclear attack rather than that of a minor disruption of trade, the probability that a judge would erroneously deny the Executive the requested warrant approaches the infinitesimal.

A third possible fear behind the competence argument, and the one that is most realistic, is that a warrant procedure will deny the Government the benefits flowing from the fact that most surveillance could be barricaded from *any* judicial review if there were only *post hoc* review proceedings. Since surveillance often would not be used for prosecutorial purposes,[153] and since few individuals would institute damage actions on the mere possibility that they were the subject of an unreasonable wiretap, much warrantless surveillance would

---

**150.** *See* note 86 *supra.*

**151.** *See* Kelley, *supra* note 26, at 4–5.

**152.** *See also* United States v. Butenko, *supra* note 14, 494 F.2d at 629–630 (Gibbons, J., dissenting):

According to the Supreme Court a President in Lincoln's position, faced with an internal insurrection, remains subject to judicial review of his agents' compliance with the fourth amendment. But according to the [*Butenko*] majority, a peace-time President can decide, free of either congressional control or judicial review, what invasions of privacy are reasonable in the interest of his conduct of foreign affairs.

**153.** In fact, this is one argument that has actually been asserted as an affirmative reason for abrogating prior judicial review of such surveillances. *See infra,* 170 U.S.App.D.C. at ——, 516 F.2d at 648–649.

never have its legality challenged.[154] However, every search and seizure is properly subject to judicial review, and the fact that some searches are not actually reviewed is a mere convenience. To the extent that this argument is made an *affirmative* reason for abrogating the warrant procedure as a frustration of Executive power, it amounts to no more than an assertion that the Executive Branch's illegal activities are best kept secret.[155] We find such an argument to be, to say the least, somewhat less than compelling.

Thus, given the fact that judicial review of Executive-ordered surveillance would be proper in any event after it occurs, the judicial competence argument has no substantial merit as a rationale for abrogating the warrant procedure.

(2) *"Security leaks"*: It has been said that

> [t]he President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret.[156]

Disclosure of the secret information on which Executive decisions to install a wiretap are made would arguably pose the threat of security leaks which might endanger the national security or the lives of informants and agents, or which might frustrate the proposed surveillance itself. This argument was rejected in the domestic security context by the Supreme Court in *Keith, see* 407 U.S. at 320–321, 92 S.Ct. 2125, and we find that it is no more persuasive in the foreign security context. Since the warrant proceeding is conducted *ex parte,* disclosure of information can be restricted to the judge; administrative personnel can be provided by the Government should he require clerical or other assistance.[157]

■■ Moreover, the Government can seek the warrant from a judge whose loyalty and discretion it considers unimpeachable. Indeed, judges generally have maintained confidences with respect to sensitive information in criminal investigations,[158] and are likely to be even more careful where the national security is at stake.[159] And as the *Keith* Court observed, "Title III * * * already has imposed this responsibility on the judiciary in connection with such crimes as espionage, sabotage and treason, § 2516(1)(a) and (c), each of which

---

**154.** The Government may, of course, lie about the existence of wiretaps which it wishes to conceal. However, a warrant requirement should be an added deterrent to any such possible deception, since the sanctions will be stronger if the lie is unearthed. With a warrant requirement, secret surveillance is automatically unlawful; with no such requirement, even if the Government's deception were revealed it could still argue that the warrantless surveillance was a "reasonable" one.

**155.** To the extent the argument is premised on possibly more reasonable grounds for avoiding administrative burdens and expense, or minimizing the danger of security leaks, *see infra,* 170 U.S.App.D.C. at ——, ——, 516 F.2d at 647–648, 650–651.

**156.** United States v. Brown, *supra* note 113, 484 F.2d at 426, *quoting* Chicago & Southern Air Lines v. Waterman S. S. Corp., *supra* note 113, 333 U.S. at 111, 68 S.Ct. 431. *See also supra,* 170 U.S.App.D.C. at ——, 516 F.2d at 622–623; sources cited at note 123 *supra.*

**157.** *See, e. g., Keith, supra* note 2, 407 U.S. at 321, 92 S.Ct. 2125; *cf.* Committee for Nuclear Responsibility v. Seaborg, *supra* note 83, 149 U.S.App.D.C. at 388 n.12, 463 F.2d at 791 n.12. Indeed, given the number of individuals already involved in a decision to install a national security wiretap, *see supra,* 170 U.S.App. D.C. at —— & note 24, 516 F.2d at 642–643 & note 24, the additional oversight of a single federal judge poses a miniscule marginal risk of a security breach.

**158.** *See, e. g.,* Note, *supra* note 85, 87 Harv.L. Rev. at 982; Note, *supra* note 53, 45 S.Cal.L. Rev. at 900–901.

**159.** In particular, there is no evidence that there has been any breach of secrecy in the increasing number of cases in which federal judges have examined national security information in *post hoc* review during criminal prosecutions. *See, e. g.,* notes 113 & 120 *supra.*

may involve domestic as well as foreign security threats."[160] Furthermore, except for the possibility of frustrating the tap itself, most risks of security leakage will not be lessened in a *post hoc* review setting.[161] Finally, it is important to realize that the judge need only satisfy himself that "probable cause"[162] to conduct the surveillance exists. Thus, in cases where wiretapping would in fact be reasonable, the Government should be able to make this showing without actually disclosing the vast majority of the data it has available;[163] indeed, even as to information which it does disclose, it could withhold the name or other information which would identify an informant or destroy the cover of an agent.[164]

(3) *"Strategic" information-gathering:* Foreign security wiretaps, even more than domestic security wiretaps,[165] are likely to be aimed at collecting and maintaining "strategic" intelligence information on a continuing basis rather than at obtaining evidence for use in criminal prosecutions. Such long-term intelligence gathering is supposedly less offensive to Fourth Amendment values and less susceptible to judicial review than are searches in the criminal context.[166] It is, of course, a myth to characterize national security surveillance as purely non-prosecutorial in the criminal sense; the whole controversy concerning wiretap legislation pre-*Katz* revolved around the question whether evidence obtained in the course of a national security surveillance should be admitted into evidence if the wiretap had not received prior judicial approval.[167] Incriminating evidence is often uncovered through such a wiretap,[168] and the cases which have dealt with the issue of the constitutionality of warrantless national security surveillance[169] demonstrate that the Executive Branch will not hesitate to utilize the fruits of its surveillance to obtain criminal convictions.[170]

---

**160.** 407 U.S. at 321, 92 S.Ct. at 2138.

**161.** And even the risk that a tap would be frustrated may persist during *post hoc* review if there is a continuing surveillance or if other surveillances utilize similar methods or are instituted in circumstances similar to those involved in the surveillance under review.

**162.** And "probable cause" in the national security context need not be as strict as probable cause in the context of ordinary criminal investigations. *See infra,* 170 U.S.App.D.C. at ———, 516 F.2d at 656–658.

**163.** And should a court be unsatisfied with an initial showing based on relatively little information, the Government could come back with additional data; thus a court's initial denial of a search's reasonableness need not preclude the search from occurring if it is in fact reasonable. Indeed, appellees in effect are making a similar argument when they claim that disapproval of the surveillance in this case by other courts was based on the fact that those courts were not sufficiently informed of the reasons underlying the surveillance. *See* note 16 *supra.*

**164.** *See, e. g.,* United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) (warrant may be based on hearsay so long as magistrate is informed of some of the underlying circumstances which support the affiant's conclusion; identity of an informant need not be disclosed); Aguilar v. Texas, *supra* note 24, 378 U.S. at 114, 84 S.Ct. 1509.

**165.** The proponents of Title III believed that "the special advantage of electronic surveillance is that it is a valuable tool for gathering strategic intelligence about organized crime and that it thus enables law enforcement officials to obtain 'a look at the overall picture' for 'prevention' purposes." Schwartz, The Legitimation of Electronic Eavesdropping: The Politics of "Law and Order", 67 Mich.L.Rev. 454, 468–469 (1969), and sources cited therein.

**166.** *See* sources cited note 124 *supra.*

**167.** *See, e. g.,* S.Rep.No.1097, 90th Cong., 2d Sess., 67–69 (1968); Theoharis & Meyer, *supra* note 53.

**168.** Many activities of the subjects of national security surveillances would likely be criminal, even if the purpose of the surveillance were purely intelligence gathering for long- or short-term national security information. *See, e. g.,* 18 U.S.C. §§ 791–799 (1970) (relating to espionage); *id.* §§ 2151–2157 (relating to sabotage); *id.* §§ 2381–2391 (relating to treason, sedition, and subversive activities).

**169.** *See, e. g.,* cases cited *supra,* 170 U.S.App. D.C. at —— & note 111, 516 F.2d at 639–641 & note 111. *See also* note 240 *infra.*

**170.** Domestic threats to the national security may also prompt purely intelligence gathering surveillance. *See* note 165 *supra*; *Keith, supra* note 2, 407 U.S. at 318–319, 92 S.Ct. 2125. The Supreme Court nevertheless rejected this as a reason for abrogating the warrant re-

More important is the fact that "[o]fficial surveillance, *whether its purpose be criminal investigation or ongoing intelligence gathering,* risks infringement of constitutionally protected privacy of speech." *Keith, supra,* 407 U.S. at 320, 92 S.Ct. at 2138 (emphasis added). Indeed, the ongoing nature of such surveillance just increases its intrusiveness and the likelihood that individuals will fear that their conversations are being overheard. *See id.* Nor are the Fourth Amendment privacy interests any weaker merely because the offensive search does not lead to a criminal prosecution.[171] Public disclosure of many legal activities could be highly embarrassing and intimidating; indeed, mere knowledge that one's "private" discussions have been overheard may be extremely insulting or traumatic.[172] In short, the premise be-

hind the "strategic information" rationale for abrogating the warrant procedure, the idea that the Fourth Amendment is limited to remedies in the criminal process, is anomalous, since it would suggest that the more innocent the individual the less protection his privacy interests merit.[173]

■■■ (4) *"Delay"*: It is frequently asserted that electronic surveillance must often be hastily instituted, and that the delay which would result from compliance with a warrant procedure could mean loss of essential intelligence information and subsequent disastrous harm to the national security.[174] Admitting the validity of this contention, we nevertheless find it to be nothing more than an argument that warrantless electronic surveillance, like many other warrantless searches,[175] may be justifiable in exigent

quirement, *see id.* at 320, 92 S.Ct. 2125, although it recognized that such considerations may affect the probable cause showing necessary for securing a warrant, *see id.* at 322, 92 S.Ct. 2125.

171. *See, e. g.,* Camara v. Municipal Court, *supra* note 79, 387 U.S. at 528–531, 87 S.Ct. 1727, *citing with approval* Abel v. United States, 362 U.S. 217, 254–256, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960) (Brennan, J., dissenting), *and* District of Columbia v. Little, *supra* note 107; note 173 *infra.*

172. *See, e. g.,* Berger v. New York, *supra* note 110, 388 U.S. at 64–66, 87 S.Ct. 1783 (Douglas, J., concurring), and sources cited therein; Note, *supra* note 85, 87 Harv.L.Rev. at 986–987. *See also, e. g.,* Washington Star-News, May 16, 1974, at A–1, col. 1 (President Nixon's resentment at discovery he was allegedly wiretapped during 1962 gubernatorial campaign); note 86 *supra.*

173. Like most of the Bill of Rights [the Fourth Amendment] was not designed to be a shelter for criminals, but a basic protection for everyone; to be sure, it must be upheld when asserted by criminals, in order that it may be at all effective, but it "reaches all alike, whether accused of crime or not." * * * It is the individual's interest in privacy which the Amendment protects, and that would not appear to fluctuate with the "intent" of the invading officers. It is true that the greatest and most effective preventive against unlawful searches that has been devised is the exclusion of their fruits from criminal evidence, * * * but it is strange reasoning to infer from this that the central

thrust of the guarantee is to protect against a search for such evidence.

Abel v. United States, *supra* note 171, 362 U.S. at 255, 80 S.Ct. at 705 (Brennan, J., dissenting), *cited approvingly in* Camara v. Municipal Court, *supra* note 79, 387 U.S. at 530, 87 S.Ct. 1727.

The basic premise of the prohibition against searches was not protection against self-incrimination; it was the common-law right of a man to privacy in his home, a right which is one of the indispensable ultimate essentials of our concept of civilization. * * * It belonged to all men, not merely to criminals, real or suspected. * * * To say that a man suspected of crime has a right to protection against search of his home without a warrant, but that a man not suspected of crime has no such protection, is a fantastic absurdity.

District of Columbia v. Little, *supra* note 107, 85 U.S.App.D.C. at 245–246, 178 F.2d at 16–17, *cited approvingly in* Camara v. Municipal Court, *supra* note 79, 387 U.S. at 530, 87 S.Ct. 1727. *See also* Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 392, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (finding constitutional remedy for Fourth Amendment violations, despite fact no criminal indictment was imminent); Wyman v. James, *supra* note 94, 400 U.S. at 317, 91 S.Ct. 381 (dictum).

174. *See* sources cited note 125 *supra. See also* note 120 *supra.*

175. *See, e. g.,* Coolidge v. New Hampshire, *supra* note 96, 403 U.S. at 454–455, 91 S.Ct. 2022; Camara v. Municipal Court, *supra* note

circumstances. It cannot be gainsaid that even if national security surveillance is subjected to prior judicial approval, a traditional exigent circumstances exception should be available where delay might cause irreparable harm. Indeed, even Title III provides for up to 48 hours of warrantless surveillance if "an emergency situation exists with respect to conspiratorial activities threatening the national security interest." [176] However, to allow the potential for harm in certain exigent circumstances to serve as a justification for dispensing with a warrant in all national security contexts is to let the tail wag the dog. And particularly when one recalls that the average national security surveillance has a duration of from 70 to 200 days,[177] it is obvious that even if a warrantless wiretap must be hastily installed, a judge could be requested within a brief period to authorize its continuation.[178] Finally, given former Attorney General Saxbe's description of Executive procedures relating to departmental wiretap authorizations,[179] it would appear that most wiretap installations are carefully planned in advance, particularly where the goal is general intelligence gathering. Thus in the vast majority of cases delay will be no problem, and those rare cases in which it would be a problem may be subsumed within the normal exception for searches conducted in exigent circumstances.

(5) "Administrative burden" on courts and the Executive: It has been suggested that

> judges [should not be] burdened with the grave responsibility of deciding whether [national security] surveillances are reasonable and necessary to fulfill information requirements of foreign policy and national defense[.] [180]

If this "burden" refers to the imposition of a task beyond the capability of the judiciary, our "judicial competence" argument should indicate our feelings as to this asserted factor for abrogating the warrant procedure. If, however, it refers to the desirability of removing the weight of responsibility for making admittedly difficult decisions from our shoulders, we can only respond that we are grateful for the sympathy with which our role is viewed. Nevertheless, we are mindful that the judicial system is the focal point of all the conflicts and controversies of our society, and that the task of a judge, though not always a pleasant or a simple one, is to resolve those controversies in the fairest manner

79, 387 U.S. at 539, 87 S.Ct. 1727; United States v. Mapp, 2 Cir., 476 F.2d 67, 76 (1973); notes 89 & 93 supra.

176. 18 U.S.C. § 2518(7) (1970), discussed note 240 infra. Moreover, as the Supreme Court perceived in Katz v. United States, supra note 54, 389 U.S. at 358 n.21, 88 S.Ct. at 515, in holding a surveillance not to fall within the "hot pursuit" exception to the warrant requirement:

> Although "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others,"Warden v. Hayden, 387 U.S. 294, 298–299, [87 S.Ct. 1642, 1646, 18 L.Ed.2d 782], there seems little likelihood that electronic surveillance would be a realistic possibility in a situation so fraught with urgency.

Of course, there may be exigent circumstances where imminent danger of loss of vital information would justify dispensing with the warrant procedure, although a warrant should generally be obtainable during the period in which wiretap preparations are being made and Executive authorization is being sought. See supra, 170 U.S.App.D.C. at ——, 516 F.2d at 642–643.

177. See Keith, supra note 2, 407 U.S. at 325–326 & n.3, 334, 92 S.Ct. 2125 (appendix to opinion of Douglas, J., concurring). See also note 26 supra.

178. Cf. 18 U.S.C. § 2518(7) (1970) (authorizing warrantless surveillance when "emergency situation exists with respect to conspiratorial activities threatening the national security interest," if application for warrant pursuant to statute is made within 48 hours after interception begins).

179. See supra, 170 U.S.App.D.C. at ——, 516 F.2d at 642–643.

180. Kelley, supra note 26, at 9. See also United States v. Butenko, D.N.J., 318 F.Supp. 66, 72 (1970), affirmed, 3 Cir., 494 F.2d 593, cert. denied, 419 U.S. 881, 95 S.Ct. 147, 43 L.Ed.2d 121 (1974).

of which he is capable. Faced with such problems, we can only recall Chief Justice Marshall's lament:

> With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, then to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty.

Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821). Although the "burden" argument may be cast alternatively as the administrative cost and burden which will be imposed on the Executive Branch if it must justify in every case[181] its request for a wiretap, we decline to accept an argument grounded in expediency as a basis for resolving our constitutional inquiry. As the Supreme Court in *Keith* observed in rejecting a similar argument in the domestic context, "Although some added burden will be imposed upon the Attorney General, this inconvenience is justified in a free society to protect constitutional values." 407 U.S. at 321, 92 S.Ct. at 2139.[182]

### D.

Having analyzed those factors which might dictate abrogation of the warrant requirement for that category of cases in which surveillance is based upon the President's constitutional powers with respect to the conduct of foreign affairs, we find that they do not suggest that the warrant procedure would actually fetter the legitimate intelligence gathering functions of the Executive Branch. Indeed, our analysis would suggest that, absent exigent circumstances, *no* wiretapping in the area of foreign affairs should be exempt from prior judicial scrutiny, irrespective of the justification for the surveillance or the importance of the information sought. As in *Keith,* we need not rest our decision on so broad a holding, since we are only presented with a case in which foreign threats of retaliation against individual citizens abroad were *provoked* by the actions of the domestic organization which was subsequently wiretapped, rather than a case in which the wiretapped organization acted in collaboration with, or as the agent of, the foreign power from which the threat emanated.[183]

---

**181.** *Cf. supra,* 170 U.S.App.D.C. at ——, 516 F.2d at 646–647.

**182.** If the number of foreign security wiretaps is as small as the Government has periodically asserted, *see, e. g.,* Schwartz, Reflections on Six Years of Legitimated Electronic Surveillance, in Privacy in a Free Society 38, 50–51 (final report of Annual Chief Justice Earl Warren Conference on Advocacy in the United States 1974); Note, *supra* note 53, 45 S.Cal.L. Rev. at 901 & n.51; N.Y. Times, Dec. 19, 1971, at 20, col. 4, there should be no substantial burden or expense involved in complying with the warrant procedure. If there are considerably more wiretaps than the Government admits, one might question whether they are all necessary for national security purposes or doubt the candor of the Government's assertion that the proper remedy for excessive Executive-ordered surveillance is through the political process. *See also* Wicker, A Gross Invasion, N.Y. Times, Dec. 19, 1971, § 4, at 11, col. 6.

**183.** Q Was there anything in the information that you obtained regarding the JDL prior to September 14, 1970 *that indicated that the* JDL was acting on behalf of a foreign power?

A No, sir.

Q Was there anything in the information that you received that indicated that it was engaged in espionage?

A Not to my recollection.

Q Or in plotting the violent overthrow of the United States Government?

A Well, I suppose that could be considered in the matter of degree of an organization like this carrying out activities that fly in the face of the governmental control of foreign policy. It's a matter of degree as to whether there would be or would not be. When they are usurping authority, it may very well be construed as that.

Q But you are focusing your attention on the activities that were engaged against Soviet officials, not against American officials.

A And Arab officials.

In the Solicitor General's brief to the Supreme Court in *Keith,* the Government argued strenuously that foreign and domestic threats to the national security were often intertwined and that, since warrantless surveillance for foreign intelligence gathering should certainly be sustained, warrants should not be required for any national security surveillance.[184] The Court rejected this argument by imposing the warrant procedure on domestic security wiretapping and limiting the scope of its decision. Pointing to the facts before it, the *Keith* Court made clear that no foreign threat was involved:

> [T]he instant case requires no judgment on the scope of the President's surveillance power with respect to the activities of foreign powers, within or without this country. The Attorney General's affidavit in this case states that the surveillances were "deemed necessary to protect the nation from attempts of *domestic organizations* to attack and subvert the existing structure of Government" (emphasis supplied). There is no evidence of any involvement, directly or indirectly, of a foreign power.[185]

In concluding its opinion, the Court reemphasized the scope of its holding:

> [T]his case involves only the domestic aspects of national security. We have

not addressed, and express no opinion as to, the issues which may be involved with respect to activities of foreign powers or their agents.[186]

Although appellants contend and appellees admit [187] that the JDL is a domestic organization with no Russian connection, that fact does not mean that appellants are correct in their assertion [188] that the warrantless surveillance here is automatically unlawful. In *Keith,* "[t]here was no evidence of any involvement, directly or indirectly, of a foreign power." Here, by contrast, while there is no collaboration between the JDL and Russia—quite the reverse— JDL's activities did involve Russia in a confrontation with the United States. Thus this case does indeed involve the foreign affairs of this country and therefore falls outside the holding in *Keith* and into the area it reserved for future disposition. Although the type of involvement here was not anticipated in *Keith,* there is no indication that *Keith* intended to limit "involvement" to collaboration with a foreign power. Collaboration simply was the most obvious example of how a domestic organization could become involved in the foreign affairs of this country.[189]

■ The rationale underlying *Keith* nevertheless requires that warrants be obtained before surveillance can take

---

Q Soviet and Arab officials.

A Their acts related to acts that could be taken against American officials, particularly those overseas.

Q But there was no evidence that you had that they themselves were plotting the violent overthrow of the United States Government?

A As a total concept, no.

Q Or that they were plotting any invasion of the United States on behalf of a foreign power?

A No.

JA at 48–50 (deposition of Attorney General Mitchell). Appellees have acquiesced in appellants' contention that they are a domestic organization. *See* brief for appellees at 28.

184. Brief for the United States in *Keith, supra* note 2, at 31–33. *See also* United States v. Hoffman, *supra* note 111, 334 F.Supp. at 506–507.

185. 407 U.S. at 308–309, 92 S.Ct. at 2132 (footnote omitted). *See also* note 189 *infra.*

186. 407 U.S. at 321–322, 92 S.Ct. at 2139. At this point in the opinion the Court also dropped its footnote 20, *see supra,* 170 U.S. App.D.C. at ——, 516 F.2d at 636–637, which noted, though not approvingly, the view that warrantless surveillance might be constitutional where "foreign powers are involved." 407 U.S. at 322 n.20, 92 S.Ct. 2125.

187. *See* note 183 *supra.*

188. *See* brief for appellants at 20–23.

189. *See* 407 U.S. at 309 n.8, 92 S.Ct. 2125. For example, if the defendant in *Keith* had been financed by a foreign power, the Court would have treated the case as involving the foreign aspects of our national security even though the foreign power had itself taken no overt action against this country. In our case, since the threat to national security emanated from Russia, there is no question that the President's foreign affairs powers must be considered in our decision whether the surveillance was lawful.

place on a domestic organization that shares no community of interest with the foreign power "involved" in the case. Judge Costantino, in assessing the legality of the same wiretaps involved in this case, although in a criminal context, succinctly stated the appropriateness of applying the reasoning of *Keith* to our case:

> [T]he President's duty "to preserve, protect and defend the Constitution of the United States," was not [under *Keith*] a sufficient basis to allow warrantless surveillance for the purpose of "domestic security." It would likewise be held, then, that the President's power to conduct foreign affairs would not be a basis for allowing warrantless surveillance of domestic groups whose activities and conduct are not in any way controlled by a foreign power. That a domestic group, through conduct which would be violative of the internal laws of this country, may by some indirect manner affect the relations between this country and another would not be, under the reasoning of *Eastern District of Michigan,* a sufficient cause to allow warrantless surveillance. Of greatest significance, is the fact that the conduct which forms the gravamen of this case involves "domestic" crimes, and that there is only an indirect relation between the alleged conduct of the defendants and the foreign affairs of this country.[190]

■ Much of the *Keith* opinion was concerned with the vagueness of the as-

serted power to protect the "domestic security"[191] and the substantial danger to political dissent that could result from abuse of such a power. As we have noted,[192] the concept of "affecting foreign relations" is no less vague and no less subject to abuse, particularly when a domestic organization has no positive nexus with the foreign power making threats against this country. It would indeed be anomalous to allow the Government to engage in warrantless surreptitious surveillance of activity, which would otherwise remain private and protected, merely because another government is antagonized by such activity. To the extent such activity constitutes domestic crime, there is no reason to accord the suspect less protection merely because a foreign power objects to the activity; to the extent such activity constitutes protected speech, there is the inherent danger that the Government will use the protests of foreign powers or the fact that the speech "affects" its foreign relations to dampen protests to its foreign relations policies. For example, such an exception to the warrant requirement would have allowed warrantless surveillance of all groups protesting our policies during the conflict in Vietnam, for the Johnson and Nixon Administrations were both of the opinion, in concurrence with the opinion of the government of South Vietnam, that such protests were making successful negotiation in Paris impossible and military operations in Vietnam more dif-

---

**190.** United States v. Schwartz, *supra* note 16 (memorandum and order suppressing wiretaps and ordering disclosure for *Alderman* hearing) (slip op. at 4).

**191.** 407 U.S. at 314, 320, 92 S.Ct. 2125. As Senator Hart worried during the floor debate on § 2511(3), *discussed infra,* 170 U.S.App. D.C. at ———-—— & note 219, 516 F.2d at 659–670 & note 219:

> As I read it—and this is my fear—we are saying that the President, on his motion, could declare—name your favorite poison—draft dodgers, Black Muslims, the Ku Klux Klan, or civil rights activists to be a clear and present danger to the structure or existence of the Government.

114 Cong.Rec. 14750 (1968), *quoted in Keith, supra* note 2, 407 U.S. at 314, 92 S.Ct. 2125. *See also* S.Rep.No.1097, *supra* note 167, at 174 (additional views of Senator Hart on Title III of S. 917). Given the way in which the activities of many similar organizations may also be said to "affect" in some manner the foreign relations or foreign policy decisions of the United States, the "affecting foreign relations" test would appear to be similarly overbroad and vague.

**192.** *See, e. g., supra,* 170 U.S.App.D.C. at ———-—— & notes 42 & 108, 516 F.2d at 633–636 & notes 42 & 108. *See also* note 67 *supra.*

ficult, and that they thus posed a severe threat to the national security.[193]

Moreover, when domestic organizations are involved, not only are the interests in favor of requiring a warrant strongest, but the possible arguments against the warrant procedure, which are weak in any event, have even less force. There is less objection to the competence of judges to properly weigh the respective interests, since judges are both familiar with criminal activity and sensitive to the importance of protecting First Amendment rights. For example, the Government does not suggest that we are incapable of assessing the reasonableness of the wiretaps here in question on the basis of State Department documents which were also available when the surveillance was originally instituted. Furthermore, security leaks during a warrant proceeding are less likely to disrupt foreign relations in a case such as the present one, since the domestic organization by hypothesis has no ties with the foreign power. Indeed, if it had been disclosed that JDL conversations were being overheard in an effort to appease the Soviet Government, a furor might have resulted domestically, but it is doubtful such a disclosure would have caused the Soviet Union to act to our detriment.[194] Moreover, in this case all of the essential information which prompted the wiretap installation, including the fact of Soviet protests, was already in the public domain.[195] Nor is there as much force in the argument that long-term surveillance is justifiable for strategic information gathering purposes when the domestic organization can yield no information about "the intentions, capabilities and possible responses of other countries."[196] For example, surveillance of the JDL could provide no information as to action which the Soviet Government would itself take. To the extent information on criminal activities which would antagonize the Soviet Union could be obtained through surveillance, a traditional warrant would serve as well; to the extent information on First Amendment demonstrations which would antagonize the Soviet Union could be obtained, it is doubtful whether the Government could or should be able to take any actions to prevent such "embarrassment."[197]

Most important, given the way in which almost any activity can be said to relate, at least remotely, to foreign affairs or foreign policy making, the potential scope of such an exception to the warrant requirement is boundless, and thus a substantial danger to the values the Fourth Amendment was fashioned to protect. And although we doubt that an exception to the warrant requirement should be created even for the activities of foreign agents or collaborators, at least such an exception would be more "carefully delineated"[198] than an exception allowing warrantless wiretapping whenever the activities of domestic

**193.** *See, e. g.,* N.Y. Times, Feb. 9, 1972, at 1, col. 1, 12 col. 3; N.Y. Times, July 28, 1972, at 1, col. 8, 10 cols. 1–8 (presidential news conference on foreign and domestic affairs).

**194.** Even if a breach of security frustrates the surveillance itself or endangers Government informers or agents in the United States, the threat is not therefore different from that in an ordinary criminal situation.

**195.** *See* note 23 *supra.*

**196.** *See* United States v. Butenko, *supra* note 14, 494 F.2d at 601. *See also id.* at 608 (President should be "aware of the posture of foreign nations toward the United States, the intelligence activities of foreign countries aimed at uncovering American secrets, and the policy positions of foreign states on a broad range of international issues").

**197.** Recently there have been disturbing revelations concerning secret FBI counterintelligence programs which in fact employed such improper practices. *See, e. g.,* Statement of Attorney General William B. Saxbe and Report on FBI Cointelpro Activities (Dept. of Justice release, Nov. 18, 1974); N.Y. Times, Nov. 19, 1974, at C27, cols. 1–8; Washington Post, Nov. 18, 1974, at C9, cols. 4–6.

**198.** *See* 407 U.S. at 318, 92 S.Ct. 2125; *supra,* 170 U.S.App.D.C. at ——, 516 F.2d at 631–632.

groups incur the wrath of a foreign power or affect in any manner the conduct of our foreign affairs.[199]

### E.

Since we have determined that the President's authority with respect to the conduct of foreign affairs does not excuse him from seeking judicial approval before instituting a surveillance, at least where the subject of the surveillance is a domestic organization that is not the agent of or acting in collaboration with a foreign power, we feel we should at least briefly adumbrate our views as to the role of the judge in such a proceeding. Although such a statement is not necessary for resolution of the pending case, we believe it would serve the salutary purpose of informing both the Executive Branch and members of the judiciary of some of the considerations which should guide their actions in the future.[200] Moreover, we find such a statement particularly necessary in light of the fact that those courts which have limited the role of the judiciary to *post hoc* determination of the "reasonableness" of national security surveillances have also sharply circumscribed the judiciary's role in balancing the actual need of the Government for specific information against the interest in protecting the First and Fourth Amendment rights of our citizens.

For example, the Third Circuit in *Butenko* stated:

Since the primary purpose of these searches is to secure foreign intelligence information, a judge, when reviewing a particular search must, above all, be assured that this was in fact its primary purpose and that the accumulation of evidence of criminal activity was incidental. * * * Since, we reiterate, *the district court has found that the * * * interceptions* of conversations of [defendant] Ivanov *were "solely for the purpose of gathering foreign intelligence information," they are reasonable under the Fourth Amendment.*

*United States v. Butenko, supra,* 494 F.2d at 606 (emphasis added). And the Solicitor General, in his Memorandum in Response to the Petition for a Writ of Certiorari in *Butenko,* suggested that *"[a]ll that the Fourth Amendment requires is a determination that the purpose of the surveillance is intelligence gathering."*[201] The full significance of

---

**199.** *But see supra,* 170 U.S.App.D.C. at ——, 516 F.2d at 634–636; Note, *supra* note 85, 87 Harv.L.Rev. at 993–994.

**200.** Judge Goldberg, although referring to the analogous problem in the context of *post hoc* review, has noted the primary circumstance which prompts us to make such a statement:

It is unfortunate *for the development of the law in this area of foreign intelligence wiretapping that the essential information on which the legality of executive action turns*—the subject, location, scope, and duration of the surveillance—cannot be revealed. This circumstance places tremendous responsibility for both national security and cherished constitutional rights in the hands of individual judges, acting largely in *ignorance of the related decisions of their colleagues and permanently insulated from the helpful criticisms and suggestions that result from the adversary process and the publication of explanatory opinions.*

United States v. Brown, *supra* note 113, 484 F.2d at 427 (special concurrence). *See also* Note, *supra* note 85, 87 Harv.L.Rev. at 994–1000.

**201.** Memorandum for the United States at 13 (emphasis added) in Ivanov v. United States, *cert. denied,* 419 U.S. 881, 95 S.Ct. 147, 43 L.Ed.2d 121 (1974). *See also* United States v. Butenko, *supra* note 14, 494 F.2d at 605–606; 363 F.Supp. at 943–944. In elaborating this test the Solicitor General quoted the dissenting opinion of Judge Adams (who authored the Third Circuit's *en banc* majority opinion) from the original three-judge panel in *Butenko:*

[T]he test of "reasonableness" in such cases should be *the relationship between the search and the President's foreign affairs power.* Before the contents or fruits may be used in a judicial proceeding, the government should have to demonstrate to the satisfaction of the trial judge *in camera* that the electronic surveillance was, in fact, *related to the Chief Executive's foreign affairs authority. Once such a showing has been made, a conclusion that the wiretap was "reasonable," and thus constitutional, would be appropriate.* On the other hand, should the government fail to demonstrate satisfactorily *a relationship* between the surveillance and the President's foreign affairs power,

this formulation only becomes apparent when one recognizes not only that it focuses on only one side of the Fourth Amendment balance, but also that "intelligence gathering" pursuant to the President's foreign affairs powers is not thereby limited to situations such as those enumerated in Title III—threats of foreign attack or aggression, and intelligence and counterintelligence activities.[202] The Third Circuit found that the President's duties as Commander-in-Chief and as the nation's representative in foreign affairs implied the responsibility to "exercise an informed judgment." 494 F.2d at 601. This responsibility seemingly opened the door to warrantless Executive intelligence gathering that would relate even remotely to any decision, however minor, pertaining to foreign relations: "[T]he efficient operation of the Executive's *foreign policymaking apparatus* depends on a continuous flow of information. A court should be wary of interfering with this flow. * * * The government [has a weighty interest in acquiring] the information

necessary to exercise an *informed judgment in foreign affairs." Id.* at 605–606 (emphasis added).[203]

■ We recognize that the Supreme Court has indicated that the "probable cause" standard for warrant issuance is a flexible one which may vary depending on the type of search involved and the Government interests subserved thereby.[204] And there are factors which indicate that the determination of probable cause for conducting a foreign, no less than for conducting a domestic, security surveillance should reflect the fact that "the focus of * * * surveillance may be less precise than that directed against more conventional types of crime." 407 U.S. at 322, 92 S.Ct. at 2139. Thus it would appear to be proper to issue warrants where there is "probable cause" to believe that certain categories of intelligence information are likely to be obtained from the surveillance, even though evidence of crime is neither sought nor likely to be uncovered.[205]

the court would properly find that the tap was illegal * * *.
Memorandum for the United States, *supra,* at 14 n.13 (emphasis added).

**202.** *Compare* cases cited *supra,* 170 U.S.App. D.C. at ——–—— & notes 113 & 120, 516 F.2d at 636–641 & notes 113 & 120, *with* 18 U.S.C. § 2511(3) (1970), *quoted* note 219 *infra. But see* United States v. Butenko, *supra* note 14, 494 F.2d at 608.

**203.** Indeed, the Government took a similarly sweeping view of the rationale and scope of its purported foreign intelligence powers in the District Court in this case:

In fulfilling these responsibilities [to safeguard the nation against foreign aggression and to *formulate and execute the nation's foreign policy*] the President must, of course, exercise an informed judgment. This, in turn, implies both a power and a duty to utilize all of the investigative resources at his disposal in order to insure that he will have available to him *all* the information which is necessary for him to make a proper judgment.
Memorandum of Points and Authorities in Support of Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Partial Summary Judgment at 14 (April 24, 1973) (emphasis added). *See also*

United States v. Brown, *supra* note 113, 484 F.2d at 426, *quoted* note 120 *supra* (referring to foreign encroachment in this country's "intercourse" with other nations). The *Brown* court's "intercourse" language presumably implies a presidential power to conduct warrantless electronic surveillance whenever trade with foreign powers is affected. In our economically interdependent world, a power so attenuated from traditional concepts of national security effectively grants the President *carte blanche* authority to covertly oversee, without being held responsible to anyone, the operations of almost any business organization operating in the United States, particularly those with overseas investments or foreign investors. *Compare, e. g.,* Foreign Investment Study Act of 1974, Pub.L.No.93–479, 88 Stat. 1450 (1974) (authorizing Secretaries of Commerce and Treasury to conduct a study of foreign direct and portfolio investment in the United States, and to analyze, *inter alia,* its effect on national security).

**204.** *See, e. g.,* Almeida-Sanchez v. United States, *supra* note 86, 413 U.S. at 283–285, 93 S.Ct. 2535 (Powell, J., concurring); *Keith, supra* note 2, 407 U.S. at 322–324, 92 S.Ct. 2125; Camara v. Municipal Court, *supra* note 79, 387 U.S. at 534–539, 87 S.Ct. 1727.

**205.** Indeed, even if there is no exemption from the warrant requirement for situations in

However, we do not believe that every search must be deemed to be "reasonable" merely because the Third Circuit's test is met and *some* information relevant to *any* decision *relating to foreign affairs* is likely to be obtained from the surveillance. Such an approach would not assure that surveillances are "reasonable both in relation to the legitimate need of the Government for intelligence information *and* the protected rights of our citizens," 407 U.S. at 323, 92 S.Ct. at 2139 (emphasis added); the *Butenko* test assesses neither the Government's need for the information nor the countervailing individual interests affected by a search.

To be sure, some information relating to foreign affairs is of paramount importance—for example, information such as that relating to imminent attack or other hostile actions by a foreign power, or to prevention of espionage activities directed at obtaining important military defense data. On the other hand, there is some information which, though "relevant" to foreign affairs decisions, would appear to be of minimal importance to the Government—for example, information pertaining to the attitudes of hotel proprietors and restaurateurs may be "relevant" to assuring that no embar-

rassing "international incidents" occur when this counry hosts foreign Olympic teams or the Bolshoi Ballet.[206] This is not to say that the President or Congress would never have authority to obtain such information—for example, by conditioning governmental patronizing of these establishments on the disclosure of certain information by their owners. Rather, it is to say that obtaining such information through installation of wiretaps would be unreasonable, particularly given the *low ratio of expected relevant information to nonrelevant information* and the relative *nonurgency of the information sought.*[207] In this circumstance, Fourth Amendment protection under the *Butenko* test would "approach the evaporation point." [208]

■ This example also highlights another possible factor that judges might consider in determining whether a proposed search would be reasonable. Since most of the crucial intelligence information sought through legitimate surveillance is likely to relate to military or diplomatic affairs, and since the sources of such information are likely to be aliens whose primary allegiance is to the foreign power and who are diplomatically immune from various types of legal process, there may be a greater justifica-

---

which the subject is an alien or foreign collaborator, warrants would probably issue almost automatically for surveillance of foreign embassies and other installations where there is a substantial likelihood of obtaining foreign intelligence information on a regular basis.

**206.** Cancellation of scheduled tours of the United States by Soviet cultural organizations was among the influences which JDL activity was found to have exerted on our foreign relations. *See* 363 F.Supp. at 940.

**207.** Moreover, such surveillance poses particularly acute threats to privacy, given the high volume of usage of such telephones and the general expectation that such conversations are private. Of course, depending on such factors as the information sought or its likelihood of being uncovered through surveillance of various scope and duration, a judge might approve a wiretap for even relatively non-urgent information by significantly curtailing the likely intrusiveness of the tap. For example, he

could set strict standards as to the subject matter of conversations that may be overheard or the identity of the subjects of the surveillance.

It should also be noted that judges should accord great deference to Executive assertions concerning the importance of information sought. *See, e. g., supra,* 170 U.S.App.D.C. at ——, 516 F.2d at 642. Nevertheless, "[t]he time has long passed when the words 'foreign policy,' uttered in hushed tones, can evoke a reverential silence from either a court or the man on the street." Pillai v. CAB, 158 U.S. App.D.C. 239, 252 n.34, 485 F.2d 1018, 1031 n.34 (1973). *See also Keith, supra* note 2, 407 U.S. at 320, 92 S.Ct. 2125. Some showing should be required of the Government that the information sought, even when its need is viewed most favorably to the Government, is of sufficient import to justify the intrusion of surreptitious surveillance.

**208.** *Cf.* Chimel v. California, *supra* note 89, 395 U.S. at 765, 89 S.Ct. 2034.

tion for· conducting electronic surveillance when such aliens are the proposed subjects than when citizens or domestic organizations are involved. In short, a judge could require a showing that the *subject of the surveillance is hostile to the Government and that alternative means of obtaining the information, such as subpoenas or routine FBI questioning, have been exhausted or would prove to be unsuccessful or inconsistent with the information gathering goals.*[209] Certainly there are less intrusive means than surreptitious surveillance for obtaining information concerning domestic political, economic, or social events which might nevertheless tangentially affect the conduct of foreign affairs.

Nor does the role accorded the judiciary by the *Butenko* test allow for adequate protection of individual constitutional rights. For the intrusiveness of a wiretap certainly bears on whether it is constitutionally "unreasonable." If only one member of the JDL were engaged in activity that would justify wiretapping, the *Butenko* test would allow installation of a wiretap on any phone he might use, regardless of the number of others whose conversations would also be overheard. But even if the Government sought to institute the surveillance on JDL's headquarters in good faith, a court might conclude that a tap on the individual's home phone would serve the Government's purposes just as adequately, particularly if the information sought were not of surpassing import.[210] Moreover, a judge could pass on the reasonableness of the proposed scope or duration of the surveillance, and could grant renewals based on the success of an initial period of surveillance, rather than in 90-day blocks on a *pro forma* basis.[211]

■■■ These are merely some of the considerations which a judge should take into account in deciding whether it is reasonable to authorize installation of electronic surveillance equipment. This approach must inevitably be somewhat *ad hoc,* but we believe the judiciary must take some role more active than that suggested by the *Butenko* court if there is to be any meaningful protection for individual rights and any meaningful restraint on the Government's ability to abuse any power to wiretap to gather information "relating to" the conduct of foreign affairs. Nor should such a role in any way hamper the Government; in other contexts the judiciary has shown great deference to Executive judgments on foreign affairs matters, and we believe any errors on the part of the judiciary are likely to result in "unreasonable" searches rather than "unreasonable" denials of intelligence data.

Finally, we must observe that we do not now delineate the exact procedures the Executive must follow in securing warrants and preserving the records of electronic surveillance. Since we will indicate, in the next section of this opinion, that Congress intended the procedures and remedies of Title III to apply to all surveillance subjected by the courts to the warrant procedure,[212] we do not consider what other protective standards, whether stricter or moɪ․ᐟ permissive than those currently embodied in Title III,[213] Congress could· constitution-

---

**209.** *Cf.* 18 U.S.C. § 2518(1)(c) (1970); S.Rep. No.1097, *supra* note 167, at 101.

**210.** A court could also assess whether there is adequate reason to believe the individual is a member of the organization or that he will make calls over the organization's telephones. *See* note 98 *supra.* In addition, the court could particularize what the authorized subject of the surveillance is and limit its approval of surveillance to calls actually pertaining to that subject.

**211.** *See* note 26 *supra.*

**212.** *See also* note 228 *infra.*

**213.** *See, e. g.,* S. 2820, *text and commentary reported at* 119 Cong.Rec. S23025–S23030 (daily ed. Dec. 17, 1973); S. 4062, S. 3440, 93d Cong., 2d Sess. (1974); H.R. 1864, H.R. 539, H.R. 414, H.R. 266, H.R. 214, H.R. 141, 94th Cong., 1st Sess. (1975). *See generally* Joint Hearings, *supra* note 1; Subcommittee On Surveillance, *supra* note 1; Committee of Federal Legislation and the Committee on Civil Rights, Judicial Procedures for National Security Electronic Surveillance, 29 Record of N.Y. C.B.A. 751 (1974).

ally provide for the conduct of surveillance in this area.

### III

We have held that the electronic surveillances involved in this case were illegal because they were executed without a warrant. If this were a criminal case, as in *Keith,* we could end our inquiry here. However, this is a civil suit for damages, and both the measure of damages and the allowable defenses will turn on whether the provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1970), apply in this case, or whether appellants are relegated to the remedies afforded under the seminal decision of Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, *supra,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619.[214] Under the latter approach, only compensatory damages would be allowed, appellees could interpose a general "good faith" defense,[215] and jurisdiction would be premised on 28 U.S.C. § 1331 (1970), which requires over a $10,000 amount in controversy, *see, e. g.,* Sullivan v. Murphy, 156 U.S.App.D.C.

28, 50, 53, 478 F.2d 938, 960, 963, *cert. denied,* 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973); under a statutory theory, appellants could recover not only actual damages (with minimum liquidated damages computed at the rate of $100 per day for each day of violation), but also punitive damages and attorney's fees, and appellees could interpose only a narrow and specific good faith defense.[216] This statutory remedy, however, is limited by 18 U.S.C. § 2520 (1970) to eavesdropping that is "in violation of this chapter [Title III]."[217] We must therefore determine whether appellees' actions violated the statute as well as the Constitution.

### A.

Section 2511 of Title III declares that "[e]xcept as specifically provided in this chapter," interception of "*any* wire or oral communication" is illegal. In granting appellees' motion for summary judgment, Judge Pratt found as a matter of law that Title III "has no application and cannot be invoked with respect to electronic surveillances conducted pursuant to the President's national security

---

**214.** *See supra,* 170 U.S.App.D.C. at ——, 516 F.2d at 611. As appellants recognized in oral argument, after stating that their complaint was based upon a *Bivens* rationale as well as upon statutory grounds, *see* Transcript of Proceedings at 10, the nonstatutory theory "presents more difficult questions as to liability." *Id.* at 11; *see infra,* 170 U.S.App.D.C. at ——, ———–——, 516 F.2d at 659–660, 669–673.

**215.** *See, e. g.,* Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 2 Cir., 456 F.2d 1339 (1972) (on remand from the Supreme Court). *Bivens* held that agents of the Federal Bureau of Narcotics have no absolute immunity to protect them from damage suits alleging violations of constitutional rights by the agents in performance of their law enforcement duties. However, the court found that a sufficient defense to such an action could be established if the agent met a two-pronged standard comprised of a subjective and an objective test; that is, if the officer can prove both that he believed, in good faith, that his conduct was lawful and that such belief was in fact reasonable. *See infra,* 170 U.S. App.D.C. at ——, 516 F.2d at 669–673.

**216.** 18 U.S.C. § 2520 (1970), amending 18 U.S.C. § 2520 (1968), provides:

Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter [Title III] shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and (2) be entitled to recover from any such person—

(a) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;

(b) punitive damages; and

(c) a reasonable attorney's fee and other litigation costs reasonably incurred.

A good faith reliance on a court order or legislative authorization shall constitute a complete defense to any civil or criminal action brought under this chapter or under any other law.

*See also infra,* 170 U.S.App.D.C. at ———–——, 516 F.2d at 669–673.

**217.** *See* note 216 *supra.*

powers." 363 F.Supp. at 943.[218] This conclusion was predicated on the belief that it was mandated by Mr. Justice Powell's opinion in *Keith.* *See id.* at 942–943. However, although there is some apparent merit to Judge Pratt's position, we find that the opinion in *Keith,* which did not specifically address itself to the issue *sub judice,* offers only ambiguous guidance as to the proper resolution of our problem.

After noting the "comprehensive" nature of Title III, the Supreme Court in *Keith* addressed the Government's argument that Section 2511(3), the so-called "national security proviso" of Title III,[219] was a congressional affirmation or recognition of presidential authority to conduct *warrantless* domestic security surveillances. *See* 407 U.S. at 302–303, 92 S.Ct. 2125. Rejecting that contention,[220] the Court found the language of the Act to be "essentially neutral" and determined that "Congress simply left presidential powers where it found them." *Id.* at 303, 92 S.Ct. at 2130. "Congress only intended to make clear that the Act simply did not legislate with respect to national security surveillances." *Id.* at 306, 92 S.Ct. at 2131. Besides relying on the language and context of the proviso, the Court grounded its interpretation on the legislative history of Section 2511(3).[221] Finally, opining that one

---

**218.** Judge Pratt apparently treated the complaint as if it were based solely on statutory grounds. As noted *supra,* 170 U.S.App.D.C. at ——, 516 F.2d at 605–606, appellants in fact grounded their complaint on both statutory and· constitutional theories. Thus, given our holding that appellees acted unconstitutionally, appellants have stated a cause of action whether or not Title III remedies are appropriate and whether or not appellees may establish meritorious affirmative defenses.

**219.** 18 U.S.C. § 2511(3) (1970), the so-called "national security" proviso to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1970), provides:

> Nothing contained in this chapter [Title III] or in section 605 of the Communications Act of 1934 * * * shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial, hearing, or other proceeding only where such interception was reasonable, and shall not be otherwise used or

disclosed except as is· necessary to implement that power.

**220.** Judge Pratt, following appellees' brief, indicates that *Keith* states that § 2511(3) constitutes "an implicit recognition that the President does have certain powers in the specified areas [of national security]." 363 F.Supp. at 943, *quoting Keith, supra,* note 2, 407 U.S. at 303, 92 S.Ct. 2125. For clarification, it should be noted that this was not in the context of assessing congressional attitudes toward a warrant requirement or other procedures for regulating any substantive powers the President might possess; rather, it was in the context of acknowledging that the President does in fact have substantive powers in the field of foreign affairs. *Cf. supra,* 170 U.S.App.D.C. at ——, 516 F.2d at 615–616.

**221.** *See* 407 U.S. at 303–308, 92 S.Ct. 2125. The *Keith* Court quoted the solitary Senate floor debate expressly concerning § 2511(3):

> "Mr. HOLLAND. . . . The section [2511(3)] from which the Senator [Hart] has read does not affirmatively give any power. . . . *We are not affirmatively conferring any power upon the President.* We are simply saying that nothing herein shall limit such power as the President has under the Constitution. . . . We certainly do not grant him a thing.
> "There is nothing affirmative in this statement.
> "Mr. McCLELLAN. Mr. President, *we make it understood that we are not trying to take anything away from him.*
> "Mr. HOLLAND. The Senator is correct.
> "Mr. HART. Mr. President, there is no intention here to expand by this language a constitutional power. Clearly we could not do so.
> "Mr. McCLELLAN. Even though intended, we could not do so.

"could hardly expect a clearer expression of congressional neutrality," and concluding that the floor debate on the section "explicitly indicates that nothing in § 2511(3) was intended to *expand* or to *contract* or to *define* whatever presidential surveillance powers existed in matters affecting the national security," *id.* at 308, 92 S.Ct. at 2132, the Court held that "the statute is *not the measure of the executive authority asserted in this case." Id.* (emphasis added). The Court thereupon proceeded to scrutinize the constitutional validity of warrantless electronic surveillance based on domestic threats to the national security. Having concluded that such warrantless surveillance was unconstitutional, the Court reiterated its earlier statements that "our decision [that a warrant was required does not] rest on the language of § 2511(3) or any other section of Title III of the Omnibus Crime Control and Safe Streets Act of 1968. That Act does not attempt to define or delineate the powers of the President to meet domestic threats to the national security." *Id.* at 322, 92 S.Ct. at 2139.[222]

Although not necessitated by its decision, later in its opinion the Court indicated, as it had in upholding the warrant requirement in such prior cases as *Camara v. Municipal Court, supra,* that the standards and procedures under the warrant requirement need not be the same in all cases. Introducing this discussion, it specified that "we do not hold that the same type of *standards and procedures* prescribed by Title III are *necessarily* applicable to this case." 407 U.S. at 322, 92 S.Ct. at 2139 (emphasis added). Adumbrating some of the "potential distinctions between Title III criminal surveillances and those involving domestic security," *id.,* the Court suggested that

Congress may wish to consider protective standards for the latter which differ from those already prescribed for specified crimes in Title III. * * * It may be that Congress, for example, would judge that the application and affidavit showing probable cause need not follow the exact requirements of § 2518 but should allege other circumstances more appropriate to domestic security cases; that the request for prior court authorization could, in sensitive cases, be made to any member of a specially designated court * * * and that the time and reporting requirements need not be so strict as those in § 2518.

The above paragraph does not, of course, attempt to guide the congressional judgment but rather to delineate the present scope of our own opinion. We do not attempt to detail the precise standards for domestic security warrants any more than our decision in *Katz* sought to set the refined re-

---

"Mr. HART. . . . However, we are agreed that this language should not be regarded as intending to grant any authority, including authority to put a bug on, that the President does not have now.

"In addition, Mr. President, *as I think our exchange makes clear, nothing in section 2511(3) even attempts to define the limits of the President's national security power under present law, which I have always found extremely vague . . . Section 2511(3) merely says that if the President has such a power, then its exercise is in no way affected by title III.*"

407 U.S. 306–307, 92 S.Ct. at 2131, *quoting* 114 Cong.Rec. 14751 (1968) (emphasis supplied by *Keith* Court). *See also* S.Rep.No. 1097, *supra,* note 167, at 94; *infra,* 170 U.S. App.D.C. at ——, 516 F.2d at 663–665.

**222.** In contrast to the majority, Mr. Justice White believed that the legality of a national

security wiretap was to be first determined by analyzing whether it fell within the specific language of § 2511(3), since he interpreted Title III to render all other "national security" wiretaps illegal; only then should the constitutional validity of the § 2511(3) exemption be faced. *See generally* 407 U.S. at 335–344, 92 S.Ct. 2125 (White, J., concurring) (particularly n. 2). Under Justice White's approach, if the surveillance in this case were deemed not to be encompassed by § 2511(3), the remedies of the Act would clearly apply; if the surveillance were deemed to fall within § 2511(3), our prior analysis indicates that Congress could not constitutionally immunize it from prior judicial review as required by the Fourth Amendment. Justice White gave no indication as to whether, in the latter situation, the remedies of Title III would be available.

quirements for the specified criminal surveillances which now constitute Title III. We do hold, however, that prior judicial approval is required for the type of domestic security surveillance involved in this case and that such approval may be made in accordance with such reasonable standards as the Congress may prescribe.

*Id.* at 322–324, 92 S.Ct. at 2139.

In contrast to Judge Pratt, we believe these statements are susceptible of at least two alternative interpretations. To be sure, the *Keith* language could be interpreted as totally ousting Title III whenever national security surveillance is involved. The broad language early in the opinion could support that position, and the later discussion on warrant standards could be construed as indicating that although Title III requirements do not currently apply, Congress could regulate national security wiretaps if it so desired. Nevertheless, another interpretation of *Keith* would support the applicability of Title III in all cases where a warrant is required.

Under this latter interpretation, the early language of *Keith*[223] would only refer to the question whether the Executive was free of the *warrant* requirement in conducting national security surveillance; the later discussion of warrant standards and procedures would be construed as indicating that although Title III requirements do currently apply where the President must comply with the warrant requirement, Congress could provide less rigorous procedures that would still be constitutionally acceptable. This interpretation is reinforced by the fact that the early discussion was written as a response to the Government's argument that Section 2511(3) *affirmatively recognized and approved* Executive power to conduct *warrantless* national security surveillances, which was the only question actually presented in *Keith.* The Court was not forced by the circumstances of that criminal prosecution[224] to decide whether, given the constitutional requirement that a warrant be obtained for domestic security surveillance, it should be obtained in compliance with Title III.[225] And although the Court ambiguously commented on that problem, it apparently deliberately cast the discussion in terms of "standards and procedures," *see* 407 U.S. at 322, 92 S.Ct. 2125, which are provided and available in Title III. This was in marked contrast to its discussion of the applicability of Title III to the warrant question, which was cast in terms of presidential "powers," as to which the Court found Congress had asserted its "neutrality."[226]

---

**223.** *See supra,* 170 U.S.App.D.C. at ——, 516 F.2d at 660–661.

**224.** Under *Alderman,* evidence derived from wiretaps that are illegal—whether under a statute or the Constitution—must be disclosed to a criminal defendant. *See* note 14 *supra.* Thus, once the *Keith* Court held the surveillance in that case to be unlawful under the Fourth Amendment, it did not have to address the question whether it was also unlawful under Title III.

**225.** Indeed, at oral argument Justice Department attorneys acknowledged that subsequent to the *Keith* decision the Government ceased all nonstatutory internal security surveillance; it is unclear whether this result was a recognition of the correctness of our statutory construction or merely skepticism concerning the productivity of domestic information-gathering activities.

**226.** *See also* 407 U.S. at 307–308 n.7, 92 S.Ct. at 2133 (approvingly quoting law review article in which "author concludes that in § 2511(3) 'Congress took what amounted to a position of neutral noninterference on the question of the *constitutionality* of *warrantless* national security wiretaps authorized by the President.' ") (emphasis added). Moreover, we doubt that the Supreme Court would have given as little guidance as it did on the standards and procedures governing national security surveillance if it believed that Title III was not now applicable and the President was operating in a vacuum. If the Court believed that no statutory regulations to guide a magistrate in an internal security warrant proceeding were in effect, and none need be forthcoming, it would have been appropriate to speak with more clarity for the benefit of lower federal courts and the Executive Branch of the Government concerning the contours of the warrant proceeding. If, on the other hand, the Court was merely indicating that Congress could constitutionally relax the procedural aspects of its regulation of wiretaps in the context of domestic security surveillances, there

Since we do not believe the *Keith* case[227] held the standards and procedures of Title III to be inapplicable when a purported national security surveillance is involved,[228] we must look to the language and legislative history of Section 2511(3) to determine congressional intent in its enactment. Section 2511(1) unequivocally declares that "[e]xcept as specifically provided in this chapter," interception of "*any* wire or oral communication" is illegal.[229] Section 2511(3), however, only states that "[n]othing contained in this chapter

\* \* \* shall limit the *constitutional* power of the President" to take the actions he deems necessary in the field of national security.[230] Since Section 2511(3) is merely a disclaimer that "constitutional" actions by the President are not to be invalidated under the statute, it is reasonable to assume that Congress intended to prohibit "unconstitutional" Executive surveillance, which would therefore be "in violation of this chapter" within the comprehension of the damages provision of Title III.[231] Thus,

was no necessity for elaborating possible alternative procedures in great detail.

**227.** *See also* Philadelphia Resistance v. Mitchell, E.D.Pa., 58 F.R.D. 139, 147 (1972); Kinoy v. Mitchell, S.D.N.Y., 331 F.Supp. 379, 382 (1971). We cannot agree with appellants that Gelbard v. United States, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), and In re Evans, 146 U.S.App.D.C. 310, 452 F.2d 1239 (1971), *cert. denied,* 408 U.S. 930, 92 S.Ct. 2479, 33 L.Ed.2d 342 (1972), are dispositive of the question whether Title III's remedies are applicable in situations involving unconstitutional Executive surveillance conducted for national security reasons. Both cases involved the issue of whether 18 U.S.C. § 2515 (1970), which prohibits use of evidence derived from an unlawful wiretap, forms the basis for a valid defense in a contempt proceeding brought under 28 U.S.C. § 1826(a) (1970) against grand jury witnesses who refused to answer questions posed to them because they claimed the questions were based upon illegal surveillance. Both cases held that § 2515 applies, without distinguishing the type of surveillance involved. Appellants argue that, since "the basis for the surveillance was apparently 'national security' " in both cases, it can be inferred that even national security surveillances are subject to the procedures and remedies of Title III. *See* brief for appellants at 42–43. However, neither the *Gelbard* Court nor this court in *Evans* was presented with an assertion that § 2515 was inapplicable because national security wiretaps were involved. Indeed, in *Gelbard* the Government had explicitly denied that any surveillance had taken place, and in *Evans* the Government had not yet made either an affirmative or a negative response to the witnesses' assertions that their conversations had been illegally overheard.

**228.** Although it has been suggested that it might be unconstitutional for Congress to restrict any inherent Executive power to engage in warrantless surveillance, *see, e. g.,* United States v. Butenko, *supra* note 14, 494 F.2d at 601 (majority opinion), 611 (Seitz, C.J., con-

curring in part and dissenting in part) (commenting on majority opinion), we find no reason to infer any such constitutional limitation on congressional power, particularly given Congress' own powers in the areas of foreign affairs and interstate commerce. *See, e. g.,* 407 U.S. at 338–340 & nn.2–3, 92 S.Ct. 2125 (White, J., concurring); *Butenko, supra,* 494 F.2d at 627–637 (Gibbons, J., dissenting). *See also, e. g.,* Youngstown Sheet & Tube Co. v. Sawyer, *supra* note 70, 343 U.S. at 635–638, 72 S.Ct. 863 (Jackson, J., concurring); 29 Record of N.Y.C.B.A., *supra* note 213, at 760–761.

**229.** 18 U.S.C. § 2511(1) (1970) (emphasis added).

**230.** 18 U.S.C. § 2511(3) (1970) (emphasis added).

**231.** *See supra,* 170 U.S.App.D.C. at —— & note 216, 516 F.2d at 659–660 & note 216. This interpretation arguably renders the last sentence of § 2511(3), *see* note 219 *supra,* redundant in light of 18 U.S.C. § 2515 (1970). Section 2515 prohibits introduction into evidence of the contents of intercepted communications and evidence derived therefrom "if the disclosure of that information would be in violation of this chapter." Under the interpretation of § 2511(3) propounded in text, this provision would of its own force thereby interdict introduction of evidence obtained through unconstitutional Executive-ordered national security surveillance. However, the last sentence of § 2511(3) would not, in fact, be rendered superfluous. That clause authorizes introduction of evidence from such surveillance "only where such interception was reasonable, and [the evidence] shall not be otherwise used or disclosed except as is necessary to implement [the President's national security] power." As the Supreme court observed in *Keith,* this was merely a precautionary measure, "intended to assure that when the President conducts lawful surveillance—pursuant to whatever power he may possess—the evidence is admissible." 407 U.S. at 306 n.6, 92 S.Ct. 2131. Thus there is actually no redundancy under our interpretation of Title III since § 2515 is directed at illegal Exec-

even if the *procedures* of Title III were inapplicable to national security wiretapping, the *remedies* of Title III should apply to *unconstitutional* exercises of presidential power.

An analysis of the legislative history of Title III also indicates that it would be reasonable to interpret Section 2511(3) as a statement that the question reserved in *Katz*[232] should be left for judicial resolution, but that, to the extent the President does not have the constitutional power to engage in warrantless surveillance activities, the procedures and remedies of Title III are fully operative. This interpretation is fully consistent with the *Keith* Court's understanding of the legislative history of Section 2511(3) and the two-decade struggle in Congress concerning wiretap legislation.

In the colloquy between Senators McClellan, Holland, and Hart, which the *Keith* Court cited as the definitive statement of congressional intent in enacting Section 2511(3),[233] it is interesting to focus on a paragraph the *Keith* Court considered crucial, but which it quoted only in part.[234] Senator Hart, summarizing the interchange concerning Section 2511(3), stated:

[A]s I think our exchange makes clear, nothing in section 2511(3) even attempts to define the limits of the President's national security power under present law, which I have always found extremely vague, especially in domestic security threats, as opposed

to threats from foreign powers. As I recall, in the recent *Katz* case, some of the Justices of the Supreme Court *doubted that the President has any power at all under the Constitution to engage in tapping and bugging in national security cases without a court order.* Section 2511(3) merely says that *if the President has such a power* [to tap and bug without a court order], then its exercise is in no way affected by title III.[235]

Moreover, the interchange had begun with Senator Hart's query as to whether the second sentence of Section 2511(3) was granting the President unlimited and readily abusable authority "in areas that do not come within our traditional notions of national security." 114 Cong. Rec. 14750 (1968). In particular, he was troubled by the fact that the statute might be interpreted as allowing the President to authorize installation of a wiretap on "an organization that is advocating the withholding of income tax payments," *see id.* at 14751,[236] merely because the President believed such an organization posed a clear and present danger to the structure or existence of the Government. In effect, Senator Hart was inquiring as to the *substantive* scope of Section 2511(3), not what procedures would apply in areas covered by the proviso.[237] In response, Senator Holland reassured him that the provision was "simply saying that nothing herein shall limit such power as the President has under the Constitution. *If he does not have the power to do any specific*

utive surveillance while the main thrust of the last sentence of § 2511(3) is directed at lawful Executive surveillance.

**232.** *See supra,* 170 U.S.App.D.C. at ——, 516 F.2d at 611. Title III was passed less than one year after *Katz* was decided.

**233.** Indeed, this was the only explicit floor debate concerning § 2511(3). *See* 407 U.S. at 306–307 & n.7, 92 S.Ct. 2125; note 221 *supra.*

**234.** The omission was understandable since the *Keith* Court was only faced with the question whether a warrant had to be obtained as a prerequisite to domestic security surveil-

lance; the Court was not directly presented with the question of what other procedures were mandated or what compensatory remedies—as opposed to suppression of evidence in a criminal proceeding—were appropriate when the Executive acted illegally.

**235.** 114 Cong.Rec. 14751 (1968) (emphasis added). *Compare id. with* note 221 *supra.*

**236.** *See also* note 191 *supra.*

**237.** The warrant requirement itself was intimately associated with the question of the scope of the President's substantive powers. *See* note 52 *supra*; 170 U.S.App.D.C. at —— & note 240, 516 F.2d at 664–667 & note 240 *infra.*

*thing,* we need not be concerned." *Id.* (emphasis added).[238]

Given the otherwise comprehensive nature of Title III, we believe that the statements of Senators Hart and Holland indicate that Congress was primarily concerned with avoiding any legislative expression about an inherent Executive power to wiretap *without a warrant,* and the *substantive scope* of such a power if it in fact existed.[239] It would thus appear that Congress merely intended that if the judiciary ascertained that the President had the constitutional power to wiretap without a warrant for certain purposes and in certain circumstances, the statute would not apply to them.[240]

**238.** This use of the term "power" parallels that used by the Supreme Court in *Keith,* where presidential "powers" appeared to be contrasted with the "standards and procedures" pursuant to which those powers were to be exercised. *See supra,* 170 U.S.App.D.C. at ——, 516 F.2d at 661–663.

**239.** Indeed, the Senate colloquy indicates that the proviso was included because of congressional doubts as to whether Congress could constitutionally limit any such inherent power. For example, we find these statements in the crucial dialogue between Senators Hart, Holland, and McClellan:

> Mr. McCLELLAN: * * * *I do not want to undertake to detract from any power the President already has. I do not think we could do so by legislation anyway. In fact, I know we could not.* However, what we have done here is in keeping with the spirit of permitting the President to take such action as he deems necessary where the Government is threatened. * * *
>
> * * * * * *
>
> Mr. HOLLAND: * * * [Section 2511(3)] simply says, and I will not read the first part of it because that certainly says that nothing shall limit the President's constitutional power * * * *We are simply saying that nothing herein shall limit such power as the President has under the Constitution.* * * *
>
> * * * * * *
>
> Mr. McCLELLAN: Mr. President, we make it understood that we are not trying to take anything away from him.
>
> Mr. HOLLAND: The Senator is correct.
>
> * * * * * *
>
> Mr. HART: * * * *Section 2511(3) merely says that if the President has such a power* [to engage in tapping and bugging in national security cases without a court order], *then its exercise is in no way affected by title III.* * * * I am now sure no President thinks that just because some political movement in this country is giving him fits, he could read this as an agreement from us that, *by his own motion,* he could put a tap on.
>
> * * * * * *
>
> Mr. HOLLAND: * * *
>
> *We are simply negating any intention to take away anything that the President has* *by way of constitutional power. We could not do it if we wanted,* and we are making clear that we are not attempting any such foolish course.
>
> Mr. PASTORE: That is the point I make. No matter what is "deemed," *you just cannot take powers away from the President that he constitutionally has.* All we are saying is that we do not intend to do it because of anything that is in the bill.

114 Cong.Rec. 14751 (1968) (emphasis added). Not only do these statements indicate that Congress did not intend to create a statutory warrant requirement where there is no constitutional warrant requirement, *see* note 46 *supra,* but they also indicate that Congress was deferring to the judiciary in answering the question reserved in *Katz,* while comprehensively legislating to the full extent of its perceived constitutional power. We doubt that these serious constitutional concerns would have been expressed by Congress if it were acknowledged that presidential surveillance was subject to prior judicial scrutiny and the only issue was the specific standards and procedures governing the warrant proceeding. *See also* note 244 *infra.*

**240.** The Senate Report on the Omnibus Crime Control and Safe Streets Act of 1968, which, as the *Keith* Court observed, *see* 407 U.S. at 307 n.7, 92 S.Ct. 2125, is not as explicit as the floor debate which followed, but which is the only committee report concerning Title III, stated in its section-by-section analysis:

> [Section 2511(3)] is intended to reflect a distinction between the administration of domestic criminal legislation not constituting a danger to the structure or existence of the Government and the conduct of foreign affairs. It makes it clear that nothing in the proposed chapter or other act amended by the proposed legislation is intended to limit the power of the President to obtain information by whatever means to protect the United States from the acts of a foreign power including actual or potential attack or foreign intelligence activities, or any other danger to the structure or existence of the Government. *Where foreign affairs and internal security are involved, the proposed system of court ordered electronic surveillance envisioned for the administration of domestic criminal legislation is not intended*

That is, *the applicability of the statute was contingent upon further judicial pronouncements, and the procedures and remedies of the statute were to completely occupy the wiretapping field except to the extent the President's powers were rendered constitutionally immune from the warrant procedure of the Fourth Amendment.*

*necessarily to be applicable.* The two areas may, however, overlap. Even though their activities take place within the United States, the domestic Communist party and its front groups remain instruments of the foreign policy of a foreign power (Communist Party, U.S.A. v. Subversive Activities Control Board, 367 U.S. 1 [81 S.Ct. 1357, 6 L.Ed.2d 625] (1961)). Consequently, they fall within the field of foreign affairs and outside the scope of the proposed chapter. Yet, their activities may involve violations of domestic criminal legislation. See Abel v. United States, 362 U.S. 217 [80 S.Ct. 683, 4 L.Ed.2d 668] (1960). These provisions of the proposed chapter regarding national and internal security thus provide that the contents of any wire or oral communication intercepted by the authority of the President *may be received into evidence* in any judicial trial or administrative hearing. *Otherwise, individuals seeking the overthrow of the Government, including agents of foreign powers and those who cooperate with them, could not be held legally accountable when evidence of their unlawful activity was uncovered incident to the exercise of this power by the President.* The only limitations [sic] recognized on this use is that the interceptions be deemed reasonable based on an ad hoc judgment taking into consideration all of the facts and circumstances of the individual case, which is but the test of the Constitution itself (Carroll v. United States, 267 U.S. 132 [45 S.Ct. 280, 69 L.Ed. 543] (1925)). The possibility that a judicial authorization for the interception could or could not have been obtained under the proposed chapter would be only one factor in such a judgment. No preference should be given to either alternative, since this would tend to limit the very power that this provision recognizes is not to be deemed disturbed.

S.Rep.No.1097, *supra* note 167, at 94 (emphasis added). This rather ambiguous statement is not inconsistent with the interpretation of § 2511(3) elucidated in text. The Report appears to expect that there would be no warrant requirement placed on the President's national security surveillances, since it contemplates that a *post hoc* determination of reasonableness will be made in criminal proceedings. The Report's analysis of § 2511(3) thus concentrates on explicating congressional intent concerning the statutory problem that had beset the courts and Congress before *Katz:* if

Moreover, this interpretation of the scope of Title III is particularly plausible the surveillance is constitutional, when can evidence derived therefrom be introduced into evidence? *See supra,* 170 U.S.App.D.C. at ——, ——, 516 F.2d at 616–617, 648; *infra,* 170 U.S.App.D.C. at ——, 516 F.2d at 666–667. Commenting on this issue in light of its expectation that national security surveillance would be immunized from prior judicial review, the Report merely indicates that if the President acts under any constitutional right to proceed *without a warrant,* then the fact that certain statutory provisions afford him an alternative of receiving prior authorization is not determinative of the legality of the surveillance and the admissibility of its fruits. Rather, it is but one factor among the circumstances that must be considered in assessing the reasonableness of a wiretap not undertaken pursuant to a warrant. Particularly when it is noted that the Report cautioned that the provisions of Title III are not *necessarily* applicable in the foreign affairs or internal security contexts, the statement can be seen to be consistent with the interpretation, supported by other legislative history and policy considerations, *see supra,* 170 U.S.App.D.C. at —— ——, 516 F.2d at 662–666; *infra,* 170 U.S.App.D.C. at —— ——, 516 F.2d at 667–669, that if the President *must* comply with the warrant procedure, he must do so according to the provisions of Title III.

It should also be observed that in § 2518(7) Congress authorized up to 48 hours of warrantless surveillance when it is reasonably determined that "an emergency situation exists with respect to conspiratorial activities threatening the national security * * * that requires a wire or oral communication to be intercepted before an order authorizing such interception can with due diligence be obtained * * *." Yet court approval had to be sought subsequent to installation of the surveillance for it to be lawful under the statute. At first, this section might appear unnecessary if the President was to be totally exempted from the procedures of Title III, since there would be no necessity of exempting him from provisions to which he is not subject. However, § 2518(7) is far broader than any constitutional exception for *presidential* surveillance; its coverage extends to "any investigative or law enforcement officer, specially designated by the Attorney General or by the principal prosecuting attorney of any State or subdivision thereof acting pursuant to a statute of that State." Section 2518(7) is thus a statutory recognition of the general doctrine of exi-

in light of the ebb and flow of proposed legislation in the wiretapping field over the prior 20 years. As we indicated above,[241] there was no constitutional prohibition against non-trespassory wiretapping until 1967, although Section 605 of the Federal Communications Act of 1934 prohibited use of evidence derived from such surveillance in criminal prosecutions. During this period, numerous bills were introduced in Congress to authorize wiretapping and use of any evidence and fruits obtained therefrom; however, they were all defeated because of bitter divisiveness over the question whether Congress should enact, as a statutory precondition to admissibility, a requirement that prior judicial approval be obtained for the surveillance.[242] Passage of Title III came shortly after the Supreme Court handed down *Katz v. United States, supra,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, which finally placed non-trespassory wiretapping and eavesdropping within the ambit of Fourth Amendment protection. Since *Katz* had reserved the question whether prior judicial authorization was a constitutionally mandated safeguard against unreasonable national security surveillance,[243] it was reasonable for Congress to avoid that constitutional thicket until the Supreme Court spoke more fully on the President's asserted inherent power to conduct warrantless wiretapping in furtherance of his constitutional responsibilities. Indeed, the proviso probably was included merely to avoid a challenge to the statute as an unconstitutional limitation on Executive powers.[244]

Finally, there are strong policy considerations which guide us in our determination of congressional intent in enacting Title III. First, as Congress itself indicated,[245] there is a policy in favor of providing fairly uniform standards to govern issuance of all wiretap authorizations. Second, there is the factor, to which we alluded earlier, that Title III

gent circumstances, *see* S.Rep.No.1097, *supra* note 167, at 94, which would serve a function whether or not presidentially ordered surveillance was subjected to Title III's mandate. Thus its inclusion in the statute does not in fact further the analysis of congressional intent with respect to the latter question.

**241.** *See supra,* 170 U.S.App.D.C. at —, —, 516 F.2d at 616–617, 648.

**242.** *See, e. g.,* Gasque, *supra* note 53, 15 S.C.L. Rev. at 66; Theoharis & Meyer, *supra* note 53.

**243.** *See supra,* 170 U.S.App.D.C. at —, 516 F.2d at 611.

**244.** *See* 114 Cong.Rec. 14781 (1968); note 221 *supra.* Since many of the provisions of Title III were denounced as unconstitutional, *see, e. g.,* S.Rep.No.1097, *supra* note 167, at 161 (individual views of Mr. Long and Mr. Hart); *id.* at 166 (additional views of Mr. Hart); *id.* at 178 (individual views of Mr. Burdick); *id.* at 179 (individual views of Mr. Fong), such worries probably pressed themselves strongly upon the draftsmen of Title III. Indeed, a similar concern was evident in Congress' treatment of interception of oral communications. *See* 18 U.S.C. § 2511(1)(a)(b) (1970); S.Rep.No.1097, *supra* note 167, at 91–92. The validity of such worries with respect to regulating presidential surveillance is questionable. *See* note 228 *supra.*

Moreover, in analyzing the national security proviso, one should pay heed to its context.

*See* 407 U.S. at 303–304, 92 S.Ct. 2125. Section 2511(1) broadly interdicts *all* surveillance "[e]xcept as otherwise specifically provided in this chapter." Section 2511(3), unlike the four specific exceptions of § 2511(2), does not say "it shall not be unlawful * * * to intercept" particular types of communications, but rather disclaims any attempt at legislative interference with inherent presidential power; there is no intention to "limit the constitutional power of the President." As *Keith* indicated, Congress took a neutral position on the question of the President's power to proceed without a warrant. *See* 407 U.S. at 303, 308, 92 S.Ct. 2125. However, to the extent such power does not exist, the disclaimer is effectively rendered superfluous and the general prohibition of *all* nonstatutory surveillance becomes operative. Thus, as in *Keith,* we are only forced by the proviso to decide a "narrow" constitutional question reserved by *Katz, see id.* at 309, 92 S.Ct. 2125: whether safeguards other than prior authorization of a magistrate are constitutionally sufficient under the circumstances of this type of case, in which the foreign affairs powers of the President are implicated but the surveillance was installed on individuals who were not themselves agents of or collaborators with a foreign power.

**245.** *See, e. g.,* S.Rep.No.1097, *supra* note 167, at 66.

668

will provide clear guidance to both courts and the Executive Branch concerning the procedures surrounding wiretap issuance, thus avoiding many of the problems attendant upon *ad hoc* future development in *in camera* proceedings.[246] Third, we believe that the Title III procedures are salutary prophylactic measures designed to protect privacy interests while still accommodating the legitimate Executive need to conduct surveillance.

 Title III provides, *inter alia*, for particularity in descriptions of the location of the wiretap,[247] the type of communications sought to be intercepted,[248] and the identity of the subject of the surveillance;[249] for utilization of electronic surveillance only after alternative investigative procedures have been tried and failed or would be unlikely to succeed;[250] for a statement to the judge of any previous applications for a warrant concerning the same persons, facilities, or places specified in the application, and the judicial action taken on those prior applications;[251] for judicial authority to request additional supporting evidence for the warrant application;[252] for maximum time limits on any surveillance, with provisions for renewals;[253] for execution of the warrant as soon as practicable, and in a manner that minimizes interception of communications not the subject of the order;[254] for judicial authority to request progress reports on the surveillance and the need for continued interception;[255] for careful recording and "warehousing" of communications intercepted;[256] for notification of the primary subjects of the surveillance that their conversations were intercepted, unless good cause is shown for not serving the inventory of specified information;[257] for various procedures to safeguard the use of such intercepted communications;[258] for the important safeguard of official reporting concerning the scope, nature, and extent of surveillance, whether approved or denied;[259] and, of course, for civil damages for violations of the Title.[260] Each of these provisions implements the important policies of the First and Fourth Amendments in the context of electronic surveillance;[261] yet none is likely to inhibit or limit in any manner "the constitutional power of the President to take such measures as he deems necessary"[262] in the national security area. They are procedures which, given the necessity that a warrant be obtained before a foreign security surveillance can commence, do not impose any substantial additional

246. *See* pp. 69–70 & notes 200 & 226 *supra*.

247. 18 U.S.C. § 2518(1)(b)(ii)(1970).

248. *Id.* § 2518(1)(b)(iii).

249. *Id.* § 2518(1)(b)(iv).

250. *Id.* § 2518(1)(c).

251. *Id.* § 2518(1)(e). This provision mitigates the problem of judge-shopping otherwise possible with respect to requests for search warrants. *See* note 147 *supra*.

252. *Id.* § 2518(2).

253. *Id.* § 2518(5).

254. *Id.*

255. *Id.* § 2518(6).

256. *Id.* § 2518(8)(a). For an eloquent discussion of the importance of the warehousing provisions, indicating that national security wiretaps should be subject to that requirement, *see* United States v. Huss, *supra* note 10, 482 F.2d at 47–48, 52 (Kaufman, C. J.) (dictum) (discussing the wiretaps involved in this case, in context of civil contempt proceeding). *See also* United States v. Bryant, 142 U.S.App.D.C. 132, 140–143, 439 F.2d 642, 650–653 (1971).

257. 18 U.S.C. § 2518(8)(d) (1970). *See also* S.Rep.No.1097, *supra* note 167, at 105.

258. 18 U.S.C. §§ 2518(9)–(10) (1970).

259. *Id.* § 2519. Public disclosure of the extent of national security surveillance will, of course, make congressional or public oversight more feasible and more informed, and could provide the foundation for congressional investigation or corrective legislation if it appears that such surveillance is being abused. *See also* United States v. Coplon, *supra* note 59, 185 F.2d at 638 (constitutional limits requiring disclosure in criminal trials prevent government action from going "unpurged by the alembic of public scrutiny and public criticism").

260. 18 U.S.C. § 2520 (1970).

261. *See generally* Katz v. United States, *supra* note 54; Berger v. New York, *supra* note 110; S.Rep.No.1097, *supra* note 167, at 99–107.

262. *See* note 219 *supra*.

burden on the Executive Branch; indeed, they are the type of procedures which courts scrutinizing wiretap applications would probably develop in any event,[263] but which Congress has conveniently promulgated for use on a uniform basis. We are thus of the opinion that Congress intended the procedures and remedies of Title III to apply to all Executive surveillance which, under the Constitution, must be initiated pursuant to judicial warrant.[264]

One caveat should, however, be appended to this conclusion. There are several provisions of Title III which, in the context of *pure* intelligence gathering activities, would frustrate the constitutional power of the President and which therefore cannot apply to such surveillance given the plain language and legislative history of Section 2511(3). Section 2516 authorizes the Attorney General to apply for a warrant to conduct surveillance in situations in which evidence of specified crimes is likely to be uncovered.[265] And Section 2518(1)(b)(i) requires that the application make a detailed showing of the facts and circumstances upon which the applicant has formed his belief that those specified crimes have been, are being, or are about to be committed.[266]

Although most pure intelligence gathering surveillance could even be justified under these provisions, since specified crimes within the cognizance of Section 2516 will generally be engaged in by the subjects of the surveillance (and a statutory basis for the surveillance would thus be available),[267] there will be the very rare instance[268] in which no crime is involved. In these situations, in which adherence to the strictures of Title III would unduly trammel the inherent power of the President to conduct certain surveillances in furtherance of his constitutional duties, Section 2511(3) indicates that Congress intended that the provi-

**263.** Most of the Title III requirements merely grant judges the power to require compliance with procedures that could be judicially mandated in any event in a warrant proceeding. And although absolute requirements such as the 30-day limit on the duration of any surveillance might not be identical with those which judges would impose *sua sponte*, provisions such as those concerning renewals render them flexible enough so that there is no necessary interference with or limitation of Executive intelligence gathering functions.

**264.** It should also be observed that the very breadth of the § 2511(3) disclaimer indicates that Congress merely wished to defer to the judiciary with respect to resolving the issue reserved in *Katz.* Senator Hart noted that the "internal security" clause could be read, for example, to cover a taxpayer who withholds funds as a means of protesting governmental policies. And as Judge McGowan suggests, a formidable spectrum of legal and illegal activity could have a substantial impact on the President's conduct of foreign affairs. Yet it is inconceivable that Congress deliberately created a statutory lacuna in which the comprehensive procedures of Title III would be inapplicable to such situations even when the President would be constitutionally compelled to submit to prior judicial review; such a two-track system of judicial warrant procedures would nullify the uniformity and much of the protection for individual privacy which Title III was intended to provide.

**265.** *See generally* 18 U.S.C. § 2516 (1970).

**266.** *See* 18 U.S.C. § 2518(1)(b)(i) (1970). *See also id.* §§ 2518(1)(b)(iv), (3)(a), (3)(b), (3)(d), (4)(c), 2519(1)(e).

**267.** *See* note 168 *supra.* These specified crimes cover the full gamut of national security offenses. And although the Senate Report indicated that the availability of statutory surveillance in these situations should not be interpreted as a requirement that the President refrain from reliance on any inherent powers he might possess, this statement apparently assumed that the courts would hold that certain national security surveillances are exempt from prior judicial scrutiny, and the thrust of the commentary was directed primarily at the problem of when evidence obtained without a warrant would be admissible in court. *See* note 240 *supra.* If Congress truly intended that Title III not apply to national security surveillances even when the warrant requirement applies, it was unnecessary to include *any* authority to conduct surveillance for national security crimes such as espionage or sabotage, which would always fall within the language of the proviso.

**268.** For example, one such situation would be where the Government seeks to determine where or when protected demonstrations that might result in violence against foreign officials and a rupturing of diplomatic relations are likely to take place, so that adequate security measures may be taken.

sions of Sections 2516 and 2518(1)(b)(i) would not limit presidential powers, although there is no reason to consider that Congress intended that the other procedural provisions of Title III, which do not substantially affect the conduct of such surveillance, would be ousted. In effect, this is to say that Section 2511(3), which explicitly acknowledges the foreign intelligence gathering function of the President, should be read to implicitly include intelligence gathering as a legitimate statutory subject of warranted surveillance under Section 2516, and to incorporate the corresponding constitutionally appropriate standard of probable cause as the required showing under Section 2518.

### B.

In light of our disposition of this case, the trial court on remand will have to decide some of the issues not previously reached because of the grant of appellees' motion for summary judgment.[269] We believe, however, that that court should be accorded some guidance concerning the standard of good faith that should be applied as a statutory defense to the liquidated damages claim.

■ As originally enacted, Section 2520 provided that a "good faith reliance on a court order *or on the provisions of section 2518(7)* of this chapter shall constitute a complete defense to any civil or criminal action brought under this chapter."[270] Although this clause was amended in 1970 to provide that a "good faith reliance on a court order or *legislative authorization* shall constitute a complete defense to any civil or criminal action brought under this chapter or under any other law,"[271] the amendment was not effective until after the second wiretap installation in this case had already been authorized.[272] We do not pause to consider which of these two provisions should apply in this case, since we are of the belief that under a literal interpretation of either version, appellees would in effect be held strictly liable for their actions and could assert no good faith defense.[273] However, we do not perceive

**269.** See notes 8 & 18 *supra*.

**270.** *See* note 216 *supra* (emphasis added). *See also* note 240 *supra* (discussing § 2518(7)).

**271.** Pub.L.No.91-358, § 211(c), 84 Stat. 654 (1970), *amending* 18 U.S.C. § 2520 (1968). The amendment was one of three "conforming amendments" which the D.C. Court Reform Act made to Title III. The legislative history is obscure as to the exact intent of these amendments. *See* S.Rep.No.538, 91st Cong., 1st Sess., 18–25 (1960); H.R.Rep.No.907, 91st Cong., 2d Sess., 77–79, 174 (1974); H.R.Rep. No.1303, 91st Cong., 2d Sess., 237–239 (1970) (conference report).

**272.** The amendment was approved on July 29, 1970. One wiretap installation was approved on Sept. 15, 1970, and the second one was approved on Jan. 4, 1971. The effective date of the amendment was Feb. 1, 1971. *See* Plaintiffs' Exhibits M–1, M–2; 1970 U.S.Code Cong. & Adm.News 785.

**273.** Under the 1968 version, it is clear that no court order was obtained and the warrantless surveillance was not limited to the 48 hours provided by § 2518(7). Under the 1970 version, there is a more colorable claim that appellees could base a defense on the "legislative authorization" language. For although the amendments were effective after the wiretap was installed, the language had been approved before the surveillance was authorized by Mr. Mitchell. *See* note 272 *supra*. And appellees could have taken the new language as indicative of congressional intent with respect to construction of the prior statute. *Cf., e. g., Erlenbaugh v. United States,* 409 U.S. 239, 243–245, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972). Since § 2511(3) does exempt from the statute "constitutional" Executive surveillance, appellees could claim they relied on the good faith belief that their actions were constitutional and that they therefore did not have to comply with the statute. *See infra,* 170 U.S.App.D.C. at —— & note 219 *supra,* 516 F.2d at 670–673, note 219 *supra.* Of course, *Keith* subsequently held that § 2511(3) is not a specific grant of authority to conduct warrantless surveillance. *See supra,* 170 U.S.App.D.C. at ——, 516 F.2d at 660–661. But appellees could argue that before *Keith* such a belief was reasonable. In any event, Mr. Mitchell did not claim to have relied on the statutory language, but on inherent Executive powers. *See* JA at 29 (deposition of Mr. Mitchell). Under our approach to the good faith defense, such a good faith belief would be a complete defense in any event since it amounts in effect to a belief that the Executive actions were exempt from the strictures of the statute.

the relevant standard of good faith in this case to be that literally specified in Section 2520; rather, we find that a good faith defense to liability, whether under the *Bivens* rationale or the statutory theory, will be established if appellees can demonstrate (1) that they had a subjective good faith belief that it was constitutional to install warrantless wiretaps under the circumstances of this case; and (2) that this belief was itself reasonable.[274]

■ As we indicated above, Congress intended that applicability of Title III procedures and remedies in the national security context be contingent upon further judicial pronouncements concerning the constitutional question reserved in

*Katz*, since Section 2511(3) expressly declined to restrict "constitutional" Executive surveillance.[275] But as the Supreme Court has observed, "[A] police officer is not charged with predicting the future course of constitutional law." Pierson v. Ray, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967). *See also* Wood v. Strickland, 420 U.S. 308, 321, 95 S.Ct. 992, 1000–1001, 43 L.Ed.2d 214 (February 25, 1975). Thus, in light of the fact that Congress made the applicability of Title III turn on the future course of constitutional law, as well as the fact that the legislative history and language of Title III are themselves somewhat ambiguous concerning the applicability of that chapter to national security surveillance,[276] and considering the

**274.** Cf., e. g., Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, *supra* note 215, 456 F.2d at 1347–1348, and sources cited therein. In making this determination, the trial court on remand will probably have to take additional testimony concerning, *inter alia*, the details of the conduct of this surveillance in order to ascertain whether appellees in fact believed these wiretaps were being utilized to gather national security intelligence rather than to obtain evidence for criminal prosecutions in circumvention of the warrant requirement. *See* note 23 *supra*. Moreover, the court will have to determine whether appellees in fact believed that surveillance of this scope and duration was actually necessary for performance of their intelligence gathering duties. *Cf. Bivens, supra,* 456 F.2d at 1348 (belief that probable cause exists, rather than existence of probable cause in the constitutional sense, must be proved).

We decline to express any views as to the reasonableness of any belief that warrantless wiretapping under the circumstances of this case was constitutional, at least until the trial court determines that appellees did in fact have such a belief. However, we note that this determination should be made in light of Supreme Court and other judicial precedent, *see supra,* 170 U.S.App.D.C. at —— —— & notes 36 & 37, 516 F.2d at 620–628 & notes 36 & 37, presidential practice, *see supra,* 170 U.S.App.D.C. at ————, 516 F.2d at 615–620, and congressional legislation, *see* note 219 *supra,* extant as of the installation of the wiretaps. *See also* note 276 *infra.*

**275.** *See supra,* 170 U.S.App.D.C. at ————, 516 F.2d at 661–669.

**276.** *See generally supra,* 170 U.S.App.D.C. at ————, 516 F.2d at 659–663. If we had

today held that Title III was totally inapplicable to national security surveillance, appellees would have been able to interject, as a defense to an action under a *Bivens* rationale, a good faith belief that they reasonably expected that warrantless national security surveillance was constitutional. And if we had today held that warrantless surveillance was constitutionally permissible under the President's foreign affairs powers, § 2511(3) would have exempted the challenged actions from Title III's procedures and remedies. Given the fact that either of those results could be supported by at least colorable arguments, we do not believe our resolution should preclude a defense of a good faith belief that those results would be forthcoming. As the Supreme Court has noted in another context:

A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does. Although the matter is not entirely free from doubt, the same consideration would seem to require excusing him from liability for acting under a statute that he reasonably believed to be valid but that was later held unconstitutional on its face or as applied.

Pierson v. Ray, 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967) (footnote omitted). We similarly conclude that Executive officials who reasonably believed they had certain powers under the Constitution, and who thus would not believe they had to conform to a statute which does not cover such powers when they do exist, should not be precluded from demonstrating the existence and the reasonableness of their belief.

Nor is it a response to an argument that the statute was ambiguous to say that appellees

policy that statutes in derogation of the common law should be relatively strictly construed,[277] we do not believe Congress intended to preclude a good faith defense that Executive officials acted under what they reasonably believed were the constitutionally inherent (and therefore statutorily exempt) powers of the President.[278]

In light of the expressed congressional intent not to disturb whatever inherent constitutional powers the President was found to possess, we doubt that Congress desired that a final judicial resolution of that complex and controversial issue would have to result in the extremes of either holding Title III totally inapplicable to national security surveillance or else holding Executive officials strictly liable for having erred in their assessment of the powers in fact constitutionally granted the President and thereby statutorily insulated from liquidated damages. Thus we hold that under the

---

277. See, e. g., A. Sutherland, Statutes and Statutory Construction ch. 61 (4th ed. C. D. Sands, ed. 1974).

278. Appellants argue that this result may deny them compensatory damages in contravention of Congress' statement concerning the purpose of § 2520:

> All too often the invasion of privacy itself will go unknown. Only by striking at all aspects of the problem can privacy be adequately protected. The prohibition, too, must be enforced with all appropriate sanctions. *Criminal penalties have their part to play. But other remedies must be afforded the victim of an unlawful invasion of privacy. Provision must be made for civil recourse for damages.* The perpetrator must be denied the fruits of his actions in civil and criminal proceedings. Each of these objectives is sought by the proposed legislation.

S.Rep.No.1097, *supra* note 167, at 69, *quoted in* brief for appellants at 56 (supplying emphasis). However, merely because Congress accorded a statutory remedy for illegal surveillance before such a remedy was judicially established for all Fourth Amendment violations, *see supra,* 170 U.S.App.D.C. at ——, 516 F.2d at 611, does not mean that it intended strict liability to ensue if the judiciary subjected the President's national security surveillance to prior judicial approval. The rights of victims of unconstitutional actions must to some extent be balanced against the needs of law enforcement, particularly when an official in good faith acts according to a reasonable belief that his actions are lawful. Given congressional expressions of the importance of national security surveillance, *see, e. g.,* notes 219, 221, 240 *supra,* we cannot believe that compensation was to be accorded at the expense of denying law enforcement officials their traditional defense of good faith, particularly since this would discourage the exercise of possible powers which Congress did not seek to disturb.

should have resolved any ambiguity by according the benefit of the doubt to the statute and complying with its strictures. *See* brief for appellants at 46–48, 61–64. As the Senate Report on Title III indicated, the existence of Title III's procedures was not to be taken as a congressional statement that they must be complied with in national security situations, *see* note 240 *supra,* at least until doubts as to the constitutionality of warrantless surveillance were resolved, *supra,* 170 U.S.App.D.C. at ——, 516 F.2d at 663–667. Nevertheless, it has been suggested that appellee Mitchell may not properly be included in our provision for remand to the District Court to find whether appellees acted reasonably in believing the Constitution authorized warrantless surveillance under the circumstances of this case and thus that the national security proviso of § 2511(3) exempted them from the requirement of compliance with Title III procedures. The argument is made that it was incumbent on Mitchell to have gone to a judge, using the emergency provisions in the Act—18 U.S.C. § 2518(7)—and asked for a ruling as to whether a warrant was required. To avoid misunderstanding, this court expresses neither approval nor disapproval of that contention, but considers that this issue, like any other issue of good faith, is for consideration in the District Court in the first instance. On remand the parties can, if they are so advised, develop and present for disposition, in the light of presentation by all counsel, the contention that any belief that warrantless wiretapping in the JDL situation was constitutional was unreasonable because the Attorney General could have gone to court to resolve any ambiguities that *Katz* and other precedents created concerning inherent presidential surveillance powers or the meaning of Title III. Thus we expressly do not indicate any views on the propriety of the decision in Sinclair v. Kleindienst, D.D.C. Civil Action No. 610–73 (April 30, 1975) (finding "good faith" defense in civil action brought by defendant in *Keith* case) or the consistency of that decision with the principles we have elucidated in this opinion.

circumstances of this case,[279] the proper statutory good faith defense is identical with the common law good faith defense that would apply to the *Bivens* cause of action.

\* \* \*

We have carefully considered the opinions of Judges McGowan, Robb, and Wilkey which join us in holding that the warrantless surveillance in this case was illegal and gives rise to a cause of action.

Judge Wilkey confronts the question of whether the President had inherent constitutional authority to conduct such surveillance without a warrant, and concludes—as we do—that this was impermissible under the Fourth Amendment. We also agree with Judges MacKinnon and Wilkey that on the record as it stands there was an effort by the Executive to cope with the problem of national security, thereby necessitating a resolution of that constitutional question.

Judges McGowan and Robb conclude—as we do—that the liquidated damages provision of Title III applies to this case. Insofar as they conclude that the constitutional question may be bypassed in reaching this determination, their opinions are apparently based on a view of the record different not only from ours but also from that of the District Court, and are premised, so far as the legal issues are concerned, on what is discerned from the language of the statute and the emanations they glean from the *Keith* opinion. The same sources lead Judge Wilkey to a different view of the meaning of the statute. In our opinion we have referred in greater detail to the legislative history, in order to ascertain the intent of Congress in passing the proviso, and we believe that Congress was defining the reach of the statute in terms of abstaining from any congressional enactment in those instances where the President has inherent consti-

tutional authority to proceed with national security surveillance without a warrant. This is entirely in accord with *Keith*, which did reach and decide the constitutional issue as we do and which, being a criminal case, did not address the question of the applicability of the remedial provision of Title III to instances of unconstitutional presidential surveillance.

Reversed and remanded for proceedings not inconsistent with this opinion.

## APPENDIX A

### THE WHITE HOUSE WASHINGTON

CONFIDENTIAL May 21, 1940

MEMORANDUM FOR THE ATTORNEY GENERAL

I have agreed with the broad purpose of the Supreme Court decision relating to wire-tapping in investigations. The Court is undoubtedly sound both in regard to the use of evidence secured over tapped wires in the prosecution of citizens in criminal cases; and is also right in its opinion that under ordinary and normal circumstances wire-tapping by Government agents should not be carried on for the excellent reason that it is almost bound to lead to abuse of civil rights.

However, I am convinced that the Supreme Court never intended any dictum in the particular case which it decided to apply to grave matters involving the defense of the nation.

It is, of course, well known that certain other nations have been engaged in the organization of propaganda of so-called "fifth columns" in other countries and in preparation for sabotage, as well as in actual sabotage.

---

**279.** Of course, a good faith belief that warrantless national security surveillance of domestic organizations was constitutional could not be asserted in the future, given the decisions in *Keith* and the case *sub judice*; no such belief could be defended as reasonable. *See also* note 67 *supra*.

It is too late to do anything about it after sabotage, assassinations and "fifth column" activities are completed.

You are, therefore, authorized and directed in such cases as you may approve, after investigation of the need in each case, to authorize the necessary investigation agents that they are at liberty to secure information by listening devices direct[ed] to the conversation or other communications of persons suspected of subversive activities against the Government of the United States, including suspected spies. You are requested furthermore to limit these investigations so conducted to a minimum and to limit them insofar as possible to aliens. .

/s/ F. D. R.

OFFICE OF THE ATTORNEY
GENERAL
WASHINGTON, D. C.

July 17, 1946.

The President,
 The White House.

My dear Mr. President:—

Under date of May 21, 1940, President Franklin D. Roosevelt, in a memorandum addressed to Attorney General Jackson, stated:

"You are therefore authorized and directed in such cases as you may approve, after investigation of the need in each case, to authorize the necessary investigating agents that they are at liberty to secure information by listening devices directed to the conversation or other communications of persons suspected of subversive activities against the Government of the United States, including suspected spies."

This directive was followed by Attorneys General Jackson and Biddle, and is being followed currently in this Department. I consider it appropriate, however, to bring the subject to your attention at this time.

It seems to me that in the present troubled period in international affairs, accompanied as it is by an increase in subversive activity here at home, it is as necessary as it was in 1940 to take the investigative measures referred to in President Roosevelt's memorandum. At the same time, the country is threatened by a very substantial increase in crime. While I am reluctant to suggest any use whatever of these special investigative measures in domestic cases, it seems to me imperative to use them in cases vitally affecting the domestic security, or where human life is in jeopardy.

As so modified, I believe the outstanding directive should be continued in force. If you concur in this policy, I should appreciate it if you would so indicate at the foot of this letter.

In my opinion, the measures proposed are within the authority of law, and I have in the files of the Department materials indicating to me that my two most recent predecessors as Attorney General would concur in this view.

Respectfully yours,
/s/ TOM C. CLARK
Attorney General

July 17, 1947 [*sic*]

I concur.
/s/ HARRY S. TRUMAN

ADMINISTRATIVELY
CONFIDENTIAL

THE WHITE HOUSE
WASHINGTON

June 30, 1965

MEMORANDUM FOR THE HEADS
 OF EXECUTIVE DEPARTMENTS
 AND AGENCIES

I am strongly opposed to the interception of telephone conversations as a general investigative technique. I recognize

that mechanical and electronic devices may sometimes be essential in protecting our national security. Nevertheless, it is clear that indiscriminate use of these investigative devices to overhear telephone conversations, without the knowledge or consent of any of the persons involved, could result in serious abuses and invasions of privacy. In my view, the invasion of privacy of communications is a highly offensive practice which should be engaged in only where the national security is at stake. To avoid any misunderstanding on this subject in the Federal Government, I am establishing the following basic guidelines to be followed by all government agencies:

(1) No federal personnel is to intercept telephone conversations within the United States by any mechanical or electronic device, without the consent of one of the parties involved (except in connection with investigations related to the national security).

(2) No interception shall be undertaken or continued without first obtaining the approval of the Attorney General.

(3) All federal agencies shall immediately conform their practices and procedures to the provisions of this order.

Utilization of mechanical or electronic devices to overhear non-telephone conversations is an even more difficult problem, which raises substantial and unresolved questions of Constitutional interpretation. I desire that each agency conducting such investigations consult with the Attorney General to ascertain whether the agency's practices are fully in accord with the law and with a decent regard for the rights of others.

Every agency head shall submit to the Attorney General within 30 days a complete inventory of all mechanical and electronic equipment and devices used for or capable of intercepting telephone conversations. In addition, such reports shall contain a list of any interceptions currently authorized and the reasons for them.

/s/ LYNDON B. JOHNSON

_____

DEPARTMENT OF JUSTICE

November 3, 1966
MEMO NO. 493 .

TO: All United States Attorneys
FROM: Ramsey Clark
Acting Attorney General

\* \* \* \* \* \*

\* \* \* Present practice, adopted in July 1965 in conformity with the policies declared by President Johnson on June 30, 1965 for the entire Federal establishment, prohibits the installation of listening devices in private areas (as well as the interception of telephone and other wire communications) in all instances other than those involving the collection of intelligence affecting the national security. The specific authorization of the Attorney General must be obtained in each instance when this exception is invoked. Intelligence data so collected will not be available for investigative or litigative purposes.

BAZELON, Chief Judge (concurring in part, dissenting in part):

My concern is with the Court's discussion of possible defenses available to John Mitchell and various former subordinates of his in the Federal Bureau of Investigation. While purporting to leave the question for another appeal, the Court has apparently determined to grant all these defendants a *carte blanche* mistake of law defense to the civil liability imposed by Title III.[1] This important holding is not accompanied by any serious attempt to defend what must remain a significant extension of the isolated cases granting mistake of law defense. The purpose of this concurring opinion is to explain why I would hold that the subordinate FBI of-

1. *See* 18 U.S.C. § 2520 (1970).

ficials do have a defense of mistake of law drawn from established precedent and also hold that John Mitchell does not.

The Court relies on two arguments to support its erosion of the general rule that mistake of law is not a defense.[2] The first argument is that such a defense is merely declarative of the common law, as the common law was itself declared in Bivens v. Six Unknown Named Agents, 456 F.2d 1339, 1347–48 (2d Cir. 1972). However, there is a severe distinction between the case *sub judice* and Bivens, a distinction central to the common law and which defeats the Court's argument. In Bivens, the issue pertained to whether the arresting[3] officers had, if the true facts were as the officers believed them to be, probable cause or reasonable grounds to make the arrest. While Bivens is more than a little obscure on the issue, it appears that the court there would find the arrest justified if the officers had a reasonable belief (a standard seemingly equal to the standard of probable cause itself) that a crime had been committed and that the arrested person committed it.[4] If this is the meaning of Bivens, it is indeed declarative of the mature position of the common law.[5] The distinction of our case here is that *even if the facts were as the defendants supposed them to be*, the search could not be justified as within the law's intention. The reason for this conclusion is that the search here was conducted for an extensive period without a warrant and is outside of the "exigent circumstances" exception to the warrant requirement.[6] The Court today holds and I concur completely that a warrant is required to justify searches of

---

**2.** For statements of the general rule, *see* United States v. International Minerals & Chem. Corp., 402 U.S. 558, 563, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971); Lambert v. California, 355 U.S. 225, 228, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957); Shevlin-Carpenter Co. v. Minnesota, 218 U.S. 57, 68, 30 S.Ct. 663, 54 L.Ed. 930 (1916); Ellis v. United States, 206 U.S. 246, 257, 27 S.Ct. 600, 51 L.Ed. 1047 (1907) (Holmes, J.); United States v. Gris, 247 F.2d 860, 864 (2d Cir. 1957); Dennis v. United States, 84 U.S.App.D.C. 31, 171 F.2d 986, 990–91 (1948), aff'd, 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734 (1950); Momsen-Dunnegan-Ryan Co. v. Helvering, 63 App.D.C. 9, 68 F.2d 754 (1933); United States v. Ehrlichman, 376 F.Supp. 29, 35 (D.D.C.1974); United States v. Polizzi, 323 F.Supp. 222, 226 (C.D.Cal.1971); Van Aalten v. Hurley, 176 F.Supp. 851, 857 (S.D.N.Y.1959). It will be noted that the general rule applies both to civil and criminal law. It thus does not matter for purposes of application of the general rule at least that the action authorized by 18 U.S.C. § 2520 (1970) is denominated civil in nature. Presumably, a person liable under § 2520 would also be liable under the criminal provisions of 18 U.S.C. § 2511(1)(1970).

**3.** In this opinion, I will presume that the legal principles controlling searches and seizures are identical to the principles controlling arrests. It would seem that the personal interest in freedom from arrest is greater than the interest in freedom from official searches, although both find constitutional roots in the Fourth Amendment. But on the other hand the government interest in the search and sei-

zure circumstance is less than in the arrest circumstance. I use common law authority on arrest and false imprisonment in large part because of an absence of case law on the trespass liability of public officers.

**4.** *See* 456 F.2d at 1348:

> The standard governing police conduct is composed of two elements, the first is subjective and the second is objective. Thus the officer must allege and prove not only that he believed, in good faith, that his conduct was lawful, but also that his belief was reasonable.

If this language is interpreted to mean that even if the facts are as the officer believes them to be and there is still no probable cause in the constitutional sense, the officer is still free from liability, I would question whether Bivens is consistent with the common law position. *See, e. g.*, Laster v. Chaney, 180 Miss. 110, 177 So. 524 (1937); Collyer v. S. H. Kress & Co., 5 Cal.2d 175, 54 P.2d 20, 23 (1936). However, the so-called "objective" standard enunciated in Bivens seems to embrace the standard of probable cause or reasonable ground, if the facts were as the officer perceived them to be. The margin of police error permitted by Bivens is thus that grouped under the concept of mistake of fact.

**5.** *See* Model Penal Code § 3.09(1) (Tent.Draft No. 8, 1958) and Commentary at 18, 76–77; Wilgus, Arrest Without a Warrant, 22 Mich.L. Rev. 673 (1924).

**6.** This exception is now codified for wiretapping in 18 U.S.C. § 2518(7) (1970).

this ilk. The defendants mistakenly believed that no warrant was required. This belief was not based on a misapprehension of salient facts but on an erroneous concept of law—that the Fourth Amendment did not require a warrant in so-called "national security" circumstances.

This distinction between the two cases is sensible to the common law which makes a consistent distinction between mistakes of fact and law.[7] The distinction is reflected in the law of arrest and false imprisonment. If an officer apprehends an individual on the basis of facts which if true would not constitute an offense known to the law, or on the basis of a warrant suffering from the same defect, that officer is liable in an action for false imprisonment.[8] His good faith or reasonable belief that the facts did constitute an offense is not a defense. Such was the harsh principle of the common law. The actions of Mitchell and the other defendants fall clearly within this principle—they are mistakes of law concerning the necessity of a search warrant. Unless we are willing to erode the common law principle, there can be no

mistake of law defense in the statutory "false arrest" cause of action established by 18 U.S.C. § 2520 (1970), which is, of course the subject of the instant litigation.[9]

The Court's second argument is that Congress intended application of the § 2520 cause of action to depend on the "future course of constitutional law" and under Pierson v. Ray, 386 U.S. 547, 557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), a police officer is not to be held liable for a mistaken prediction as to the course of constitutional law. But Pierson v. Ray involved police actions premised on a state statute later declared to be unconstitutional and not police actions premised on their own view as to the correct constitutional command.[10] This distinction also informs the common law approach to the problems of arrest and false imprisonment: an arrest made in *bona fide* reliance on an existing ordinance or state statute is *prima facie* justified. Here we consider law enforcement actions not taken in reliance on an existing legislative action but rather in reliance on the official's own interpretation of the law.[11] The mistake is thus

7. *See* authorities cited note 2 *supra.*

8. *See* Winters v. Campbell, 148 W.Va. 710, 137 S.E.2d 188, 196–97 (1964); Donovan v. Guy, 347 Mich. 457, 80 N.W.2d 190, 193 (1957); Larson v. Collins, 195 Mich. 492, 162 N.W. 86 (1917); Williamson v. Glen Alum Coal Co., 72 W.Va. 288, 78 S.E. 94 (1913); Crumpton v. Newman, 12 Ala. 199, 46 Am.Dec. 251 (1847). *See also* Stine v. Shuttle, 134 Ind.App. 67, 186 N.E.2d 168, 171 (1962); Holmes v. Nester, 81 Ariz. 372, 306 P.2d 290 (1957); Brinkman v. Drolesbaugh, 97 Ohio St. 171, 119 N.E. 451, 454 (1918); State v. Leach, 7 Conn. 452, 18 Am.Dec. 118 (1827); 32 Am.Jur.2d § 67, at 129–30 (1967); 35 C.J.S. False Imprisonment § 28b(3), at 671 (1960).

9. The same argument, of course, applies to the constitutional cause of action established by Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

10. *See* 386 U.S. at 550, 87 S.Ct. 1213. For common law authority supporting this result, *see* Anno., 16 A.L.R.3d 535 (1967). *But see* Coleman v. Mitnick, 137 Ind.App. 125, 202 N.E.2d 577 (1964), on rehearing, 203 N.E.2d 834 (Ind.App.1965) (strict mistake of law prin-

ciple). *Cf.* Miller v. Stinnett, 257 F.2d 910 (10th Cir. 1958).

11. *Compare* authorities cited note 10 *supra with* cases cited note 8 *supra.* The significance of this distinction lies in its relation to the policies of the mistake of law rule. A legislative judgment as to the validity of a particular measure is accorded great weight in constitutional adjudication and the legislature is generally delegated the highest law-making role in the constitutional order. Constitutional opinions of law enforcement officials are entitled to no such deference. *See infra* 170 U.S. App.D.C. p. ——, 516 F.2d pp. 678–681. *See generally* Collyer v. S. H. Kress & Co., 5 Cal.2d 175, 54 P.2d 20, 23 (1936).

There is furthermore nothing in 18 U.S.C. § 2520 (1970) which could support an extension of *Pierson* such as the Court attempts. Section 2520 does grant a defense on the basis of a court order (not relevant to this case) and on the basis of "good faith reliance on . . . legislative authorization." As the Court relates, an earlier form of § 2520, in effect when these taps were instituted, provided a defense only for usage of the procedures of 18 U.S.C. § 2518(7) (1970). The reasons for the change

not as to the future course of constitutional law but as to its present command untrammelled by a contrary legislative judgment. The mistake is one of pure law and must be justified, if at all, on that basis and not by reliance on the *Pierson* principle.

Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) adds little to the court's argument. In ruling on a sovereign immunity claim, the Court indicated that no immunity existed for violation of a student's constitutional rights when the violation was caused by "ignorance or disregard of settled, indisputable law . . . ." *Id* at 1000. This ruling certainly recognizes the force of the rule that mistakes of law do not excuse, as the dissent clearly points up. Its reference to "settled, indisputable law" is made in the context of actions of school board members who did not have available a means for ascertaining any questions of constitutional inter-

pretation that might arise, a means which would insure against liability. The Court's treatment of *Pierson* is explicitly limited to that case's factual predicate—actions taken under a statute later declared to be unconstitutional. Wood v. Strickland does not support the court's decision here.

To be sure, *Pierson* involves a limited erosion of the general rule that mistakes of law do not constitute a defense. We may certainly use the principle of that case to make further limited intrusion into the general rule. I recently had occasion to express my views on the proper mode of analysis of this question in United States v. Barker, 168 U.S.App. D.C. 312, 514 F.2d 208 (1975) (Bazelon, C. J. concurring). The holding of that opinion controls the claim of the various subordinate FBI officials and mandates my conclusion that those defendants do have a cognizable mistake of law defense to their actions.[12]

are not entirely clear but seem to include a desire to protect common carriers from liability for following the orders of law enforcement officials and to declare Pierson v. Ray to be the law in this area. The amendments involved were added on the floor of the Senate by Senator McClellan. His stated purpose was to relieve common carriers of any fear of liability. *See* 115 Cong.Rec. 37192–93 (1969) (Remarks of Senator McClellan). Both Senator McClellan's amendments to Title 18 and the District of Columbia Court Reform Act to which those amendments were attached and which enacted the federal wiretapping statutes into law in the District of Columbia contained the change from § 2518(7) to "legislative authorization." *See id.* 37183, 37188, 37192–93. The Report on the District of Columbia Court Reform Act sections involved during the debate resulting in Senator McClellan's amendments (*i. e.* S.2869) states that certain changes in the language of the Title 18 wiretapping provisions are made to eliminate ambiguities. The Report then cites to a law review article. *See* S.Rep.No.538, 91st Cong., 1st Sess. 18 (1969), *citing* Blakey & Hancock, A Proposed Electronic Surveillance Control Act, 43 Notre Dame Law. 657 (1968). This article in discussing a proposed draft of an analogue to § 2520 includes the phrase "legislative authorization" and in an accompanying footnote explains that the phrase codifies *Pierson*. *Id.*, 386 U.S. at 681 n. 57, 87 S.Ct. 1213. Thus, the statutory defenses are no broader than *Pierson* for law

enforcement officials. And as discussed in the text, *Pierson* exculpates a mistake of law only when there is in fact a legislative approval for the disputed actions. *Pierson* is not a general abandonment of the mistake of law rule. Certainly nothing in the aforementioned legislative history indicates the slightest intent to alter established doctrine.

The foregoing argument disposes of any contention that a mistaken belief that § 2511(3) authorized warrantless taps could permit exculpation. Such a mistake is one of pure law as is established by United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). And nothing in § 2520 or the common law exculpates pure mistakes of law.

12. The center of the reasoning of my *Barker* opinion is that those who mistakenly believed that their actions were authorized are sufficiently similar to those who are called to the aid of an officer that the mistake of law defense of the latter recognized at common law should be extended to the former. *See* 514 F.2d page 235 & nn.36–38 of that opinion. For additional authority, *see* Moyer v. Meier, 205 Okl. 405, 238 P.2d 338 (1951); Anno., 29 A.L.R.2d 825 (1953). Part of the reasoning of the common law "call to aid" rule is, I have suggested, the tenuous relation between mistakes of fact and law in determining a police officer's authority. A further explanation of the rule lies in various state law provi-

But I do not perceive how any limited erosion of mistake of law doctrine can produce a defense for John Mitchell. He has made the most pure mistake of law imaginable. He relied on no legislative judgment that his actions were permissible or constitutional. He relied on no superior orders or any form of authorization. Furthermore, the reason of the mistake of law rule is surely served by imposition of liability. While I will assume for purposes of this decision that one could make a reasonable constitu-

tional judgment that a warrant was not required in so-called "national security" circumstances,[13] it is equally clear that every informed official and certainly the chief law enforcement officer of the Nation would be aware that the matter was not yet settled. Yet no attempt was made to bring this disputed matter to the courts which are given the ultimate task of saying what the law is. The procedure for obtaining such a judicial determination was available to Mr. Mitchell.[14] Under these circumstances.

sions which make it a misdemeanor to fail to aid a legitimate police officer. In the case *sub judice*, Mitchell's authority was not as close to a question of fact as was the case in *Barker* and in the general "call to aid" situation (both of which depend upon the appearance of authority to take an immediate or clandestine action). However, there is more of a legal obligation on the part of employees of the Justice Department to carry out the directives of their superiors when those superiors assure them their actions are legal. I think it would be unrealistic to suppose that employees of the Justice Department should be forced to choose between termination of employment for refusal to follow directives and maintenance of a correct view of constitutional duties in opposition to the incorrect view of superiors. Civil disobedience within the Department is highly unlikely and we may doubt whether it should be encouraged. *Cf.* Raley v. Ohio, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959) (reliance on official advice); United States v. Calley, 22 U.S.C.M.A. 534, 541–44 (1973) (superior orders defense). *See also* Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (reliance on a legislative judgment); James v. United States, 366 U.S. 213, 221–22, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), *followed in* United States v. Bishop, 412 U.S. 346, 361, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973) (reliance on a court decision).

**13.** I am not informed as to how one determines whether a constitutional judgment is "reasonable" or not. Does one make such a determination by reference to the position of the interpreter or the number of lawyers in the country who agree with the interpretation? The assumption of reasonableness I make does suggest that in this case the standard of liability under § 2520 is not clear. When the standard of liability is not clear, there is some authority for the proposition that mistakes of law should be permitted. *Cf.* Lambert v. California, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957); Williams v. United States, 341 U.S. 97, 100–01, 71 S.Ct. 576, 95 L.Ed. 774 (1951); Screws v. United States, 325 U.S. 91,

95–97, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). Furthermore, an ambiguity in application of a criminal statute generally is resolved in favor of the accused. United States v. Bass, 404 U.S. 336, 347–48, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); United States v. Moore, 164 U.S.App. D.C. 319, 505 F.2d 426, 427 (1974), cert. granted, 420 U.S. 924, 95 S.Ct. 1116, 43 L.Ed.2d 392 (1975). Perhaps the combination of these authorities is the true basis of the Court's erosion of the rule against mistakes of law. However, as is discussed in note 14 *infra*, the provisions of § 2520 are saved from uncertainty by the availability of a means of obtaining judicial approval or review of any activity alleged to be constitutional. Furthermore, § 2520 is a civil sanction which operates only through a liquidated damage provision. There is thus less concern with the harshness of the various forms of absolute liability in the law when the sanction lies only in loss of property and not physical incarceration. *See* United States v. Park, 499 F.2d 839, 840 n.2 (4th Cir. 1974); People ex rel. Price v. Sheffield Farms Co., 225 N.Y. 25, 32–33, 121 N.E. 474, 477 (1918) (Cardozo, J.). *Cf.* Holdridge v. United States, 282 F.2d 302, 310 (8th Cir. 1960).

**14.** That procedure is embodied in 18 U.S.C. § 2518(7) (1970) which permits a law enforcement official to place a tap and to seek emergency judicial approval. If Mr. Mitchell wished to preserve his contention that no warrant was necessary, he could have so informed the court and argued that no warrant was necessary to continue the tap. If this position were approved, Mitchell would have been protected from liability by the express provisions of § 2520. *See* note 11 *supra*. If every judge to which the application were directed refused to uphold Mitchell's contention, he would have the right to mandamus relief. *See* United States v. United States District Court, 444 F.2d 651 (6th Cir. 1971), aff'd, 407 U.S. 297, 307 n.3, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). Furthermore, at the time Mitchell placed the taps in issue in this case on the various lines, he was aware that the Administration's contentions about warrantless "national security"

and with the rights of American citizens in the balance, it was incumbent upon Mr. Mitchell to find out what the law was, to call to his conscience whether his actions agreed with the constitutional order. When thus viewed, Mitchell's actions fall directly within the intendment of the rule against mistakes of law: both to assert the primacy of the legislature and the judiciary in the making of law within their constitutional powers and to assert the duty of all citizens to know that law and obey it.[15] Former Justice Griffith of the Supreme Court of Mississippi instructs us on the point:[16]

> When a person has been chosen to the high position of sheriff and has assumed the duties thereof which in actual execution so largely deal with the liberties of the people, it will be naturally supposed that he has taken some pains to acquaint himself with the power and authority conferred upon him by law in relation to arrests, and with the limitations thereon as laid down by the law. And when an arrest has been made by him and his deputy, and an imprisonment imposed, and the facts admitted by him show no legal grounds whatever therefor, as is the case here, the jury should be permitted to say whether the conduct of the officers has been characterized by such gross wrong as to evince a wanton or willful disregard of the rights of others, and, if so, to administer a corrective by way of smart money.

The short of the matter is that the Court has by its action permitted the Executive Branch to make constitutional law and intends to overrule that Executive Branch determination only prospectively. I understand the Court in footnote 276 mandates the District Court to consider whether it would have been unreasonable for Mitchell not to have sought a judicial determination of his authority to wiretap without a warrant in so-called "national security" circumstances. But how is the District Court to give proper consideration to the issue? Whether such an action is "reasonable" or "unreasonable" is merely a question of law, *viz.* should Mitchell's erroneous view of the law be excused. This is in turn a simple restatement of the issue of the case: should the general rule that mistake of law is not a defense prevail or should it be eroded. Since the body of the Court's discussion is directed to a proof that a mistake of law should be permitted, if a true national security purpose motivated the taps, the District Court may well find itself more than a little confused.

I recognize that the rule that mistakes of law are not a defense is a harsh rule. Perhaps serious arguments could be presented that it should be abandoned *in toto*. I might well agree with such arguments. But the Court here neither purports to abandon the rule nor explains why this case is any different from the mass of cases in which mistakes of law have been found to be no justification for illegal activity. I would have trouble enough with a wholesale abandonment of the rule since I do not

---

taps were undergoing litigation in a number of forums. The Administration's contention was a departure from the clear language of the Fourth Amendment and relied largely on past executive practice. Thus, in light of the uncertainty as to the legality of the Administration's position and the availability of judicial approval to exculpate the law enforcement officials, it seems difficult to argue that mistake of law doctrine should be eroded to exculpate Mitchell at this point.

Further argument for this conclusion may be drawn from the fact that even if § 2518(7) were extended to permit a more lengthy search prior to seeking judicial approval, a

failure to seek judicial approval for better than six months is such an unreasonable delay that liability should attach on that basis alone. It is settled that unreasonable delay in bringing an arrestee before a magistrate is the basis for false imprisonment liability even if the arrest itself were justified. 32 Am.Jur.2d § 23, at 89 (1967).

**15.** *See* United States v. Barker, 168 U.S.App. D.C. 312, at 334–335, 340–341, 514 F.2d 208, at 230–231, 236–237 n.39 (1975) (Bazelon, C. J. concurring) and authorities quoted.

**16.** Laster v. Chaney, 180 Miss. 110, 177 So. 524, 526 (1937).

think the law develops in that manner.[17] More serious in my mind, however, is the Court's apparent selective administration of this harsh rule. For these reasons, I dissent from that portion of the Court's opinion which purports to permit a cognizable defense for John Mitchell to this civil action.

McGOWAN, Circuit Judge (concurring in the judgment):

Believing, as I do, that this record presents no situation falling within the Congressional disclaimer of any purpose to limit "the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities," I have no occasion to look beyond the statute in order to reach the result reflected in the judgment.

Title III, in which the foregoing proviso appears, is a part of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520—a statute which the Supreme Court characterized in *Keith* as "a comprehensive attempt by Congress to promote more effective control of crime while protecting the privacy of individual thought and expression." 407 U.S. at 302, 92 S.Ct. at 2129. This case, like *Keith*, "raises no constitutional challenge to electronic surveillance as specifically authorized by Title III . . . .," nor, as the Supreme Court went on to say, "is there any question or doubt as to the necessity of obtaining a warrant in the surveillance of crimes unrelated to the national security interest," as that interest is defined in the proviso. *Id.* at 308, 92 S.Ct. at 2132.

Title III is addressed to law enforcement, which embraces the detection, prosecution, and prevention of crime. That, in my reading of the record, is what this case is about. Nowhere is that clearer than in the representations of the State Department that initiated the surveillance in question.

Those representations began on June 30, 1970 with a communication from the State Department to the FBI. The State Department official making that communication referred to having received the intra-departmental memorandum attached thereto "with a request that it be brought to the attention of federal law-enforcement authorities," and concluded with an assurance that "the Department will be most grateful for anything you can do to assist us with this problem." Exhibit B–1(1). The record includes at that point a protest from the Soviet Union to the State Department complaining of JDL activities that "cannot be qualified as anything but criminal," and insisting that appropriate law enforcement steps be taken. Exhibit B–1(3). The memorandum attached to the June 30 communication was an internal State Department document which reads as follows:

The recent JDL raid on the Amtorg office in New York City is only the latest in a series of incidents which is causing increasing concern to the office of Soviet Union Affairs. I need not recount previous JDL-inspired actions as they are known to you.

I should like to note, however, that such JDL activity is beginning to have a negative effect on the conduct of our relations with the USSR: this has been noticeable in the area of cultural exchanges. In addition, the JDL's resort to physical violence during its raid on the Amtorg office raises the possibility of Soviet retaliation against U.S. Embassy personnel in Moscow. Finally, *it seems to me that the JDL is an organization of legitimate concern to Federal law-enforcement authorities*, in view of the organization's activities in various parts of the United States. (Emphasis supplied).

17. *See* United States v. Barker, 168 U.S.App.D.C. 312 at 335–337, 514 F.2d 208 at 231–233 (1975) (Bazelon, C. J. concurring).

I would be grateful if you could bring our views to the attention of these law-enforcement authorities for whatever action they deem appropriate.

Exhibit B–1(2).

The law enforcement actions taken in response to that request resulted in a letter of February 10, 1971 from the Under Secretary of State to the Attorney General, of which the first paragraph is as follows:

All of us in the Department were pleased with the prompt action by the Federal Grand Jury which is currently investigating acts of violence attributed to the militant Jewish Defense League. We are hopeful that *the return of indictments and resulting prosecutions under Federal statutes* will demonstrate to JDL members and sympathizers, as well as to the American public and the international community, the resolve of the United States Government not to tolerate *unlawful* attacks upon official and commercial representatives of foreign governments. More fundamentally, we believe that the deterrent effect of such *prosecutions* upon violent anti-Soviet acts will measurably improve the ability of the United States to deal with the Soviet Union on substantive foreign policy issues such as those with which JDL leaders have expressed concern. (Emphasis supplied).

Exhibit B–1(5).

It thus appears that what the State Department sought was more effective enforcement of the criminal laws, and that such law enforcement was, in its opinion, the way to minimize the harmful effect of the activities of the Jewish Defense League upon the relations of the United States and the Soviet Union.

It was not the State Department, but rather the FBI that significantly shifted the emphasis away from criminal law enforcement alone in its request to the Attorney General for authority to tap the telephone of the JDL headquarters for the purpose of obtaining advance knowledge of JDL activities generally so as to "allow for adequate countermeasures to be taken." This was a reason stated in justification for its request for wire tap authority in the memorandum of the Director of the FBI to the Attorney General on September 14, 1970, and it was the reason which was repeated in the two successive memoranda asking renewal of that authority.[1]

However, this new and broader objective conceived by the FBI and the Department of Justice seems to me no less a law enforcement purpose than that of the State Department. At best it might be said that the threatened crimes in this case were of a kind that the FBI would have greatly preferred—by the provision of security and by other precautionary steps—to prevent rather than prosecute, but I cannot see why this generally laudable preference should make the difference.[2] The effort to pre-

---

1. *See* Exhibits I–IV. The Government maintains that the fruits of the surveillance in this case were used solely for the purpose of providing security. The Attorney General's authorizations for the surveillances indicate that they were carried out subject to an earlier directive to the FBI (not itself of record) that overhearings of defendants and attorneys in pending criminal prosecutions were to be avoided if possible; and, if they could not be avoided, their contents were to be sealed and not made available to other Justice Department personnel. Exhibits I, II. *See also* Exhibit IV at 31 (Deposition of John Mitchell). Whether the fruits of the surveillances in this case were in fact ever used in any criminal prosecution is not ascertainable from this record.

2. I would stress this point in response to the claims by both Judge Wright and Judge Wilkey that the FBI's role in this case was something other than that of law enforcement. I assume that numerous conversations took place between the Justice Department and the National Security Council and State Department, that their tenor was as Judge Wright describes, *see* Wright op., 170 U.S.App.D.C. at —— n.39, 516 F.2d at 612 n.39, and that the ultimate goal of all concerned was indeed to shore up the new and fragile foundations of detente. Since Judge Pratt found no more

vent crime can always fail, in which case prosecution is sure to follow.[3]

I disagree, therefore, with Judge Wilkey's assertion that the primary purpose of this surveillance, viewed from the perspective of either the State Department or the Justice Department, was something other than the "uncovering of evidence of domestic crime."[4] I disagree more fundamentally, however, with his suggestion that the "primary purpose" of a surveillance is the proper test of the statute's applicability.[5]

An investigation may often have both prosecutorial and informational purposes. Different investigators may have different understandings of which of these is "primary." At least at the outset, no conscious view may have been formed at all as to what is the investigation's "primary purpose," since no one can be sure of where it will lead. Even if a concerted and discrete "primary purpose" may sometimes exist in the minds of investigators, the task of proving or disproving it in later judicial proceedings is likely to be frustrating if not entirely futile. Moreover, a subjective test, such as Judge Wilkey suggests, invites the Government to supply national security purposes after the fact; and, to the extent it is successful, permits it to ignore a statute avowedly protective of important individual rights.[6]

My preference would be for a more objective test of the statute's applicability, and one which allowed it to be much less easily displaced.[7] For present pur-

than this, I assert no factual error on his part. But the fact remains that what had to be done in order to reach that goal was to enforce the law, either by preventing or by prosecuting violations of it, when such violations were directed at Soviet property and personnel.

Judge Wilkey seems to concede that the prevention of crime is as much a law enforcement purpose as its prosecution, but argues that the FBI's purpose, rather than the "prevention of crime *per se*," was "keep[ing] the Bureau and the State Department informed of every movement, criminal and noncriminal, of the JDL which might exacerbate our position *vis-a-vis* the Soviet Union." Wilkey op., 170 U.S.App. D.C. at —— n.11, 516 F.2d at 690–691 n.11. There is no record evidence of the State Department's having requested such prior information about lawful-yet-exacerbatory JDL movements (presumbably demonstrations and harassments), and I doubt that such information would have been of any significant use to it if it had. That the FBI sought to inform itself about noncriminal as well as criminal activites, I have no doubt. Still I am not ready to assume that the gaining of foreknowledge of entirely lawful activities was that agency's *primary* purpose.

3. Whether or not it has been the Government's practice to refrain from using fruits of nonstatutory surveillances in criminal prosecutions, *see* note 1 *supra*, that practice clearly is not required either by the Constitution or by the statute, which expressly authorizes the use of such fruits where the surveillance was reasonable. *See* § 2511(3).

4. Wilkey op., 170 U.S.App.D.C. at ——, 516 F.2d at 691.

5. Judge Wilkey enunciates such a "primary purpose" test for the statute's applicability infra, 170 U.S.App.D.C. on pages —— and ——, 516 F.2d on pages 690 and 694. 170 U.S.App.D.C. at p. ——, 516 F.2d at p. 697 he suggests a different test when he states that

If it appears to the trial judge that the *sole* objective of a "foreign affairs" or domestic security wiretap was that of gathering specific evidence with regard to one of the crimes enumerated in section 2516—as opposed, for example, to garnering information to ward off or prevent the "hostile acts" of another country—then he has the discretion to prevent an end run around Title III by holding the surveillance invalid. (Emphasis added).

If the principle is that a non-prosecutorial motive makes the statute inapplicable if it is only *one* of the Government's objectives, then my disagreement is even more emphatic.

6. The problem of *post hoc* rationalization would be somewhat alleviated if we could be sure that, because of an independent constitutional warrant requirement, the question of the statute's applicability could also be decided before the fact. We do not know whether such an independent requirement exists, however, and since I find a purpose test otherwise unacceptable, I do not think it a sufficient reason to reach the constitutional question that its answer might make such a test more palatable.

7. When confronted, as we now are, by the question of whether a particular statute requires the President to utilize the means it explicitly provides him, or leaves him free to rely on his undefined powers under the Consti-

poses, it is enough that that section was not intended to apply when the subjects of surveillance are themselves so indirectly related to any foreign power. Note should be taken of the exact language of § 2511(3). It does not say that the statute is inapplicable to any surveillance with implications, however remote, for the nation's foreign relations; it merely abjures any intent to legislate with respect to the constitutional power of the President (in pertinent part)

> . . . to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities.

The nonstatutory surveillances here at issue must be defended as being "necessary to protect the Nation against . . hostile acts of a foreign power." I would construe the quoted phrase as referring only to surveillances directed against agents of, or collaborators with, the foreign power whose hostile acts are

feared. It was with such agents and collaborators that Congress was, in my submission, specifically concerned.[8] I see strong reasons not to construe the language more broadly.

In cases, such as the one before us, where the national security concern is purely that a foreign power might be provoked into hostile acts by the activity of the subjects of surveillance, none of the policies arguably underlying the national security exception to the statute are operative. A heightened necessity of secrecy is sometimes thought to distinguish national security surveillances, but there is nothing secret about what the JDL was up to, or the reasons that it was thought dangerous, or even the fact that members of that organization were under close investigation.[9] There is also sometimes thought to be a lack of judicial competence to deal with national security matters, but there was nothing in the least arcane about JDL activities and their implications. It may well be that the conduct of our foreign affairs is better left to the State Department than to the judiciary, but foreign affairs entered this case only because foreign citizens

---

tution, we should in general prefer the former construction. The President is on his strongest footing when acting with statutory authority, and we should assume, when Congress has been unclear, that it intended that he proceed in that way. The Steel Seizure Case, Youngstown Sheet & Tube v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), still speaks eloquently to the point. Indeed, Justice Jackson suggests just such a canon of construction in his statement that "[i]n view of the ease, expedition and safety with which Congress can grant and has granted large emergency powers, *certainly ample to embrace this crisis*, I am quite unimpressed with the argument that we should affirm possession of them without statute." *Id.* at 653, 72 S.Ct. at 879. (emphasis supplied). The statutory authority provided by Congress in Title III strikes me as "certainly ample to embrace this crisis" involved in this case.

8. *See* S.Rep.No.1097, 90th Cong., 2d Sess., at 94 (1968), U.S.Code Cong. & Admin.News, 1968, pp. 2112, 2182, 2183 (quoted at length in Judge Wilkey's op., 170 U.S.App.D.C. at ———, 516 F.2d at 693–695). The Report's only example of a foreign national security surveillance which might take place

within the United States was one directed at "the domestic Communist party and its front groups [who] remain instruments of the foreign policy of a foreign power . . ." In discussing the kinds of people who are within the scope of § 2511(3) but may nonetheless be prosecuted with the fruits of "reasonable" nonstatutory surveillances, the Report refers to "agents of foreign powers and those who cooperate with them."

9. Secrecy was quite the opposite of the JDL's express objective, which was to exacerbate Soviet-American relations and dramatize the plight of Russian Jews by the commission of crimes that were as flagrant and well-publicized as possible. In newspaper reports made a part of the record Meir Kahane, a leader of the JDL, is quoted as stating that "[w]e must break every law to save three million Soviet Jews." Schwartz, *Threats and Bombs—A Nasty Phase for the Two Nations*, N.Y. Times, Jan. 10, 1971, Exhibit C–2. Also reported is the same individual's boast that "[f]or the first time in fifty-three years, the Soviet Jewish problem is on Page One throughout the country, and we are responsible for that." N.Y. Daily News, Jan. 13, 1971, Exhibit C–3.

were the victims of actual and threatened criminal offenses, and, as has already been made clear, the only expressed concern of the State Department was that those offenses be averted or prosecuted.

A holding that the President may protect against "hostile acts of a foreign power" by spying upon our own citizens simply because they may provoke such acts opens a gaping and particularly dangerous hole in the statute. The following come quickly to mind as among those who would be subject to non-statutory [10] surveillance under this theory: a Congressional opponent of detente, on the ground that it must be known in advance when he will take some action to unsettle delicate trade negotiations; leakers of confidential information, on the ground that they will destroy the trust and candor of communications with our allies; organized resistors of American military actions, on the ground that they demoralize the troops and incite the enemy; multinational corporations, on the ground that violations of the law by such corporations are a major cause of foreign ill-will; suspected perpetrators of any crime that can become an "international incident" (the smuggling of an art treasure out of a foreign country, the smuggling into it of large amounts of narcotics, etc.).

The foregoing list is only intended to be suggestive, but what it says to me is that, where the activities under Government surveillance are foreign-related only by way of the foreign reaction they may provoke, those activities are likely to be either criminal, in which case the Government should submit to Congress's decision that only certain crimes pose a sufficient threat to justify surveillance, or protected by the First Amendment, in which case there should ordinarily be no surveillance. After all, if domestic activities, without being unlawful, are such as to attract the attention of a foreign power, they are bound to be of a political or at least self-expressive nature.

Such First Amendment concerns are, of course, vividly illustrated by the facts of this case. The first paragraph of Mr. Hoover's initial memorandum requesting wiretap authority is as follows:

> The captioned organization has recently emerged as the most militant pro-Jewish organization active in the United States. It has demonstrated its proclivity for demonstrations and violence by attacks on Soviet and Arab diplomatic installations in this country, as well as by participation in demonstrations in New York City, which have resulted in injury to private citizens and law enforcement officers. News media have reported that the leader of the Jewish Defense League (JDL) on September 8, 1970, stated that his organization might attempt to hijack Arab terrorist groups in the current tensions surrounding the Middle East situation.

It will be seen that the reference is both to "demonstrations," *and* to violent attacks on people and property; as well as threats of airline hijacking. In the second paragraph of that memorandum, the Director refers to the impending opportunity of the JDL "for violence or demonstrations against the foreign leaders in furtherance of JDL aims for support for Israel and the Jewish race." The tell-tale "or" is surely not without significance. The duality of these expressions is subtle and perhaps below the level of consciousness, but its consequences can be substantial. It leads, in the Government's present submission, to the legal conclusion that the warrant requirements of Title III need not be observed, which in turn means that the FBI can, without constraint from the

---

10. The word non-statutory is used because it may be that surveillances of this kind would be subject to a constitutional warrant requirement. The latter may not, however, provide anything like the same protection. For example, it leaves the Government free from what seems to me the very important constraint of having to make public the nature and amount of its surveillance. *See* § 2519.

statute, add to its stores of information about people who demonstrate, as well as those who have committed, or may reasonably be thought likely to commit, crimes.

This, in my conception, was exactly what Title III was designed to prevent. It is why law enforcement authorities should not, by an expansive reading of the foreign intelligence proviso, convert requests for more effective enforcement of the criminal laws into opportunities for warrantless invasions of privacy, especially where, as here, those whose privacy is invaded have no affinity with the foreign power whose hostile acts are the Government's professed concern.[11]

Judge Wright's discussion of the general problem of whether there should be a foreign security exception to the constitutional warrant requirement, though a scholarly effort of extraordinary proportions, seems to me unnecessary.[12] Moreover, unreserved concurrence in it could only, or so it seems to me, be understood as signifying a personal conviction that no such exception exists. We may or may not ultimately so hold, but the complexity and importance of the problem require that we address it only in our most sure-footed way, that is to say, on the concrete facts of a case presenting the issue squarely.

If and when we are called upon to decide that question, our task may be greatly complicated by our having held today that, wherever the Constitution requires a warrant, the statute requires compliance with some, albeit concededly not all, of its mandated procedures. That holding, in my view, flies in the face of both the Supreme Court's *Keith* opinion and the statute itself.

As to the former, the plain meaning of the language of *Keith* seems to me to be that there are certain national security surveillances to which the statute was not intended to apply, and that the surveillance then before the Court was one of them.[13] It is perhaps possible to read

---

**11.** There is nothing in *Keith* inconsistent with the application of the statute to the surveillance now before us, even assuming that the Supreme Court thought it inapplicable to the surveillance that took place in that case. For one thing, that surveillance was exempted under a different part of § 2511(3), that referring to presidential power, without constraint from the statute, to protect "against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure and existence of the Government." More important, the surveillance was directed against individuals who were themselves thought to be the source of the national security threat—in that case the dynamite bombing of an office of the Central Intelligence Agency—rather than against individuals whose actions could only indirectly bring about such a threat.

**12.** Judge Wright's primary objection to my failure to reach the constitutional question is based on his view that § 2511(3) disclaims any intent on the part of Congress to require a warrant where the President could constitutionally proceed without one. *See* Wright op. 170 U.S.App.D.C. at —— n.46, 516 F.2d at 614 n.46. Clearly, if I shared this view, I could not end the inquiry in this case without first satisfying myself that the surveillance was not encompassed by some exception to the constitutional warrant requirement. I do not construe § 2511(3) as Judge Wright does, however. I disagree with his interpretation of the word "constitutional" in that section as making the statute "contingent" on the Constitution in any sense, even the limited sense of its never requiring a warrant if the Constitution would not require one. The word "constitutional" refers, in my view, to the source of the presidential powers which are left undisturbed by the statute. Precisely which of those powers it did leave undisturbed (and I think entirely undisturbed, constitutional warrant requirement or no) are defined by the language of § 2511(3), within which the surveillance now before us simply does not fit. I do not, in other words, think that Congress cared whether this surveillance could constitutionally have been carried out without a warrant. It is not a surveillance within the true foreign national security area of which Congress was so wary, and in which it therefore chose not to legislate. It is instead within the area regulated by the statute.

**13.** Judge Wilkey has well stated the case for this interpretation of *Keith*. The only fact of significance to me that he has omitted is that Justice White concurred in that case on the ground that the statute applied. Apparently the majority disagreed, as it could not have done were Judge Wright's reading of the statute the correct one.

the Court's phrase, "did not legislate," as "legislated contingent upon the Constitution." It is possible also to conclude that when the Court stated later in its *Keith* opinion that perhaps Congress "would judge" the statutory procedures inapplicable to national security surveillance, 407 U.S. at 323, 92 S.Ct. 2125, it meant that perhaps Congress "would reconsider" their applicability. Even if these possible meanings commended themselves to us as the more sensible ones,[14] our obligation is to remain faithful to the Court's most probable meaning in *Keith*, and I cannot believe that that meaning is one which can only be derived by the employment of as much ingenuity as Judge Wright has shown.

Far more important, since the statements in *Keith* are *dicta* in any event, is the statute itself. To the textual and historical arguments that Judge Wilkey has quite forcefully made against the statute's applicability to all surveillances requiring a warrant, I will add only this. Judge Wright has somewhat understated the number of procedural provisions in the statute which will have to be altered or ignored before they are applied to non-criminal national security surveillances. He mentions, as calling for this treatment, § 2516, enumerating the criminal offenses which may form the justification for surveillance, and § 2518(1)(b)(i), requiring the applicant for a warrant to give details of the offense.[15] There are also the following:

—§ 2518(1)(b)(iv), requiring the warrant applicant to give "the identity of the person, if known, committing the offense . . .;"

—§ 2518(3), allowing the judge to issue a warrant only if

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

. . . . .

(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

—§ 2518(4)(c), requiring that the warrant itself contain ". . . a statement of the particular offense to which it relates;"

—and § 2519(1)(e), requiring the judge to report to the Administrative Office of the United States Courts, within thirty days of a surveillance's termination or denial, "the offense specified in the order or application."

The criminal "offense" is thus pervasively assumed in §§ 2518 and 2519. It is the linchpin of the operation of those sections, giving strong reason to doubt that they were intended to be applied, as Judge Wright would apply them, where there is no offense at all.[16]

---

14. Judge Wright sets out a number of advantages which could be gained from considering Title III as applicable to all court-ordered surveillances. Wright op., 170 U.S.App.D.C. at —— — ——, 516 F.2d at 667–669. He also concedes, however, that his strained (in my view) reading of the statute is not the only way to achieve many of those advantages. *Id.* 170 U.S.App.D.C. at —— — ——, 516 F.2d at 668–669. Nothing prevents the courts from selectively incorporating whichever of the statute's procedures are truly appropriate as elements of the "reasonableness" which both the Constitution and the statute require.

15. *See also* Wright op., 170 U.S.App.D.C. at —— n.266, 516 F.2d at 668–669 n.266.

16. Neither can I agree that, on the basis of § 2511(3)'s disavowal of any intent to limit the President's powers, the statute should be judicially tailored to fit national security cases. Even accepting Judge Wright's suggestion that only those statutory procedures be altered which would otherwise "unduly trammel" or "substantially affect" the President's national security surveillance powers, the result is, once again, a more radical surgery on the statute than Judge Wright has described. Among

ROBB, Circuit Judge (concurring):

I concur in the result and in Part III B of Judge Wright's opinion.

The Jewish Defense League is a domestic organization. Its members are citizens of the United States and there is no suggestion of any connection or collaboration between the League or its members and any foreign power or foreign agent or agency. In my opinion therefore the electronic surveillance of the League and its members cannot be justified under the proviso of Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2511(3), which recognizes "the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities." I think that proviso, and the constitutional power of the President to which it refers, relate to the activities of foreign powers and their agents, not to those of American citizens having no foreign connections. In short, I think the case is controlled in principle by United States v. United States District Court (Keith), 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), so that before installing the wiretaps in question the government was required to obtain a warrant pursuant to the procedures established by Title III, 18 U.S.C. §§ 2510–2519.

I reject the argument that the surveillance was proper because the activities of the Jewish Defense League displeased a foreign government or related to foreign affairs. Carried to its logical conclusion that argument would reduce the restrictions on warrantless wiretapping to the vanishing point, for the actions of almost any group or organization in this country, even such a body as the convention of one of our major political parties, may affect foreign policy or agitate a foreign nation.

The government's position cannot be sustained by the second proviso of 18 U.S.C. § 2511(3) or by the constitutional power of the President to which it refers. That proviso recognizes a power of the President "to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government." Any contention that the activities of the Jewish Defense League threatened the overthrow of the government or presented a clear and present danger to its structure or existence is, I think, chimerical. Whatever the constitutional prerogatives of the President in the field of national security may be, the facts of this case do not justify their invocation. On this point the *Keith* case is conclusive.

The violence directed at Soviet personnel by the League, including the bombing of Soviet installations, justified an application under 28 U.S.C. § 2518 for an order authorizing a tap on the League's telephones. Thus 18 U.S.C. § 112(a) makes it a felony to assault, strike, wound, or offer violence to a foreign official or official guest. Any person who uses an explosive to commit that felony is subject to imprisonment for not less than one year nor more than ten years. 18 U.S.C. § 844(h). Moreover chapter 102 of the Criminal Code, 18 U.S.C. §§ 2101–2102, relating to riots, would seem to apply to at least some of

the statute's procedural requirements are the following: that an applicant for a warrant give "a full and complete statement of the facts concerning all previous applications . . . involving any of the same persons, facilities or places . . .," 18 U.S.C. § 2518(1)(e)(1970); that an applicant for extension of a warrant beyond its maximum thirty days divulge "the results thus far obtained . . .," *id.*

§ 2518(1)(f); and that recordings of all interceptions be immediately made available to the issuing judge, to be preserved as he directs for at least ten years. *Id.* § 2518(8)(b). A President who was unwilling for security reasons to comply with such requirements might consider that they "trammeled" his power to carry out national security surveillances to the point of making them impossible.

the concerted activities of the League's members. Turning to Title III, we find that 18 U.S.C. § 2516(1)(c) specifically authorizes an application for a wiretap warrant in cases involving unlawful use of an explosive to commit a felony; and 18 U.S.C. § 2516(1)(a) authorizes such an application in cases involving riots. Granted that the Congress may not by statute impinge upon the constitutional prerogatives of the President in the field of foreign affairs or the national security, I think the surveillance in this case related to domestic crimes specifically covered by Title III and not to matters the Constitution may confide to the President's discretion in dealing with foreign nations or the national security. The interest of a foreign government in violations of our criminal laws by American citizens did not remove the coverage of Title III.

WILKEY, Circuit Judge (concurring and dissenting): *

I concur in the plurality's finding that the wiretaps on the Jewish Defense League were placed pursuant to the President's "foreign affairs" power, and also in the holding that the warrantless surveillance nevertheless was in violation of the Fourth Amendment. If a "foreign affairs" exemption from the warrant requirement exists, it exists only for a narrow category of wiretaps on foreign agents or collaborators with a foreign power. As this is not such a case, we leave for another time resolution of the question of the existence and precise parameters of this special constitutional exemption.

I must strongly dissent, however, from my colleagues' startling conclusion that all constitutionally objectionable wiretaps are perforce in violation of Title III and that, therefore, the statutory damages provision of section 2520 is applicable to this case. In my view, the case should be remanded to the District Court solely for consideration of the merits of a claim for damages under the Fourth Amendment.[1]

The appellants' claim of damages for an unlawful search and seizure rests on both statutory and constitutional grounds. The constitutional claim will be discussed in Part II of this opinion. Part I examines the alternative prayer under section 2520 of the Omnibus Crime Control and Safe Streets Act. That section provides for the recovery of civil damages by those "person[s] whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter [i. e., Title III of the Act, 18 U.S.C. §§ 2510–2520]."[2] The pivotal issue under the claim for statutory (as distinct from constitutional) damages, then, is whether the appellees violated any provision of Title III when they placed wiretaps on the phones of the Jewish Defense League (JDL) without any prior judicial approval. Resolution of this issue depends, first, upon whether the wiretaps were placed pursuant to a "foreign affairs" surveillance and, second, upon whether the strict procedural requirements of Title III have any application to this kind of surveillance.

## I. THE STATUTORY CLAIM

### A. The Scope of a "Foreign Affairs" Surveillance

Title III of the Omnibus Crime Control and Safe Streets Act[3] authorizes the

---

* The outline of this opinion is as follows:

I. The Statutory Claim
 A. The Scope of a "Foreign Affairs" Surveillance
 B. The Meaning of the Section 2511(3) Disclaimer
II. The Constitutional Claim
 A. The "Foreign Affairs" Exemption—Inner Distinctions and Limitations
 B. Rationales for the Foreign Affairs Exemption—the Balancing of Constitutional Powers, Responsibilities, and Rights
 C. Collaborators and Non-Collaborators with a Foreign Power
 D. The Spectrum of Executive Electronic Surveillance Authority

1. See Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2. 18 U.S.C. § 2520 (1970).

3. 18 U.S.C. §§ 2510–2520 (1970).

use of electronic surveillance for the classes of crimes set forth in section 2516. Sections 2511 and 2520 provide criminal and civil penalties for violations of the Act. Section 2511, however, also specifies several categories of conduct which are either not unlawful or are not regulated by the Act. One such category is defined in subsection (3) which provides in pertinent part:

> *Nothing contained in this chapter . . . shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States,* or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. *The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence* in any trial hearing, or other proceeding *only where such interception was reasonable,* and shall not be otherwise used or disclosed except as is necessary to implement that power.[4]

According to the Senate Report of the Act,[5] the section 2511(3) disclaimer was intended "to reflect a distinction between the administration of domestic criminal legislation [by the President]

. . . and the conduct of foreign affairs."[6] In the latter area, as the disclaimer itself reads, Title III does not "limit the constitutional power of the President .to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power . . . ."[7]

The appellants in this case apparently would construe this language to allow the President freedom of action in intelligence gathering only when the country was actually exposed to an armed attack. Neither of the principal reasons given by the Government for conducting the wiretaps in question—(1) the severe strain which the activities of the JDL placed on the conduct of our relations with the U.S.S.R.; (2) the threat of retaliation by Soviet citizens against American Embassy personnel in Moscow—involved a serious danger of war with the Soviet Union. It follows, appellants argue, that the Executive was not justified in treating the conduct of this wiretap differently from an ordinary criminal wiretap.

The appellants' position is refuted by both the language of the disclaimer itself and by the function which the surveillance served. In the first place, section 2511(3) preserves the President's authority to protect the nation not only against "actual or potential attack" but also against "other hostile acts" of a foreign country. That this disjunctive wording was intentional is made clear by the Senate Report, which explains that the President's authority is unfettered by Title III "to obtain information by whatever means to protect the United States from the acts of a foreign power *including* actual or potential attack or foreign intelligence activities."[8] "Hostile acts of a foreign power," therefore,

---

**4.** 18 U.S.C. § 2511(3) (1970).

**5.** Report on S.917, Omnibus Crime Control and Safe Streets Act of 1968, S.Rep.No.1097, 90th Cong., 2d Sess. (1968), U.S.Code Cong. & Admin.News, 1968, p. 2112.

**6.** *Id.* at 94, U.S.Code Cong. & Admin.News, 1968, p. 2182.

**7.** 18 U.S.C. § 2511(3) (1970).

**8.** S.Rep.No.1097, 90th Cong., 2d Sess., at 94 (1968), U.S.Code Cong. & Admin.News, 1968, p. 2182.

is clearly a category which includes armed aggression against this country only as one of its components. It would certainly appear, then, that the prevention of an attack on American citizens abroad also fits within that broader category. It is difficult to conceive of a more appropriate situation for utilization of the President's foreign affairs power than in the protection of American Embassy personnel in another country.

Equally important, in view of the responsibility of the Executive to conduct our foreign relations, and the intent of Congress in section 2511(3) to recognize the informational requirements which inhere in the proper exercise of this responsibility,[9] the purview of the term "hostile acts" would also appear to include inimical diplomatic retaliation. That the well-being of this country can suffer greatly from a breakdown of friendly relations with a country like the Soviet Union is beyond question. If the President has any special investigative prerogative by virtue of his foreign affairs power, it must include a situation where a rupture of diplomatic ties is threatened.

This position is buttressed by the conduct of the surveillance in question. The function which the surveillance was intended to serve was not primarily one of uncovering evidence of domestic crime. Rather, the purpose was to acquire advance knowledge of the tactics of physical intimidation and harassment practiced by the JDL on Russian diplomatic personnel in this country—with the avowed design of "creat[ing] a crisis between the U.S. and the U.S.S.R." [10]—in order to minimize the disruptive effect of these activities on our relations with the Soviet Union. This was an informational surveillance of the type Congress intended to separate from ordinary criminal wiretaps by virtue of the section 2511(3) disclaimer. It was an intelligence operation undertaken pursuant to the President's constitutional power to conduct this country's foreign affairs, as distinct from his duty to administer domestic criminal legislation.[11]

9. *Ibid.*

10. Def.Exh. B–3(11), ¶ H.

11. Judge McGowan, concurring in the result reached by Judge Wright's plurality opinion, takes the contrary position that law enforcement, not intelligence gathering, was the primary purpose of the Government's surveillance of the JDL. He finds support for his view in a State Department memorandum which notes, first, that the activities of the JDL are having "a negative effect on the conduct of our relations with the U.S.S.R."; second, that the JDL's bombing of the Amtorg office "raises the possibility of Soviet retaliation against U.S. Embassy personnel in Moscow"; and, third, that "the JDL is an organization of legitimate concern to Federal law-enforcement authorities." This memorandum was sent to the FBI on 30 June 1970 with a cover letter stating that "the Department will be most grateful for anything you can do to assist us with this problem." (Exhibit B–1(2).)

After receiving this request, that the FBI should have asked permission from the Attorney General to tap the telephone of the JDL for the purpose of obtaining advance knowledge of the organization's activities, rather than for the purpose of gathering evidence for criminal prosecutions, is hardly surprising. The principal concern of the State Department was not to enforce the criminal laws against the JDL—the primary responsibility for protecting U.N. personnel from criminal acts is vested in New York state authorities, not the FBI—but to minimize the disruptive effect of the group's activities on our relations with the Soviet Union.

To be sure, the State Department was cheered when it learned that a federal grand jury was investigating the activities of the JDL. In a letter quoted by Judge McGowan, the Department expressed to the Attorney General its hope that the indictment and prosecution of JDL members under federal statutes would follow. (Opinion of Judge McGowan, supra, 170 U.S.App.D.C. ——, 516 F.2d 682.) It is clear from the remainder of the letter, however, that the Department's desire was not so much that wrongdoers be brought to justice as that "the deterrent effect of such prosecutions upon violent anti-Soviet acts will measurably improve the ability of the United States to deal with the Soviet Union on substantive foreign policy issues . . .." (Exhibit B–1(5).) In short, the State Department viewed criminal prosecutions as one potentially effective means of achieving its overriding goal of maintaining good relations with the Soviet Union.

Certainly the FBI did not misread the Department's general request for assistance

Thus, I concur in the plurality's determination that the wiretaps in question were placed pursuant to the President's special responsibility to conduct the country's foreign affairs, within the meaning of the section 2511(3) disclaimer. This does not mean the surveillance was immune from minimal constitutional requirements. Part II below elaborates my agreement with the plurality on this point. To my mind, however, it is clear that if a particular surveillance falls into the category of foreign affairs, as in this case, or domestic security, as in United States v. United States District Court (Keith),[12] its validity is subject *only* to constitutional strictures.[13] I strongly disagree with the plurality's view that

---

when the Bureau determined that another means of minimizing the adverse impact of the JDL's activities on our foreign relations would be to learn of the organization's plans in advance so as to forewarn the objects of its demonstrations and avert the possibility of violence. Contrary to Judge McGowan's conclusion, this preventive action did not have as its purpose the gathering of evidence of specific crimes, or even the prevention of crime *per se.* These tasks were the duty primarily of local law enforcement authorities. Rather, the FBI's monitoring activity was intended to keep the Bureau and the State Department informed of every movement, criminal and noncriminal, of the JDL which might exacerbate our position vis-a-vis the Soviet Union.

**12.** 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

**13.** Judge McGowan, in his concurring opinion, agrees that

the plain meaning of the language of *Keith* seems to me to be that there are certain national security surveillances to which the statute [Title III] was not intended to apply, and that the surveillance then before the Court was one of them.

(Opinion of Judge McGowan, supra, 170 U.S. App.D.C. at p. ——, 516 F.2d at p. 686.) Nevertheless, he finds two reasons why Title III's procedures, and provision for damages, are applicable in the instant case.

The first reason rests upon the proposition that wherever a particular statute *can* be utilized, it *must* be. (*Id.* 170 U.S.App.D.C. at —— n.7, 516 F.2d at 683–684 n.7.) Despite the fact that the primary purpose of a particular surveillance may be informational, if there is any prosecutorial element in it (that is, any expectation of discovering criminal violations), then the procedures laid down in Title III must be followed. The difficulty with this position is immediately apparent. The vast majority of activities whose surveillance is exempted from the provisions of Title III by section 2511(3) will perforce involve some element of criminality. If the courts were to require Title III procedures to be followed in every case where there is evidence of a criminal violation, the scope of section 2511(3) would be so drastically reduced as to render the section virtually meaningless.

*Keith* itself is a good illustration. The defendants were indicted for a conspiracy to destroy government property. (407 U.S. at 299, 92 S.Ct. 2125.) Despite the fact that it may have been possible for the FBI to proceed according to the provisions of Title III, however, the Supreme Court indicated a much more flexible procedure would suffice. (407 U.S. at 322, 92 S.Ct. 2125.) It appears contradictory, on the one hand, for Judge McGowan to accept that Title III was not intended to apply in *Keith* and, on the other, to argue that the Government must proceed according to the statute's provisions whenever a criminal violation is suspected.

The second reason Judge McGowan gives for applying Title III's procedures in this case is that the section 2511(3) disclaimer was only intended to apply when government surveillances are directed against agents of, or collaborators with, a foreign power. (Opinion of Judge McGowan, 170 U.S.App.D.C. at ——, 516 F.2d at 683–684.) As I discuss in Part II *infra,* the collaborator/non-collaborator distinction may be useful when dealing with the scope of the President's power to engage in electronic surveillance *without prior judicial approval*; but, I think the utility of the distinction breaks down when the issue is whether Title III procedures are mandated in a particular case.

The purpose of section 2511(3) is to recognize "a distinction between the administration of domestic criminal legislation . . . and the conduct of foreign affairs." (S.Rep.No. 1097, 90th Cong., 2d Sess. 94 (1968).) The foreign affairs power of the President is no less implicated when another country's threat of "hostile acts" against this country is triggered by the activities of a non-collaborationist domestic group than when the threat comes from a collaborator or foreign agent. The question is not whether non-collaborators should be protected by the Fourth Amendment's requirement of prior judicial approval. Both my opinion and that of the plurality make clear that they must be so protected. Rather, the question is whether the President's need for information to guide his efforts in the field of foreign affairs should be subject to the strict procedural requirements—geared to prosecutorial surveillances—of Title III. I think he should not be so hampered, and the language of section 2511(3) bears out this

the strict procedural requirements of Title III—and, concomitantly, the damages provision contained in section 2520—are applicable to these special kinds of surveillance.

## B. *The Meaning of the Section 2511(3) Disclaimer*

In *Keith,* the Supreme Court was called upon to interpret the significance of the section 2511(3) disclaimer as it related to Presidential authority to gather intelligence information concerning the internal security of the country. The Court found "the conclusion inescapable that Congress only intended to make clear that the Act *simply did not legislate* with respect to national security surveillances."[14] For Congress to have dealt with "the important and complex area of national security in a single brief and nebulous paragraph . . . would not comport with the sensitivity of the problem involved or with the extraordinary care Congress exercised in drafting other sections of the Act." [15]

This rationale would appear to apply with even greater force to a case involving intelligence gathering concerning the external security of the country. It has long been recognized that the President has special constitutional responsibilities and prerogatives in the field of foreign affairs.[16] Congress intended to respect those prerogatives by virtue of section 2511(3). "Few would doubt this, as the section refers—among other things—to protection 'against actual or potential attack or other hostile acts of a foreign power.' " [17] Moreover, the factors which differentiate auditory searches for evidence of a specific crime from information-gathering surveillances are particularly applicable to foreign intelligence operations. Often the uncovering of evidence of criminal activity is only a secondary objective. The primary objective is to obtain intelligence upon which the President can base an informed judgment in the area of foreign affairs.

The rigid procedural requirements of Title III and the substantive necessity of a prior showing of probable cause to suspect criminal activity are not geared toward this kind of informational surveillance. That Congress recognized and intended to point up this limitation on the reach of Title III is made quite clear by the discussion of the rationale for section 2511(3) contained in the Senate's Report of the Act. Its direct relevance to this and other issues involved in the case at bar merits an extended quote:

> *Paragraph (3) is intended to reflect a distinction between the administration of domestic criminal legislation not constituting a danger to the structure or existence of the Government and the conduct of foreign affairs.* It makes it clear that nothing in the proposed chapter or other act amended by the proposed legislation is intended to limit the power of the President to obtain information by whatever means to protect the United States from the acts of a foreign power including actual or potential attack or foreign intelligence activities, or any other danger to the structure or existence of the Government. *Where foreign affairs and internal security are involved, the proposed system of court ordered electronic surveillance envisioned for the administration of domestic criminal legislation is not intended necessarily to be applicable.* The two areas may,

---

view. (See text accompanying notes 8 and 9 *supra.*) Note that section 2511(3) not only recognizes the President's authority to protect the country against "hostile acts of a foreign power" (emphasized by Judge McGowan) but also "to obtain foreign intelligence information deemed essential to the security of the United States." (See text accompanying note 4 *supra.*)

14. 407 U.S. at 306, 92 S.Ct. at 2131.

15. *Ibid.*

16. *See generally* United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936); Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948).

17. 407 U.S. at 303, 92 S.Ct. at 2130.

however, overlap. Even though their activities take place within the United States, the domestic Communist party and its front groups remain instruments of the foreign policy of a foreign power (Communist Party, U. S. A. v. Subversive Activities Control Board, 81 S.Ct. 1357, 367 U.S. 1 [6 L.Ed.2d 625] (1961)). Consequently, they fall *within the field of foreign affairs and outside the scope of the proposed chapter. Yet, their activities may involve violations of domestic criminal legislation.* See Abel v. United States, 80 S.Ct. 683, 362 U.S. 217 [4 L.Ed.2d 668] (1960). These provisions of the proposed chapter regarding national and internal security thus provide that the contents of any wire or oral communication intercepted by the authority of the President may be received into evidence in any judicial trial or administrative hearing. *Otherwise, individuals seeking the overthrow of the Government, including agents of foreign powers and those who cooperate with them, could not be held legally accountable when evidence of their unlawful activity was uncovered incident to the exercise of this power by the President.* The only limitations recognized on this use is that the interceptions be deemed reasonable based on an ad hoc judgment taking into consideration all of the facts and circumstances of the individual case, which is but the test of the Constitution itself (Carroll v. United States, 45 S.Ct. 280, 267 U.S. 132 [69 L.Ed. 543] (1925)). The possibility that a judicial authorization for the interception could or could not have been obtained under the proposed chapter would be only one factor in such a judgment. No preference should be given to either alternative, since this would tend to limit the very power that this provision recognizes is not to be deemed disturbed.[18]

This language provides strong support for the view that Congress intended a surveillance which falls "within the field of foreign affairs" to be "outside the scope of [Title III]." Most decisively, because it was apparent to Congress that such surveillances would not be authorized or conducted in the same fashion as ordinary criminal wiretaps, the third and last sentence of the section 2511(3) disclaimer specially provides for evidence of domestic crime which is incidentally uncovered during a foreign intelligence operation to be admissible in court, notwithstanding the fact that Title III procedures were *not* followed. (The only requirement is that the surveillance have met minimal constitutional standards of reasonableness.) If Title III's provisions do not extend to "foreign affairs" intelligence gathering, it would appear quite clear that the Executive's failure to conduct a surveillance in accordance with those provisions is not in violation of the Act; therefore, the damages provision of section 2520 is inapplicable.

Confronted with the Supreme Court's unqualified interpretation of the section 2511(3) disclaimer in *Keith,* and the Senate's clear explanation of the section's meaning in its report, Judge Wright, for the plurality, nevertheless argues that Title III is applicable to this case. First, he suggests a reading of *Keith* under which the Supreme Court's view that Congress in Title III "did not legislate" with respect to the kinds of surveillances treated in section 2511(3) would only refer to the question whether the Executive was free of the *warrant* requirement in conducting such surveillance.[19] Second he argues that the Court's discussion of possible standards and procedures for national security surveillances should be construed as indicating that Title III requirements are controlling in all cases where prior judicial approval is required, but Congress might choose to provide less rigorous procedures that would still

18. S.Rep.No.1097, 90th Cong., 2d Sess., at 94 (1968), U.S.Code Cong. & Admin.News, 1968, p. 2182.

19. Plurality Opinion, 170 U.S.App.D.C. at ———, 516 F.2d at 661–663.

be constitutionally acceptable.[20] Third, he takes the position, in a footnote, that the explanatory statement in the Senate Report is "not inconsistent" with the plurality's interpretation of section 2511.[21]

The difficulty with Judge Wright's first argument is illustrated by the following language from *Keith*:

The express grant of authority to conduct surveillances is found in § 2516, which authorizes the Attorney General to make application to a federal judge when surveillance may provide evidence of certain offenses. These offenses are described with meticulous care and specificity.

*Where the Act authorizes surveillance, the procedure to be followed is specified in § 2518.* Subsection (1) thereof requires application to a judge of competent jurisdiction for a prior order of approval, and states in detail the information required in such application. [Cite] Subsection (3) prescribes the necessary elements of probable cause which the judge must find before issuing an order authorizing an interception. Subsection (4) sets forth the required contents of such an order. Subsection (5) sets strict time limits on an order. Provision is made in subsection (7) for "an emergency situation"

. . . ..

*In view of these and other interrelated provisions delineating permissible interceptions of particular criminal activity upon carefully specified conditions,* it would have been incongruous for Congress to have legislated with respect to the important and complex area of national security in a single brief and nebulous paragraph. This would not comport with the sensitivity of the problem involved or with the extraordinary care Congress exercised in drafting other sections of the .Act. We therefore think the conclusion

inescapable that Congress only intended to. make clear that the Act simply did not legislate with respect to national security surveillances. [Cite][22]

Only the most tenuous argument can be made, in the face of this language, that the Supreme Court's position in *Keith* was that the procedures of Title III perforce apply to *all* surveillances, except for those in which no warrant is constitutionally required. If this were the case, the objects of the surveillance in, *Keith* themselves would have been eligible to recover statutory damages. That there is no intimation of this possibility in the Court's opinion is certainly not surprising, for the Court clearly was of the view that the procedural requirements of the Act were never intended to apply to national security surveillances. It was "incongruous" to think that Congress legislated procedures for such surveillances "in a single brief and nebulous paragraph," especially in view of the care Congress had given in the rest of the act to laying down precise standards for ordinary criminal surveillances. Recognizing that these "interrelated provisions delineating permissible interceptions of particular criminal activity upon carefully specified conditions" should not be applied to national security or foreign affairs surveillances, the Congress in section 2511(3) made clear that the Act "simply did not legislate" with respect to such operations.

Any doubt as to the Supreme Court's position—contrary to the plurality's second argument—is dispelled at the end of the opinion by the Court's suggestions for other possible statutory standards and procedures to govern domestic security surveillance.[23] Although it had ruled that the warrant requirement of the Fourth Amendment was applicable to such surveillance, the Court made clear that the same type of procedures required in Title III for ordinary criminal wiretaps would not be constitutionally

---

**20.** *Id.* 170 U.S.App.D.C. at —— ——, 516 F.2d at —— ——.

**21.** *Id.* at n.232.

**22.** 407 U.S. at 304–06, 92 S.Ct. at 2130–2131.

**23.** *Id.* at 322–24, 92 S.Ct. 2125.

required for those kinds of operations specified in section 2511(3). The Court recognized that "domestic security surveillance may involve different policy and practical considerations from the surveillance of 'ordinary crime' " [24]—in light of the frequent informational, as opposed to evidentiary, objectives of the former. Given these distinctions, the Court observed, "Congress may wish to consider protective standards for the latter which differ from those *already prescribed for specified crimes in Title III*." [25] Among these might be different probable cause standards and relaxed time and reporting requirements. In sum:

> We do not attempt to detail the precise standards for domestic security warrants any more than our decision in *Katz* sought to set *the refined requirements for the specified criminal surveillances which now constitute Title III*. We do hold, however, that prior judicial approval is required for the type of domestic security surveillance involved in this case and that such approval may be made in accordance with such reasonable standards as the Congress may prescribe.[26]

If the Supreme Court was of the view in *Keith* that Title III is constituted of "refined requirements for the specified criminal surveillances," it is certainly difficult to credit the plurality's position that the Court at the same time believed that Title III was intended to accommodate the very different requirements of domestic security and "foreign affairs" surveillances. Rather, as the Court made crystal clear, its view was that Congress did *not* intend to legislate with regard to the types of surveillances involved in section 2511(3). This was the *purpose* of that section. It could hardly have been otherwise, as the Court perceived it, in light of the fact that the interrelated provisions of the Act are often totally inapposite to informational surveillances.

Thus, the Court's discussion in *Keith* of possible standards and procedures was not, as the plurality would have it, merely gratuitous commentary on the flexibility of the Fourth Amendment's "reasonableness" standard. The Court had the more concrete purpose of affording guidance to the Congress on the kinds of statutory procedures which would be constitutionally acceptable if Congress, after *Keith*, should decide to legislate in the area of domestic security.

That the Court's perception of Congressional intent with respect to section 2511(3) was correct is amply supported by the Senate Report of the Act. Its discussion begins with the explanation that "[p]aragraph (3) is intended to reflect a distinction between the administration of domestic criminal legislation . . . and the conduct of foreign affairs." [27] The Report then emphasizes that "[w]here foreign affairs and internal security are involved, the proposed system of court ordered electronic surveillance *envisioned for the administration of domestic criminal legislation* is not intended necessarily to be applicable." Activities that "fall within the field of foreign affairs" are "outside the scope of the proposed chapter." Finally, the Report explains, because violations of domestic criminal legislation might be uncovered during a foreign affairs or national security surveillance, which would not necessarily be conducted in accordance with Title III procedures, it was Congress' intent in the last line of section 2511(3) to make clear that evidence of such criminal conduct is nevertheless admissible against the perpetrators—so long as minimal constitutional requirements are met.

The plurality's attempt to reconcile the language in the Senate Report with its theory of the case is unpersuasive. The Report does indeed contemplate, in the plurality's words, "that a *post hoc* determination of reasonableness [of a section 2511(3) surveillance] will be made

---

**24.** *Id.* at 322, 92 S.Ct. at 2139.

**25.** *Ibid.*

**26.** *Id.* at 323–24, 92 S.Ct. at 2140.

**27.** *See* text accompanying note 18 *supra*.

in criminal proceedings." [28] This does not mean, however, that the Report necessarily expects that a prior warrant would never be obtained in such a case. As the Supreme Court emphasized in *Keith,* the very "definition of 'reasonableness' turns, at least in part, on the more specific commands of the warrant clause." [29] If a warrant was obtained for a particular surveillance, the question of "reasonableness" in subsequent criminal proceedings is reduced to a determination whether probable cause existed for its issuance. If prior judicial approval was not obtained, the subsequent "reasonablness" inquiry must expand to include a determination whether, independent of the existence of probable cause, adequate justification is shown for not having secured a warrant. This is the constitutional requirement.

Certainly, Congress was unsure when it passed Title III whether the President could, as a constitutional matter, justify warrantless wiretaps in "foreign affairs" or "domestic security" cases. It seems equally clear, in view of the Supreme Court's analysis in *Keith* and the language of the Senate Report (e. g., that "foreign affairs" surveillances are "outside the scope of the proposed chapter"), that Congress was unwilling to lay down *any* statutory requirements for such informational surveillances. Instead, in the words of the Report, Congress left the question of the validity of a particular surveillance in the hands of the courts, for a determination of "reasonable[ness] based on an ad hoc judgment taking into consideration all of the facts and circumstances of the individual case, which is but the test of the Constitution itself." [30] Significantly, the Report adds, "[t]he possibility that a judicial authorization for the interception could or could not have been obtained *under the proposed chapter* would be only one factor in such a judgment." [31]

The import of this language seems clear. If it appears to the trial judge that the sole objective of a "foreign affairs" or domestic security wiretap was that of gathering specific evidence with regard to one of the crimes enumerated in section 2516—as opposed, for example, to garnering information to ward off or prevent the "hostile acts" of another country—then he has the discretion to prevent an end run around Title III by holding the surveillance invalid. Contrary to the majority's view, this appears the logical explanation for the Report's statement that where foreign affairs and internal security are involved Title III procedures are not intended *necessarily* to be applicable. Where it appears that the intent of such a surveillance was solely to gather prosecutorial evidence, then a court can hold that Title III procedures should have been followed.

Ironically, the plurality's own opinion points up the weakness of its position. Having strenuously argued that "Congress intended the procedures and remedies of Title III to apply to all Executive surveillance which, under the Constitution, must be initiated pursuant to judicial warrant," [32] the plurality adds a "caveat": [33] Congress did not intend, it now appears, that two provisions at the heart of Title III (*i. e.,* sections 2516 and 2518(1)(b)(i)) be given effect in the case of intelligence-gathering surveillances. Effectively, the plurality's "caveat" is an attempt to delete from the statute those sections which are most inapposite to "foreign affairs" and domestic security surveillances, in order to justify its holding that the rest of Title III's provisions *are* applicable. The only justification the plurality gives for so dissecting the Act is that adherence to sections 2516 and 2518(1)(b)(i) would "unduly trammel" the conduct of information-gathering surveillances, while the other provi-

---

**28.** Plurality Opinion at n.240.

**29.** 407 U.S. at 315, 92 S.Ct. at 2135.

**30.** S.Rep.No.1097, 90th Cong., 2d Sess., at 94 (1968) U.S.Code Cong. & Admin.News, 1968, p. 2182.

**31.** *Ibid.*

**32.** Plurality Opinion, 170 U.S.App.D.C. at ——, 516 F.2d at 669.

**33.** *Id.,* 170 U.S.App.D.C. at ——, 516 F.2d at 668–671.

sions of the Act would not "substantially affect" such surveillance.[34]

It requires little argument to reject the plurality's approach. The Supreme Court observed in *Keith* the close interrelation of the Act's provisions, "delineating permissible interceptions of particular criminal activity upon carefully specified conditions."[35] If Congress had intended to legislate with regard to information-gathering surveillances in Title III (beyond disclaiming such intent, in section 2511(3)), surely it would not have left it to the courts to guess which sections to enforce. Almost certainly, the provisions for such surveillances would have been separated from those for ordinary criminal wiretaps and specially designated. Moreover, it is likely that Congress would not have limited itself to an alteration of the probable cause requirement. (For example, as suggested by the Supreme Court in *Keith,* the time and reporting requirements might not be so strict as those in section 2518.) The logical view of section 2511(3), supported by the language of the Supreme Court in *Keith* and the Senate Report of the Act, is that Congress simply determined not to attempt in Title III to tackle the complex and controversial task of laying down procedures for informational as well as evidentiary surveillances.[36]

The plurality can point to only two instances where statutory language or legislative history might support its position. The first is the phrase in section 2511(3) which states that "[n]othing contained in this chapter . . . shall limit the *constitutional* power of the President." Based on this language, the plurality asserts:

[I]t is reasonable to assume that Congress intended to prohibit "unconstitutional" Executive surveillance, which would therefore be "in violation of this chapter" within the comprehension of the damages provision of Title III. [Cite] Thus, even if the *procedures* of Title III were inapplicable to national security wiretapping, the *remedies* of Title III should apply to *unconstitutional* exercises of presidential power.[37]

This argument collapses virtually of its own weight. It seems clear in section 2511(3) that Congress meant by its use of *"constitutional power"* only to identify the *source* of the President's prerogative in the fields of foreign affairs and national security. If in the body of Title III Congress did not legislate any procedures, or any other requirement, for foreign affairs surveillances, it is difficult to fathom the logic of drawing such surveillance within the ambit of the statute for the sole purpose of assessing damages. If Congress "simply did not legislate" with regard to such surveillances, it did not legislate—period.

The second piece of "evidence" introduced by the plurality is the colloquy with regard to section 2511(3) between Senators Hart, Holland, and McClellan on the Senate floor. The Supreme Court in *Keith* observed of that discussion, "One could hardly expect a clearer expression of congressional neutrality . . . [concerning] whatever presidential surveillance powers existed in matters affecting the national security."[38] The plurality focuses on a statement by Senator Hart, in which he first affirms that no congressional attempt was being made to define the limits of the President's powers. He then adds that he has always found those limits "extremely vague, especially in domestic security threats, as opposed to threats from foreign powers." Specifically:

---

**34.** *Id.,* 170 U.S.App.D.C. at ——, 516 F.2d at 668–670.

**35.** 407 U.S. at 306, 92 S.Ct. at 2131.

**36.** Judge McGowan, agreeing with my assessment of the court plurality's position, points out that sections 2516 and 2518(1)(b)(i) are not the only provisions of Title III which are totally inapposite in the context of an informational surveillance. Sections 2518(1)(b)(iv),

2518(3)(a), (b) & (d), 2518(4)(c), and 2519(1)(e) would also have to be ignored if Judge Wright's view were to prevail. (See opinion of Judge McGowan, 170 U.S.App.D.C. at ——, 516 F.2d at ——.)

**37.** Plurality Opinion, 170 U.S.App.D.C. at ——, 516 F.2d at 662–664.

**38.** 407 U.S. at 308, 92 S.Ct. at 2132.

As I recall, in the recent *Katz* case, some of the Justices of the Supreme Court doubted that the President has any power at all under the Constitution to engage in tapping and bugging in national security cases without a court order. Section 2511(3) merely says that if the President has such a power, then its exercise is in no way affected by title III.[39]

The Supreme Court omitted this portion of Senator Hart's statement from its quotation in *Keith,* and with good reason. It seems clear that the Senator referred to *Katz* and the questions surrounding the warrant requirement in domestic security cases only as an example of the "vagueness" of the law in the area covered by section 2511(3). Obviously, under that section, if the President has the authority to order warrantless wiretaps in domestic security or "foreign affairs" cases, the procedures he employs will not be affected by Title III. It does not necessarily follow, however, that if he does not have this authority, all such surveillances must be conducted in accordance with Title III procedures. Senator Hart does not say this, and neither the Senate Report of the Act or the Supreme Court in *Keith* supports the proposition.

In sum, there is little basis for the plurality's position that the procedures of Title III apply to all "foreign affairs" or domestic security surveillances in which prior judicial approval is required. If the procedures of Title III do not apply, the remedies for their violation cannot apply. This does not leave the appellants in this case without a remedy. If, as the next part of this opinion will elaborate, the wiretaps of the JDL were in violation of the Fourth Amendment, the appellants have a direct cause of action for damages under the Constitution. They are entitled to a remand to the District Court for an assessment of the merits of their claim and the validity of any defenses the defendants might have.[40]

## II. THE CONSTITUTIONAL CLAIM

### A. *The Foreign Affairs Exemption—Inner Distinctions and Limitations*

The issue which remains is whether the surveillance of the JDL without prior judicial approval violated the Fourth Amendment. At the outset, it must be made clear that that question cannot be answered by a simple talismanic reference to the "foreign affairs" power of the President. No matter how certain his constitutional mandate in this or any other area, the President is never free to act in complete disregard of the protection guaranteed each individual by the Bill of Rights. If his foreign affairs authority affords the Executive department an exemption from the requirement of prior judicial approval, it is not because the President can ignore constitutional safeguards in the performance of his duties; rather, it is because, on balance, the exigencies of foreign intelligence gathering outweigh the constitutional value placed on prior judicial approval.

The Supreme Court engaged in just such a comparative analytical approach in *Keith,* and found that the cost in terms of infringement on Fourth and First Amendment values was too high to justify allowing a national security surveillance to be conducted without a warrant. Appellees in the instant case distinguish the *Keith* decision by noting that the Court in that case took great pains to observe "[T]here [was] no evidence of any involvement, directly or indirectly, of a foreign power."[41] That decision "require[d] no judgment on the scope of the President's surveillance power with respect to the activities of foreign powers, within or without this

**39.** 114 Cong.Rec. at 308.

**40.** *See* Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 456 F.2d 1339 (2d Cir. 1972) (on remand from the Supreme Court).

Since I would hold as a matter of law that there was no violation of Title III in this case, I do not reach the question whether it is possible judicially to imply a "good faith" defense under the statute. *See* Plurality Opinion, 170 U.S.App.D.C. at ——, 516 F.2d at 671–673 and Opinion of Chief Judge Bazelon.

**41.** 407 U.S. at 309, 92 S.Ct. at 3132.

country." [42] This case, on the other hand, clearly does "involve" a foreign power and does require a judgment on the reach of the President's "foreign affairs" surveillance authority. It can be readily granted, therefore, that the wiretap of the JDL is distinguishable from that of the individuals in *Keith,* but the problem remains whether the situations are constitutionally different. That question can only be answered by the same kind of balancing process the Supreme Court used in *Keith.*

If the Government's view of the Executive's wiretap authority were placed on a hypothetical spectrum, it would have three parts. At one terminal, where all wiretaps in ordinary criminal cases would be grouped, officials would be required to adhere to the strict procedural requirements of Title III. In the middle would lie surveillances in national security cases, as in *Keith* Although not subject to the strictures of Title III, these wiretaps would still have to satisfy basic constitutional requirements, including that of prior judicial approval. At the other terminal would rest all surveillances related to the foreign affairs authority of the President to protect the nation from the hostile acts, whether direct attack or diplomatic retaliation, of other countries. According to the Government, the involvement of a foreign power tips the constitutional balance in such fashion that prior judicial approval is not required for this kind of wiretap. In brief, the "reasonableness" standard of the Fourth Amendment is met without a warrant.

Weighing the Government's rationale for a sweeping "foreign affairs" exemption to the warrant requirement against the inroads such an exemption would make on important Fourth and First Amendment values, I must first conclude

that a waiver of such breadth is unjustified. If a "foreign affairs" exemption exists, it is much narrower—encompassing only surveillances on foreign agents and those in criminal collaboration with a foreign power. The Government, in its attempt to justify surveillances of persons because of their involvement or connection with a foreign power, fails to distinguish between two types of involvement which are quite different, although the foreign relations of the United States may be drastically affected in either case. The relationship of the Jewish Defense League with the Soviet Union—characterized by bombs, brickbats, and verbal and written abuse—was extremely antagonistic. To say it was noncollaborative is an understatement. In contrast, the involvement, for example, of Colonel Abel [43] with the Soviet Union was that of a trusted and highly valued agent who served his native country by acquiring and transmitting the national security secrets of this country to the Soviets, until his espionage work was cut short by arrest and incarceration. Like Colonel Abel, David Greenglass and the Rosenbergs,[44] although United States citizens, served the Soviet Union as espionage agents. All were collaborators with a foreign power.

That the activities of the JDL, the "Colonel Abels," and various U.S. citizens engaged in espionage for foreign countries all have an impact on our foreign relations and security cannot be denied. That the President and appropriate Executive departments have a duty and a power, derived from the Constitution, to deal with such persons or groups in order to protect the nation against the hostile acts of a foreign power and to preserve national security information is likewise irrefutable. But the issue in the instant case is what *means and procedures* the Executive is entitled to use

---

**42.** *Id.* at 308, 92 S.Ct. at 2132.

**43.** *See* United States v. Abel, 2 Cir., 258 F.2d 485, aff'd, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).

**44.** *See* United States v. Rosenberg, 195 F.2d 583 (2d Cir.), cert. denied, 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 652 (1952).

in discharging its duty. And *on that issue it makes a great deal of difference* whether the persons or groups "involved with a foreign power" are *acting as collaborators or non-collaborators.*

Just why this is so can be seen by examining the rationales which have been advanced to justify an exemption from the requirement of prior judicial approval for "foreign affairs" surveillances.

B. *Rationales for the Foreign Affairs Exemption—the Balancing of Constitutional Powers, Responsibilities, and Rights*

A variety of rationales have been advanced to support the recognition of an exemption from the warrant requirement for "foreign affairs" surveillances. Among them are the importance of speed, expertise, and great secrecy in the decision whether to place this kind of wiretap; the necessity for a free flow of intelligence data upon which the President can base informed judgments in the area of foreign affairs; and the potential for harm to the well-being of the entire country if an intelligence operation is compromised or stymied in the process of securing a warrant. As will be discussed below, these arguments may well be sufficiently strong to outweigh competing constitutional values when applied to an intelligence operation aimed at foreign agents or collaborators.

The broader becomes the range of domestic activities purportedly covered by the "foreign affairs" exemption, however, the deeper the inroads it makes on the Fourth Amendment values of privacy, political freedom, and judicial oversight of searches and seizures by the Government. Virtually every political action in this country has some international repercussions. Certainly all protests against this country's foreign policy, as well as protests against the internal or foreign policy of another country (as in this case), would have to be included. Every group, to mention only one

example, which actively protested this country's involvement in the Vietnam war could have been subjected to a warrantless wiretap under the exemption proposed by the Government.

The constitutional waiver approved by the District Court in the instant case would cover all wiretaps connected with the President's conduct of our foreign relations with any country. Little reflection is required to recognize that this is an extremely broad exemption whose employment by the Executive might be subject to inordinate abuse.

The possibility that officials could abuse their prerogative in attempting to act under so vague a concept as the power to protect "domestic security" was one of the major factors in the Supreme Court's decision to reject the Government's appeal for a "domestic security" exemption in *Keith*. "History abundantly documents the tendency of Government—however benevolent and benign its motives—to view with suspicion those who most fervently dispute its policies." [45] "Related to the conduct of foreign relations" and "involving a foreign power" are also extremely malleable criteria. Their utilization as standards for permitting warrantless surveillance activities would pose not only grave Fourth Amendment problems but also would threaten important First Amendment values.

"Foreign affairs" might easily be substituted for "national security" in the following quote from *Keith*:

> National security cases, moreover, often reflect a convergence of First and Fourth Amendment values not present in cases of "ordinary" crime. Though the investigative duty of the executive may be stronger in such cases, so also is there greater jeopardy to constitutionally protected speech.[46]

*Keith* was not a case in which the defendants had engaged in protected First Amendment activity. They were charged with a conspiracy to destroy

---

**45.** 407 U.S. at 314, 92 S.Ct. at 2135.

**46.** *Id.* at 313, 92 S.Ct. at 2135.

government property. In the instant case, some JDL protest activity was constitutionally protected and some was not. (Not unexpectedly, the Soviet Union reacted adversely to both lawful and unlawful demonstrations of JDL disaffection with Soviet policy.) Notwithstanding the illegality of the defendants' actions, the Supreme Court observed in *Keith*: "Given the difficulty of defining the domestic security interest [or, it is submitted, "foreign affairs" interest], the danger of abuse in acting to protect that interest becomes apparent." [47]

To be sure, the Court's concern was that "[t]he price of *lawful* public dissent must not be a dread of subjection to an unchecked surveillance power." [48] It would appear, however, that in the Court's estimation the knowledge that the Executive could engage in wiretapping without prior judicial approval simply by invoking "domestic security" would deter lawful as well as unlawful dissent. The same reasoning is applicable in the instant case. Energetic protest activity often includes an element which is arguably unlawful. Public knowledge that the Executive has plenary power to authorize wiretaps without judicial scrutiny when the Government suspects an individual or group is engaged in unlawful activity might well limit the general exercise of vigorous dissent to an administration's conduct of our foreign affairs.

In *Keith* the Government attempted to counter the weight of Fourth and First Amendment arguments against a "domestic security" exception with the same kinds of reasons advanced in the instant case—speed, secrecy, expertise, and the need to avoid any impediment to the President's discharge of his constitutional duty.[49] The Supreme Court found none of these rationales of sufficient persuasiveness (or importance) to justify waiving minimal Fourth Amendment requirements. There would appear to be

only three factors in this case which might alter the constitutional balance established in *Keith*.

The first is that the President enjoys somewhat greater autonomy in the field of foreign affairs than in the exercise of his domestic duties. As was explained at the beginning of Part II, however, the certainty of the President's authority in this field cannot *ipso facto* justify the abrogation of constitutionally protected individual rights.

The second possible distinguishing feature is that the determination whether probable cause exists for a surveillance requires greater expertise where foreign affairs are involved than when domestic security is in question. That the reasonableness of a request for a "foreign affairs" wiretap is something so far beyond the ken of federal judges as to render them incompetent to make such a determination is at best a dubious proposition. "If the threat is too subtle or complex for our senior law enforcement officers to convey its significance to a court, one may question whether there is probable cause for surveillance." [50] Moreover, the Government does not contest that an evaluation by a judge must be made when, as here, there is an attempt to prosecute someone who is overheard. If a judge is able to make a proper evaluation after a wiretap is conducted, it is certainly questionable why his judgment is less sound before it is installed. Finally, judges are fully aware of the special expertise the Executive department possesses in this area. If there is error in a court's decision, it is likely to stem from excessive reliance on that expertise rather than too little respect for the Executive's judgment.

The third factor which might distinguish the result reached in *Keith* from that which should obtain here is the added danger to the welfare of the country which the involvement of a foreign power brings to a criminal case. It is this

---

**47.** *Id.* at 314, 92 S.Ct. at 2135.

**48.** *Ibid.*

**49.** *Id.* at 318–21, 92 S.Ct. 2125.

**50.** *Id.* at 320, 92 S.Ct. at 2138.

factor which necessitates speed and great secrecy in determining whether surveillance is necessary. However persuasive this argument might be when the resources of another nation are covertly directed—through the medium of an enemy agent or domestic collaborator—toward the overthrow of the government, it is not convincing when the threat is the more generalized and uncertain one of a "deterioration in our foreign relations." Certainly the subversive activities of a purely domestic organization intent on destroying government institutions present a much stronger case for secrecy and speed of surveillance than the protest activities of a group which adversely affect the conduct of our foreign relations. The Supreme Court nevertheless was unable to find in *Keith* that the danger of compromising or hindering a domestic intelligence operation was sufficiently great to justify impinging on basic Fourth Amendment values by eliminating the warrant requirement. The constitutional balance established in that case would appear to control the instant case as well.

Important support for the position that any "foreign affairs" exemption which would apply to all surveillances "related to the conduct of foreign relations" is simply too broad is found in past Executive claims of constitutional privilege in this area. When President Roosevelt asserted the power to authorize warrantless surveillances on "national security" grounds, he limited that authorization to "communications of persons suspected of subversive activities against the Government of the United States, including suspected spies." [51] Subsequent Presidential claims expanded the term "national security" to include

"cases vitally affecting the domestic security," but none argued a blanket authority to engage in warrantless surveillances in all cases touching upon the conduct of foreign affairs. Moreover, although there is very general language in some cases about the inherent authority of the President to gather foreign intelligence, the only case in which the object of a warrantless "foreign affairs" surveillance has been revealed involved an alien agent of another country acting in collaboration with a citizen of this country.[52] This authority, while arguing against the extremely broad constitutional waiver requested by the Government in the instant case, naturally raises the question whether a narrow exemption, limited to surveillances on those working on behalf of a foreign government and against this country, might not be constitutionally acceptable.

## C. *Collaborators and Non-Collaborators with a Foreign Power*

The Supreme Court in *Keith* viewed the difference between domestic and foreign groups, for the purpose of judging whether a case was one involving domestic or foreign aspects of national security, as a question of the *degree of collaboration* between a group and agents or agencies of a foreign power.[53] This distinction reflects the primary concern of the Executive and the Judiciary, since the concept of special Presidential prerogatives in the field of foreign intelligence gathering was first introduced, not to hamper the President's ability to safeguard this country against the subversive activities of foreign agents and fifth columnists. The constitutional validity of a "foreign affairs" exemption limited to surveillances on this narrow class of especially dangerous criminals is supported by the fact that it minimizes

---

**51.** Memorandum from President Roosevelt to Attorney General Jackson, 21 May 1940, *reproduced in* United States v. United States District Court, 444 F.2d 651, 669–70 (6th Cir. 1971), aff'd, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (subsequent authorizations of Presidents Truman and Johnson also reproduced).

**52.** United States v. Butenko, 494 F.2d 593 (3 Cir. 1974), cert. denied, Ivanov v. United States, 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974).

**53.** 407 U.S. at 309 n.8, 92 S.Ct. 2125.

conflict with First and Fourth Amendment values.[54]

To sum up the importance and relevance of the distinction between collaborators and non-collaborators to the issue of the existence of (or limits on) the Executive's power to conduct electronic surveillance without prior judicial approval:

*First*: the *process of balancing the interests*, which support recognition of an exemption from the warrant requirement for all "foreign affairs" wiretaps, against the inroads such blanket recognition would make on the constitutionally protected rights of groups and individuals, demonstrates that, while there may be a case for an exemption where collaborators are concerned, the argument falls flat when, as in this case, non-collaborators are the targets.

1. The importance of absolute secrecy, speed, and informality in making the decision to conduct a surveillance reaches its zenith where collaborators are involved. Usually operating in stealth, they can only be detected by great stealth. The operations of non-collaborators (*e. g.*, the Jewish Defense League), on the other hand, are likely to be notorious. This is not to say that a successful wiretap does not need to be surreptitious; but it is hard to justify any more secrecy or less formality in this situation than is required to obtain judicial approval for an ordinary criminal wiretap, when the whole world is aware of the surveillance target's activities.

2. The difficulty of finding a judge with sufficient background to make an intelligent decision on the question whether a surveillance is justified is arguably greater where collaboration with a foreign power is suspected. If the point be made that a judge with insufficient experience would probably grant the Executive's application automatically, then what protection is afforded anyone by useless formality at the sacrifice of speed and security? Where "foreign affairs" are involved, but only because of the connection of non-collaborators with a foreign power, there should be no inordinately greater difficulty in presenting the matter to a judge than in the usual criminal case. The instant case is a good example of non-collaborationist activity which involves a foreign nation, but nevertheless is readily comprehensible by a judge.

3. There are no First Amendment problems of dissuading the legitimate political dissent of collaborators with a foreign power, since they rarely have as their purpose the injection of their position into "the marketplace of ideas." [55] In contrast, almost invariably non-collaborators depend heavily on their First Amendment freedom in order to propagandize their cause; that freedom would necessarily be inhibited by the existence of a broad Executive power to conduct surveillances under a loose "foreign affairs" exemption.

4. The simple domestic/foreign distinction—*i. e.*, Executive surveillance of purely domestic activity restricted by the requirement of prior judicial approval, but no restriction where foreign affairs are concerned—is too easily subject to abuse.[56] Almost every important political action in this country has some international repercussions. Granting the Executive's constitutional powers and expertise in foreign affairs, his authority would seem justifiably unrestricted only when dealing with collaborators with a foreign power, not with non-collabora-

---

54. It is important to make clear that the distinction drawn here is not between surveillances of aliens, on the one hand, and United States citizens, on the other. Aliens and citizens alike are protected by the First and Fourth Amendments, at least within the borders of this country. *See* Colyer v. Skeffington, 265 F. 17 (D.Mass.1920); Ex parte Jackson, 263 F. 110 (D.Mont.1920). More important, domestic agents of a foreign power are equally, if not more, harmful to the nation's welfare than their foreign counterparts. Thus, the suggested exemption would draw no distinction between alien and citizen agents.

55. For an exception, see G. S. Viereck, Spreading Germs of Hate (1930).

56. Witness the recent use of "foreign affairs" as a justification for the Watergate break-in.

tors such as those involved in the instant case.

*Second*: *Executive and judicial precedents* supporting the existence of an extraordinary Executive surveillance authority within the ambit of the President's "foreign affairs" power usually have spoken in terms, or in the context, of espionage and sabotage by alien or domestic agents of a foreign country. Reference has rarely, if ever, been made to using that special power against non-collaborators.

1. Executive claims of privilege in the area of foreign affairs wiretapping have generally relied upon the importance of monitoring "persons suspected of subversive activities against the Government of the United States, including suspected spies." [57]

2. All cases which have upheld the exemption have involved, to our best knowledge, either foreign agents or U.S. citizens charged with collaboration. The Supreme Court's opinion in *Keith*, when eschewing a ruling on the foreign affairs aspects of "national security," spoke in terms of the activities of "foreign powers or their agents." [58]

3. The Supreme Court in the same case viewed the difference between domestic and foreign groups, for the purpose of judging whether a case involved domestic or foreign aspects of national security, as based upon the *degree of collaboration* between a group and "agencies of foreign powers." [59]

D. *The Spectrum of Executive Electronic Surveillance Authority*

My analysis thus brings me to a spectrum of Executive electronic surveillance authority composed of four parts, as compared with the Government's tripartite model. At one end are all wiretaps in ordinary criminal cases, in which officials must adhere to the strict requirements of Title III. Next are domestic security surveillances, as in *Keith*, which the Supreme Court declined to make subject to the strict procedures of Title III, but which the Court held nevertheless are subject to the constitutional requirements of "prior judicial approval." Third, if the above analysis is accepted, are surveillances, such as that in the instant case, whose primary purpose is the protection of our relations with another country. This type of "foreign affairs" surveillance might differ from a domestic security surveillance in the kind of probable cause showing required to justify a wiretap; [60] nevertheless, it, too, must have prior judicial approval. Fourth, and finally, at the opposite end of the spectrum from Title III surveillances, are surveillances directed at foreign agents and collaborators. To my mind this type of surveillance presents the only circumstance where the balance of constitutional powers, responsibilities, and rights may justify the Executive in dispensing with prior judicial approval. That case is not before us; and neither this opinion nor the plurality's attempts to decide the question. Even if a "foreign affairs" exemption, limited to collaborators and foreign agents, does find constitutional support, it has no application to the warrantless surveillance practiced by the Executive here.

Thus, on the particular facts of this case, I join in the plurality's determination that the defendants were in violation of the Fourth Amendment when they placed wiretaps on the phones of the JDL without obtaining prior judicial approval. Had the plurality further taken the logical position that the remedy for this constitutional violation was a damage action *under the Constitution*, I would have no substantive quarrel with their opinion. Instead, however, they have chosen to draw all surveillances subject to Fourth Amendment requirements—whether involving domestic security, foreign affairs, or ordinary crimi-

---

57. *See* note 51 *supra*.

58. 407 U.S. at 322, 92 S.Ct. 2125.

59. *Id.* at 309 n.8, 92 S.Ct. 2125.

60. *See* United States v. Smith, 321 F.Supp. 424, 428–29 (C.D.Cal.1971).

nal activity—within the ambit of a regulatory statute which is geared entirely toward auditory searches for evidence to support the prosecution of specifically enumerated crimes. Recognizing the anomaly of their position—which finds no support in the legislative history of Title III or in Supreme Court case law—the plurality determine to expunge from the regulatory scheme those provisions which are in most glaring conflict with the informational character of domestic security and foreign affairs surveillances. For the reasons detailed in Part I of this opinion, I strongly dissent from this legislative excursion by the plurality and the concomitant application to this case of the statutory damages provision of Title III.

MacKINNON, Circuit Judge (concurring in part and dissenting in part):

Except as hereafter indicated I join in Judge Wilkey's opinion in this case, and particularly in his conclusion that Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, does not apply to the instant situation. United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), stated that Title III "does not attempt to define or delineate the powers of the President to meet domestic threats to the national security" (Id. at 322, 92 S.Ct. at 2139) and that the "standards and procedures" of Title III were not necessarily applicable to the facts of that domestic security case. If Title III does not apply to the exercise of presidential powers in the domestic security field, a fortiori it is even less applicable to the exercise of presidential power in the area of our relations with foreign governments, since the President admittedly is vested with greater freedom of action in foreign affairs than in the domestic field. I readily join in the conclusion that the wiretaps on the Jewish Defense League were placed pursuant to the President's foreign affairs power, and I do not read the majority opinion as disagreeing with that finding.

At least in the case of collaborators or agents of a foreign power, I believe the national interest requires that the President be free to engage in his information gathering functions without the burden of obtaining prior judicial approval. United States v. Butenko, 494 F.2d 593 (3d Cir.), cert. denied sub nom., Ivanov v. United States, 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974). I concur in Judge Wilkey's balancing of the interests in the case of agents and collaborators, but as all opinions correctly note, that issue is not presented by the instant facts. I would not through dicta suggest a solution in advance of the problem.

In the case of pure information gathering activities directed against non-collaborators, I recognize that the imposition of a requirement of prior judicial approval of wiretaps may in some instances protect constitutional interests of the targets of the surveillance. However, I have considerable difficulty in applying the probable cause requirements of the Fourth Amendment to such surveillances. The first clause requiring that searches and seizures not be "unreasonable" can be applied, but where evidence of crime is not sought I do not know the rationale for applying the second clause which states that "no warrants shall issue, but upon probable cause . . . ." This traditionally has been interpreted to require a showing of probable cause to believe that a crime has been committed.[1] The various statutes and Rules which authorize courts to issue warrants for searches and seizures incorporate this standard. See, e. g.,

---

1. As Chief Justice Taft said in Steele v. United States, 267 U.S. 498, 504–05, 45 S.Ct. 414, 417, 69 L.Ed. 757 (1925):

In a recent case we have had occasion to lay down what is probable cause for a search. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. "If the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offense had been committed, it is sufficient."

Fed.R.Crim.P. 41(b), (c)[2]; 18 U.S.C. § 2518(3).[3] Obviously this criterion is inapplicable to situations where no crime is being investigated and the only purpose of the tap is to gather information relevant to the conduct of foreign affairs. Saying that the standard is merely "probable cause" without defining that term ignores the history of the provision and its interpretation and relegates applicants for wiretaps and judges considering such applications to weighing an amorphous concept with no definite standards.

Judge Wright recognizes the incompleteness of the standard he would impose when he states that the courts could "fashion" a standard of probable cause. Majority Op., 170 U.S.App.D.C. at ——, 516 F.2d at 624–625. He apparently would fashion this standard by striking out of Title III certain provisions relating to probable cause which he finds inconvenient to reaching his desired result and replacing them with a balancing of "possible factor[s] that judges might consider in determining whether a proposed search would be reasonable." Majority Op., 170 U.S.App.D.C. at ——, 516

F.2d at 657. Congress certainly did not intend the statute to be dissected in this manner. Furthermore, the majority specifically declines to "delineate the exact procedures the Executive must follow in securing warrants" (Majority Op., 170 U.S.App.D.C. at ——, 516 F.2d at 658) and thus leaves the area as ambiguous as it found it.

When the Supreme Court encountered this same dilemma in United States v. United States District Court, *supra*, in the field of domestic security wiretaps, it responded by urging Congress to enact standards governing the approval of applications for informational surveillance. 407 U.S. at 322–23, 92 S.Ct. 2125. Although Congress has not yet acted on this matter, the Court's approach is still valid. If the standards are to be judicially created, that is more properly done by the Supreme Court which can formulate nationwide standards than by the lower courts whose standards would vary from jurisdiction to jurisdiction.

I therefore dissent from the majority opinion, and I join in Judge Wilkey's opinion subject to the differences expressed above.

---

2. Fed.R.Crim.P. 41(b) and (c) provide:

(b) Grounds for Issuance. A warrant may be issued under this rule to search for and seize any property ·
(1) Stolen or embezzled in violation of the laws of the United States; or
(2) Designed or intended for use or which is or has been used as the means of committing a criminal offense; or
(3) Possessed, controlled, or designed or intended for use or which is or has been used in violation of Title 18, U.S.C., § 957.
(c) Issuance and Contents. A warrant shall issue only on affidavit sworn to before the judge or commissioner and establishing the grounds for issuing the warrant. If the judge or commissioner is satisfied that grounds for the application exist or that there is probable cause to believe that they exist, he shall issue a warrant identifying the property and naming or describing the person or place to be searched. . . .

3. 18 U.S.C. § 2518(3) provides:

(3) Upon such application the judge may enter an ex parte order, as requested or as

modified, authorizing or approving interception of wire or oral communications within the territorial jurisdiction of the court in which the judge is sitting, if the judge determines on the basis of the facts submitted by the applicant that—
(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;
(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;
(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.